**SIDLEY**          **JENNER&BLOCK** LLP          **Steptoe**

May 30, 2025

**BY ECF**

The Honorable Cheryl L. Pollak                          **PUBLICLY FILED**
United States District Court                            **WITH REDACTIONS**
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *United States v. Huawei Technologies Co., Ltd. et al.*, No. 18-cr-457 (S-3)
      **(AMD) (CLP); Second Motion for *Brady* and Rule 16 Material**

Dear Judge Pollak:

We write on behalf of Defendants Huawei Technologies Co., Ltd., Huawei Device USA Inc., Huawei Device Co., Ltd., and Futurewei Technologies, Inc. (collectively, "Huawei") to compel the production of *Brady* and Rule 16 material from the government.[1]

At the heart of the fraud- and sanctions-related counts of the Third Superseding Indictment ("the "Indictment") is the government's allegation that Huawei defrauded four so-called "victim" banks (the "Banks") by failing to fully disclose Huawei's relationship with defendant Skycom Tech Co., Ltd. ("Skycom"), a corporate affiliate that operated in Iran. There is no dispute that it is perfectly legal for a foreign corporation like Huawei to do business in Iran, whether directly or through an affiliate. Yet the government alleges that, had the Banks known that Huawei indirectly controlled Skycom, the Banks would have reassessed whether to continue providing Huawei with banking services due to supposed reputational and other risks presented by the Huawei-Skycom relationship.

That narrative is false. The Banks knew full well the details of Huawei's relationship with Skycom and chose not only to keep doing business with Huawei but also to aggressively court Huawei for more business.

For years—going back to its initial discovery request in March 2019—Huawei has pressed the government to turn over information in its possession that contradicts or otherwise undermines its allegations that the Banks were misled into providing banking services to Huawei, including evidence that the Banks routinely did business with clients that operated in sanctioned countries. This Court has already ruled in the defense's favor in connection with one tranche of material that the government withheld for nearly two years ████████████████ ███████████████████████████████████████████████████████████████████████

---

[1] Judge Donnelly has referred disputes over the government's compliance with its *Brady* obligations to Your Honor. *See* Feb. 18, 2021 Tr. 7–10. This is not the only issue that has arisen concerning *Brady*, but it is one that is ripe for Court resolution. The parties are working in good faith to narrow or avoid litigation over other *Brady* disputes.

United States v. Huawei Technologies Co., Ltd.,
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 2

███████████████████████████████████████████████████

The government now refuses to produce information in its possession that contradicts the central fraud and sanctions accusations in this case. Indeed, one set of materials for which the government has refused to search—materials from the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC")—includes the very kind of exculpatory documents whose belated disclosure resulted in the dismissal of similar fraud charges in this Circuit. *See United States v. Nejad*, 487 F. Supp. 3d 206 (S.D.N.Y. 2020).

This motion concerns two categories of documents related to Counts Four through Fifteen (collectively, the "*Brady* Materials"):[2]

1. *Bank Brady Materials.* Huawei seeks materials that reflect the factors that the Banks considered when deciding whether to obtain and retain customers who did business in sanctioned countries. These materials include (1) ████████████████████████████████████████████ and ████ ███████████████, as well as reports related to the █████████ ████████████████, that are analogous to the HSBC monitor reports that were the subject of the prior *Brady* litigation; (2) all interview notes, memoranda, and documents collected by the FBI or other government investigators/prosecutors from ███████'s current or former employees since 2017 regarding ██████'s customers with business in sanctioned countries; and (3) documents in the government's possession that underlie the government's sanctions-related findings in criminal and other resolutions involving all of the Banks.

   These materials likely show that the Banks sought to provide banking services to (and obtain fees from) companies regardless of whether those companies did business in countries subject to U.S., UN, and/or EU sanctions. Indeed, this is exactly what ████████████████████████ Moreover, these materials may reveal *de facto* practices regarding the provision of banking services—that is, how the Banks actually applied their policies on providing banking services to companies that did business in Iran or other sanctioned countries.

   Second Circuit caselaw makes clear that documents reflecting *actual* practices bear on whether alleged misinformation was material to banking decisions, yet the government has refused to search obvious repositories in its possession for documents evincing such *de facto* practices on the ground that those documents do not specifically mention "Huawei," "Skycom," or other Huawei-specific terms. That misses the point: the relevant question is what factors the Banks considered material in deciding whether to offer banking services to customers that did business in sanctioned countries. To the extent these materials tend to prove that the Banks did not consider it important whether a customer—*any* customer—had operations in sanctioned countries, the materials are both relevant and exculpatory

---

[2] A complete list of the materials that Huawei seeks is attached as **Appendix A** to this motion.

*United States v. Huawei Technologies Co., Ltd.,*
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 3

regardless of whether they specifically mention terms like "Huawei" or "Skycom."

2. ***OFAC Brady Materials.*** The government has refused to search the files of OFAC, a government agency that reviewed and regulated transactions involving Huawei or Skycom, for communications between OFAC and the banks involved in those transactions. The government conceded that similar OFAC records were exculpatory when it was forced to dismiss similar fraud charges in *Nejad*. There, the government initially failed to disclose that OFAC declined to investigate or take other action after receiving a letter from a bank specifically flagging one of the charged transactions as Iran-related. Such communications are exculpatory because they undermine the government's assertion—made in *Nejad* and here—that the Banks considered exposure to Iran transactions material due to a risk of regulatory enforcement. They likewise undermine the government's contentions in this case that Huawei defrauded the government or willfully violated IEEPA.

The government claims it has no obligation to search OFAC's files on the grounds that OFAC is not part of the "prosecution team." But the government is incorrect. The prosecution team includes any government entity that assisted in the investigation or prosecution of this case. And both the Indictment and discovery materials indicate that OFAC assisted in the investigation of this case. Much of the Indictment concerns charges that are within OFAC's purview and that OFAC would have helped investigate. The discovery bears that out ███████████████████████████████
███████████████████████████████████████████████████

Huawei's right to the *Brady* Materials is particularly clear given the nature of the fraud allegations in this case. This is not a case in which the allegedly fraudulent scheme caused the victim to suffer a monetary loss; there is no allegation here that Huawei failed to pay in full for the banking services it received. Indeed, each of the Banks profited significantly from their relationship with Huawei. The Supreme Court recently explained that although federal fraud statutes do not require the victim to suffer a pecuniary loss, those statutes carry a "'demanding' materiality requirement" that prevents them from sweeping too broadly. *Kousisis v. United States*, 605 U.S. ____, slip op. at 19 (2025). As the government has put it, "that standard precludes liability for misrepresentations that do not go to *the essence of the bargain*." Resp. Brief of the United States of America at 12, *Kousisis*, 605 U.S. ____ (2025) (emphasis added).

When this demanding materiality standard is coupled with the capacious *Brady* and Rule 16 standards, the government's obligation to provide the *Brady* Materials is indisputable. The defense is entitled to any and all documents or information that bear on, or call into question, the assertion that the extent of Huawei's business in Iran and its relationship with Skycom went to the "very essence" of the Banks' decision to provide services to Huawei. *Id.* at 17.

The parties have repeatedly met and conferred on these issues and have narrowed their disputes through that process. Huawei's requests represent the issues on which the parties have

United States v. Huawei Technologies Co., Ltd.,
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 4

been unable to reach agreement. Given the fast-approaching trial date, and in light of the government's history of delayed and incomplete productions in this case, the defense respectfully requests that this Court order the government to thoroughly search for and produce the *Brady* Materials.

## BACKGROUND

I.   **The Government's Failure to Produce *Brady* and Rule 16 Material Regarding the Fraud and Sanctions Charges**

At the core of the fraud- and sanctions-related charges is the government's allegation that Huawei defrauded four financial institutions—███████████████████—by withholding information about its business in Iran. The government alleges that Huawei falsely downplayed its relationship with defendant Skycom, a Hong Kong corporation with business operations in Iran, and that the precise nature of this relationship was material to the Banks because it affected their exposure to sanctions risk.

Huawei has long demanded that the government turn over the *Brady* Materials and the exculpatory information they contain. In March 2019, Huawei made its first request of the government for bank-related materials. It took roughly two years—until December 2020 and March 2021—before the government finally provided ████████████████. Although the government insisted ████████ are not exculpatory, ███████████████████████████ Specifically, ████████████████████████████████████████ Ex. A - Mar. 17, 2021 Government Disclosure, at 41, 45, 48 ████████████████████████████████

███████████████ the *Brady* Materials that Huawei now seeks bear directly on the government's allegations that Huawei engaged in fraud.

II.   **The Current Dispute**

Huawei's efforts to obtain the materials sought in this Motion are as follows:

- **Bank Brady Materials.** Huawei first requested the Bank *Brady* Materials in March 2019, and it has renewed its request multiple times, most recently in a May 2025 meet-and-confer. The government has acknowledged that it may have the materials, but it has refused to search for or produce any materials from its investigations into the Banks that do not include the words "Huawei," "Skycom," or other Huawei-specific terms. Huawei has repeatedly explained that any information

---

[3] To the extent the government provides only a summary of the *Brady* Materials, ████████████████████████████████████ Huawei reserves the right to demand that information in a form usable at trial.

*United States v. Huawei Technologies Co., Ltd.,*
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 5

tending to show the Banks did not care about customers' operations in Iran is material and exculpatory regardless of whether it specifically mentions Huawei. The government has nevertheless refused Huawei's request.

- **OFAC Brady Materials.** In March 2021, the government produced a spreadsheet to the defense identifying 170 Huawei or Skycom transactions that the government contends cleared through the United States in violation of IEEPA.[4] After receiving this spreadsheet, Huawei requested communications to and within OFAC regarding Huawei and Skycom. In response to that request, ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ but the government has failed to produce any ████████ communications between the banks and OFAC or any communications within OFAC regarding Huawei or Skycom. The government does not dispute the materiality or exculpatory value of the OFAC *Brady* Materials, but it maintains that it does not have to search for them in OFAC's files because OFAC is not part of the prosecution team. Huawei renewed its request in December 2021 and was met with the same response in March 2022. The government last reaffirmed its position that OFAC is not part of the prosecution team in May 2025.

## LEGAL STANDARDS

The government has a constitutional obligation to disclose any evidence in its possession that is "favorable to an accused" and "material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Favorable" means the evidence is exculpatory or impeaching. *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002). The government's *Brady* obligation applies equally to exculpatory evidence that is material either to guilt or to punishment. *Id*. The government is required to turn over *Brady* material "promptly after its existence becomes known to the prosecution." *See* ECF No. 261.

Evidence is exculpatory if it is favorable regarding any count in the Indictment. *See, e.g., United States v. Johnson*, 592 F.3d 164, 171 (D.C. Cir. 2010) ("[T]he *Brady* factors must be assessed count by count."). It need not be exculpatory as to all aspects of any one count, or even entirely exculpatory in nature. "Even if evidence has both incriminatory and exculpatory aspects, it still qualifies as *Brady* material." *United States v. Martinez*, 388 F. Supp. 3d 225, 230 (E.D.N.Y. 2019); *see also United States v. Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012) (vacating conviction due to *Brady* violation where withheld evidence had both inculpatory and exculpatory value but "its exculpatory character harmonized with the theory of the defense

---

[4] Ex. B - DOJ_HUAWEI_A_0000000141.
[5] *See* Ex. C - Aug. 10, 2022 Government Disclosure; Ex. D - Dec. 16, 2024 Government Disclosure; Ex. E - February 28, 2025 Government Disclosure.
[6] DOJ_HUAWEI_A_SDM_0007268824.

*United States v. Huawei Technologies Co., Ltd.,*
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 6

case") (alteration omitted) (quoting *United States v. Triumph Cap. Grp.*, 544 F.3d 149, 164 (2d Cir. 2008)). Exculpatory evidence must be produced regardless of whether it is admissible. *Gil*, 297 F.3d at 104. The government's disclosure must be "sufficiently specific and complete to be useful." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007). And the government "acts at its peril if it fails in its *Brady* or *Giglio* obligations by taking too narrow a view of what constitutes 'exculpatory' evidence." *United States v. Mirilishvili*, No. 14 Cr. 810 (CM), 2015 WL 5820966, at *17 (S.D.N.Y. Oct. 2, 2015).

The nature of the charges here informs the scope of what the government is required to produce. To show that Huawei defrauded the Banks about its relationship with Skycom, the government must show that Huawei's precise relationship with Skycom was material to the Banks' decision to maintain a banking relationship with Huawei. Materiality is a "demanding" standard in this context, *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016), and thus an expansive one for *Brady* purposes. *See also* Resp. Brief of the United States of America, *Kousisis* at 18, 605 U.S. ____ (2025) (misrepresentation must be "essential" to bargain to be material).

In addition to fulfilling its constitutional obligations under *Brady,* the prosecution is required under Rule 16 to produce "[u]pon a defendant's request" all information that is "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Proving materiality under Rule 16 "is not a heavy burden; rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Stein,* 488 F. Supp. 2d 350, 356–57 (S.D.N.Y. 2007); *id.* at 369 (ordering the government to produce documents within the government's legal control by virtue of a deferred prosecution agreement ("DPA")); *accord, e.g., United States v. Stevens,* 985 F.2d 1175, 1180 (2d Cir. 1993) (evidence is material if it "could be used to counter the government's case or to bolster a defense"). To obtain discovery under Rule 16(a)(1)(E)(i), courts in this District have required defendants to make an initial showing of "what use [it] is looking for in those documents, why [it] expects it to be there, and what [it] intends to make of the information." *United States v. Ashley*, 905 F. Supp. 1146, 1170 (E.D.N.Y. 1995).

## ARGUMENT

I.     **Huawei Is Entitled to *Brady* Material Reflecting the Banks' Decisionmaking Regarding Customers with Business in Sanctioned Countries.**

████████████████████████ undercut a central allegation of the government's fraud case: ████████████████████████████████████████████████████████████████████████████████████████████████ Despite this, the government has refused to produce ████████ Bank *Brady* Materials from other banks that would reveal those banks' attitudes with respect to obtaining and retaining clients who conducted business

*United States v. Huawei Technologies Co., Ltd.*,
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 7

in sanctioned countries. As described further in Appendix A, Huawei requests that the government produce Bank *Brady* Materials consisting of:



- All interview notes, memoranda, and documents collected by the FBI or other government investigators/prosecutors from ███'s current or former employees since 2017 regarding ███'s customers with business in sanctioned countries; and

- All materials that underlie the government's findings related to sanctions violations and compliance failures in the ████████ ████████████████████████ noted above, as well as materials that underlie the government's findings related to HSBC's sanctions violations in ████████████████████████████ ████████.

### A. The Bank *Brady* Materials reveal the banks' decisionmaking considerations regarding customers with business in sanctioned countries.

The government's fraud case against the Banks rests on the notion that the precise relationship between Huawei and Skycom was material to the Banks because those Banks were concerned about risks posed by Huawei's business with Skycom. For example, the government has maintained that ███ would have been sensitive to Huawei's relationship with Skycom because it allegedly had a "zero tolerance" policy for business related to Iran, even if that business was legal. Record of the Case for Prosecution ("ROC") ¶¶ 49–50. The government has likewise alleged that ███ was concerned about the "reputational risk" Huawei's relationship with Skycom would pose. *Id.* ¶ 42.

Despite these allegations, there is good reason to suspect that the Banks had an interest in retaining large corporate customers such as Huawei regardless of their affiliation with businesses that conducted operations in Iran. Between 2012 and 2014, three of the Banks—████████████████—entered into corporate criminal resolutions involving sanctions-related conduct (resulting in the imposition of external monitors), and ███ likewise entered into civil resolutions in 2012 and 2017 concerning its failure to maintain proper compliance controls and conduct due diligence, including with respect to issues regulated by OFAC. The resolutions tend to belie the government's allegations that—*during the very same time period*—the Banks cared so deeply about sanctions risk that they would have viewed additional information about the Huawei-Skycom relationship as material. To the contrary, the resolutions and the underlying factual materials likely show that the Banks were eager to obtain and retain clients who did business in sanctioned countries, and that the information that

*United States v. Huawei Technologies Co., Ltd.,*
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 8

Huawei allegedly concealed could not have been material to the Banks' decisionmaking during that time period.

Specifically, in 2012, ▮▮▮ admitted, among other things, that it willfully facilitated transactions for sanctioned entities in Iran, Cuba, Libya, Sudan, and Burma in violation of IEEPA. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As a result of these violations, ▮▮▮ paid a nearly two-billion-dollar fine and was subject to the five-year monitorship discussed above.

That same year, ▮▮▮ admitted as part of a DPA that it had committed sanctions violations by conspiring to process illegal transactions on behalf of Iranian customers. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Rather than alter its conduct as required, ▮▮▮ was required to enter into an amended DPA in 2014 and retain a compliance monitor to evaluate its sanctions compliance. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

In 2014, ▮▮▮ likewise admitted that it had knowingly and willfully processed approximately $100 million in illegal U.S.-dollar payments involving an Iranian oil company (even after ▮▮▮ compliance personnel had warned that the payments violated U.S. law). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In conjunction with its guilty plea, ▮▮▮ agreed to a two-year extension of the term of an Independent Consultant that had been installed by the New York Department of Financial Services in 2013 to review the bank's compliance programs. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

And in 2012, ▮▮▮ entered into a civil consent order with the ▮▮▮▮▮▮ for regulatory violations related to the bank's failure to file Suspicious Activity Reports and weaknesses in its controls related to correspondent banking (the "▮▮▮▮▮▮▮"). In 2017, the ▮▮▮ found that ▮▮▮ had failed to comply with the ▮▮▮ and assessed a $70 million penalty against the bank. ▮▮▮▮▮▮▮.

Three of these investigations (▮▮▮▮▮▮▮▮▮) resulted in monitorship reports—▮▮▮▮▮▮▮▮▮▮▮ And all four investigations led the government to collect evidence of the Banks' implementation of sanctions and risk policies, such as loan and credit applications and approvals and assessments of flagged transactions.

There is also strong reason to suspect that the government has these materials in its files, yet it has refused to confirm whether it does. The government's investigations into the Banks' sanctions and compliance issues resulted in the Banks' public admissions that they knowingly facilitated illegal transactions with sanctioned entities and failed to maintain adequate compliance programs. For example, in its ▮▮▮▮▮, ▮▮▮ admitted that "high-level" ▮▮▮ business managers "overruled explicit concerns from compliance personnel in order to allow the Cuban business to continue, valuing the bank's profits and business relationships over adherence to U.S. law." ▮▮▮▮▮▮▮▮. Having

*United States v. Huawei Technologies Co., Ltd.*,
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 9

secured admissions like these, the government is clearly in possession of internal bank communications and other documents evincing the Bank's *actual* decisionmaking regarding customers with business in sanctioned countries. Indeed, the same section of the U.S. Department of Justice ("DOJ") that is currently prosecuting Huawei—the Money Laundering and Asset Recovery Section—conducted the investigations of ▮▮▮▮▮▮▮▮▮▮▮▮▮, and thus possesses the bank records produced in those investigations. Yet the government has refused to fulfill its obligation to make a reasonable search of its files for such documents.

Moreover, the government appears not to have turned over reports from interviews it conducted with ▮▮▮ employees from around 2017 when the government was investigating *this* case. To date, the government ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Those interviews likewise could illuminate how ▮▮▮▮ treated customers with business in sanctioned countries during the relevant time period.[9]

**B. Second Circuit law requires production of the Bank *Brady* Materials.**

The government has not denied that it has the Bank *Brady* Materials in its possession. It also has not denied that these materials speak to the factors that the four "victim" Banks considered in connection with obtaining and retaining customers with business in sanctioned countries. But the government insists that the materials are neither exculpatory under *Brady* nor material under Rule 16 because they do not specifically discuss the Banks' decision to retain Huawei and Skycom as customers.

The government misunderstands its obligations. The relevance and exculpatory value of the Bank *Brady* Materials stem from the light they shed on the Banks' attitudes toward customers with business in sanctioned countries, not on their attitudes toward Huawei and Skycom in particular. "[W]hether a misrepresentation is 'material' requires examination of the factors the decisionmaker would employ." *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007) (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)). Here, those factors are illuminated by—indeed they are defined by—what the Banks considered when making decisions about customers who did business in sanctioned countries. And those considerations are relevant whether the Banks applied them in making decisions about doing business with Huawei or about some other client with business in sanctioned countries. If the government intends to prove Huawei's guilt by demonstrating that the Banks would have reacted to the truth about Huawei's relationship with Skycom by terminating their banking relationships with Huawei, Huawei is entitled to evidence undermining that proposition. That evidence includes bank communications and monitor findings tending to show that the Banks would seek out and retain lucrative customers regardless of whether they did business in sanctioned countries. And

---

[7] *See, e.g.*, Ex. G - DOJ_HUAWEI_A_SDM_0124193936; Ex. H - DOJ_HUAWEI_A_SDM_0124193955; Ex. I - DOJ_HUAWEI_A_SDM_0124193961.
[8] *See, e.g.*, Ex. J - Dec. 1, 2021 Government Disclosure.
[9] Two days prior to the due date for this motion, the government informed defense counsel that it would search its files for materials responsive to this request. To the extent the government's search narrows or eliminates the dispute between the parties, Huawei will update the Court.

*United States v. Huawei Technologies Co., Ltd.*,
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 10

that evidence is probative regardless of whether the customer in question is Huawei or a different entity.

Second Circuit law recognizes that industry practice, and not just a bank's conduct regarding specific transactions, bears on materiality. For instance, in *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), the defendant was convicted for making misrepresentations about securities he sold to the putative victims. The trial court excluded the defendant's expert testimony showing that, in the securities industry, a misrepresentation of the sort at issue would not affect a counterparty's decisionmaking calculus. *See id.* at 179–82. The Second Circuit reversed that decision as an abuse of discretion, explaining that general industry evidence was "highly probative of materiality" because it "could have educated the jury" about the likely impact of the alleged misrepresentations on the victim. *Id.* at 182–83. The jury needed "[t]he full context and circumstances" surrounding the financial activity at issue, which "were undoubtedly relevant to the jury's determination of materiality." *Id.* at 183. By preventing the defense from presenting such evidence to the jury, the trial court had "unfairly tipped the scales against the defense's theory of materiality." *United States v. Gramins*, 939 F.3d 429, 447 (2d Cir. 2019) (discussing *Litvak*).

Nor are the decisionmaker's *formal* policies the sole indicator of "factors the decisionmaker would employ." Documents that reveal the decisionmaker's *de facto* practices are also relevant to materiality. In *United States v. Binday*, No. 12-cr-152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013), for instance, the government sought to exclude evidence of particular instances in which insurers ignored the types of information that the defendants misrepresented. *Id.* at *2. The government contended that the evidence was nothing more than proof that the insurers may have acted negligently in certain cases, and that "negligence or lack of diligence or reasonableness on the part of a target of a fraudulent scheme is no defense to mail or wire fraud." *Id.* at *1. The court disagreed, explaining that such evidence could be probative of materiality: "if the policy files demonstrate pervasive, as opposed to episodic, ignorance of sound underwriting practices in connection with policy applications by older Insureds, Defendants may be able to argue that a particular Insurer had adopted a *de facto* policy of ignoring misrepresentations—or at least deeming certain types of information immaterial." *Id.* at *2; *see also United States v. Bogucki*, No. 18-cr-21 (CRB), 2019 WL 1024959, at *2 (N.D. Cal. Mar. 4, 2019) (explaining that "materiality must be assessed in the context in which the communications occurred").

So too here. ███████████████, bank communications, and other bank materials showing that the Banks in practice sought out customers with business in sanctioned countries are relevant to materiality even if the Bank had formal policies that articulated different considerations. And that would be true regardless of whether those materials discuss the Banks' relationships with Huawei specifically or with other customers. The government's position that it has no obligation to provide the Bank *Brady* Materials is therefore untenable.

## II.     Huawei Is Entitled to All Communications to and Within OFAC Relating to the Transactions and Charges in This Case.

Huawei is equally entitled to the OFAC *Brady* Materials—that is, all communications between OFAC and regulated banks, between OFAC and the prosecution team, and within OFAC that relate to Huawei or Skycom. Again, the government does not dispute that the requested material would be discoverable under *Brady* and Rule 16 given its centrality to the

*United States v. Huawei Technologies Co., Ltd.,*
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 11

fraud, IEEPA, and *Klein* charges. Instead, the government's sole reason for failing to disclose the OFAC *Brady* Materials is its assertion that OFAC is not part of the prosecution team in this case. But the Indictment itself, and the government's discovery to date, shows that OFAC assisted in investigating this case. The government cannot use OFAC's status as a separate component of the same government to avoid its *Brady* obligations. The Court should instruct the government to search OFAC's files for evidence material to this case.

### A. The OFAC *Brady* Materials are undisputedly exculpatory or useful for impeachment.

Huawei seeks historical communications to or within OFAC regarding the dollar-clearing transactions at issue in this case and communications within OFAC regarding the charges in this case. This includes communications between OFAC and the Banks regarding Suspicious Activity Reports, Suspicious Transactions Reports, and Voluntary Self-Disclosures related to Huawei or Skycom. Given the number of transactions (more than 160) and the number of financial institutions involved in those transactions (thirteen different banks), there is good reason to believe that one or more of the financial institutions notified OFAC of purported sanctions violations due to Huawei's alleged nexus with Iran. Indeed, the "statements by various banks" that the government already produced indicate the ███████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

The government does not dispute that such communications would be (1) material to Huawei's defense, and (2) exculpatory of many of the charges against them—and rightly so. The government previously *conceded* the exculpatory nature of such materials and, in light of its failure to disclose such materials, agreed to the dismissal with prejudice of similar charges against a defendant arising out of dollar-clearing transactions connected to Iran. *See Nejad,* 487 F. Supp. 3d at 206.

In *Nejad,* the defendant was charged with several offenses relating to alleged dollar-clearing transactions involving Iran, including a *Klein* conspiracy to defraud OFAC, a conspiracy to violate IEEPA, bank fraud, and other offenses. *Id.* at 209. The defendant was convicted at trial in March 2020, but the government—conceding that it had improperly withheld a document similar to the kinds of communications sought by Huawei in this case—subsequently agreed to vacatur of the guilty verdict and to dismiss the indictment with prejudice. *Id.* at 207; *see also* Order as to Ali Sadr Hashemi Nejad, *United States v. Nejad,* No. 18-cr-224-1 (AJN), ECF No. 362 (July 17, 2020). The court accepted the dismissal and "urged referral to the Office of Professional Responsibility for admitted prosecutorial failures." *Nejad,* 487 F. Supp. 3d at 225.

---

[10] Ex. C - Aug. 10, 2022 Government Disclosure.
[11] Ex. F - DOJ_HUAWEI_A_SDM_0007268824.
[12] *See* Ex. C - Aug. 10, 2022 Government Disclosure.

*United States v. Huawei Technologies Co., Ltd.*,
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 12

As relevant here, the government in *Nejad* failed to timely disclose a letter from a bank alerting OFAC to one of the alleged dollar-clearing transactions charged in the case. The letter informed OFAC that the beneficiary of the transaction, although "not listed as an SDN [Specially Designated National] . . . may be an Iranian company." *Id.* at 215. After the bank brought the transaction to OFAC's attention, OFAC did not block the transaction or take any other enforcement action. *Id.* at 215–16. As the court found and the government ultimately conceded, the letter was exculpatory and material to the defense: OFAC's failure to take action after notification of the transaction "undermine[d] several counts of the indictment, including at least the *Klein* conspiracy . . . and the bank fraud 'right to control' charges," each of which "is predicated on the prospect of OFAC enforcement—and associated penalties levied on the intermediary banks—had OFAC known of [the beneficiary's] Iranian connections." *Id.* at 215.

Huawei seeks similar communications to and within OFAC relating to the transactions and charges in this case. Any such communication would show that OFAC was on notice of such transactions, yet took no enforcement action, thereby undermining the government's bank fraud, IEEPA, and *Klein* conspiracy charges. Further, because the government will rely upon testimony from OFAC representatives regarding the ways in which Huawei allegedly defrauded it, *see* ROC ¶ 1, any communication to and within OFAC regarding the transactions and charges in this case would provide valuable impeachment evidence. The government rightly does not dispute that the requested materials are exculpatory and material to the defense.

## B. The government's discovery obligations in this case extend to materials within OFAC's files.

The government refuses to search for or produce the requested communications, asserting that OFAC is not part of the prosecution team in this case. The government is incorrect. As the Supreme Court held in *Kyles v. Whitley*, a prosecutor not only must disclose material evidence favorable to the defendant in a criminal prosecution but also "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." 514 U.S. 419, 437 (1995); *see also, e.g.*, *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (obligation extends to all members of the "prosecution team").

The prosecution team includes those "who perform investigative duties or make strategic decisions about the prosecution of the case." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015); *see also United States v. Skaggs*, 327 F.R.D. 165, 174 (S.D. Ohio 2018) (defining the prosecution team as including "any federal agency that participated in the investigation that led to the defendant's indictment"). The Court, in fact, has specifically reminded the government that its *Brady* obligations extend to "all current or former federal, state, and local prosecutors, law enforcement officers, and other officers *who have participated in the prosecution, or investigation that led to the prosecution*."[13] *See* ECF No. 261 (emphasis added). "A prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *United States v. Connolly*, No. 16-cr-370 (CM), 2019 WL 2120022, at *13 (S.D.N.Y. May 2, 2019) (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)). And where there is any doubt about whether

---

[13] *See also* EDNY Discovery Manual, at 37 (advising that the government is "expected to have knowledge of all information known to the prosecution team in connection with the Office's investigation of the case, including information known to the investigative agencies"—a requirement that is "particularly important" with respect to *Brady* information).

*United States v. Huawei Technologies Co., Ltd.,*
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 13

an individual or office is part of the prosecution team, DOJ policy requires prosecutors to "err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes." Justice Manual § 9-5.002.

OFAC is clearly part of the "prosecution team" in this case. To start, the face of the Indictment indicates that OFAC participated in the government's investigation of this case. The Indictment alleges IEEPA and fraud charges that are expressly concerned with the provision of goods and services to Iran, including dollar-clearing services, that are within OFAC's purview. *See* Indictment ¶ 112. ███████████████████████ It is thus likely—based on the allegations in the Indictment *alone*—that OFAC participated in the investigation of sanctions-related charges against Huawei. Moreover, in the extradition proceedings against Ms. Meng in Canada, the government stated that its case would rely on testimony from an OFAC official to prove the charges. *See* ROC ¶¶ 1–6.

The discovery that the government has produced corroborates ████████



_____

[14] Ex. K - DOJ_HUAWEI_A_0124185993.
[15] *See* Ex. L - DOJ_HUAWEI_A_SDM_0124193797.
[16] *Id.*
[17] Ex. F - DOJ_HUAWEI_A_SDM_0007268824; *see also* ROC ¶ 74 ████████████████
[18] *See* Ex. M - DOJ_HUAWEI_A_SDM_0124193849.

*United States v. Huawei Technologies Co., Ltd.,*
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page 14

In other words, ████████████████████████████████ ████████████████████████████ The government therefore has a duty to learn of and disclose the requested OFAC communications.

Although the government is required under law and DOJ policy to produce all *Brady* material in the possession of the prosecution team regardless of whether it is specifically requested, *Kyles*, 514 U.S. at 433; Justice Manual Section 9-5.001, Huawei has attached to this motion as **Appendix A** a list of the specific *Brady* and Rule 16 material it is seeking. This *Brady* request should be granted.

## CONCLUSION

For the foregoing reasons, this Court should compel the government to promptly produce to Huawei the *Brady* and Rule 16 material that it has improperly withheld.

Respectfully submitted,

David Bitkower
Matthew S. Hellman
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
(202) 639-6048
dbitkower@jenner.com

/s/ Douglas A. Axel
Douglas A. Axel
Michael A. Levy
Ellyce R. Cooper
Frank R. Volpe
Melissa Colón-Bosolet
Daniel J. Hay
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
(212) 839-5300
daxel@sidley.com

Brian M. Heberlig
Ryan P. Poscablo
Jessica I. Rothschild
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
rposcablo@steptoe.com

*Counsel for Huawei Technologies Co., Ltd., Huawei Device USA Inc., Huawei Device Co., Ltd., and Futurewei Technologies, Inc.*

CC:    Government counsel (by email and ECF)
       Clerk of Court (by ECF)

---

[19] This case is thus unlike cases where the connection between the government entity and the prosecution at issue was remote or attenuated, putting the government entity outside of the prosecution team. *See, e.g., United States v. Locascio*, 6 F.3d 924, 949–50 (2d Cir. 1993) (agents that created FBI report on a defendant years earlier, unbeknown to the prosecution, and were uninvolved in the investigation and trial at issue); *Bell v. Poole*, No. 00-cv-5214 (ARR), 2003 WL 21244625 (E.D.N.Y. Apr. 10, 2003) (Corrections Department that created a Prisoner Movement Slip on a defendant was an administrative, not a law enforcement, agency and did not otherwise investigate or help prosecute defendant); *United States v. Quinn*, 445 F.2d 940, 943–44 (2d Cir. 1971) (prosecutor in another state that prosecuted defendant in an unrelated matter and indictment was under seal).

*United States v. Huawei Technologies Co., Ltd.,*
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page A-1

<h3 style="text-align:center">APPENDIX A</h3>

<h3 style="text-align:center">*BRADY* AND RULE 16 MATERIAL SOUGHT BY HUAWEI</h3>

1. **Bank *Brady* Materials**

    a.

    b. All materials that underlie the government's findings related to sanctions violations and compliance failures in the criminal resolutions (███████) and consent order (██) noted above, as well as materials that underlie the government's findings related to ████ 's sanctions violations in ████████████ .

    c. All interview notes, memoranda, and documents collected by the FBI or other government investigators/prosecutors from ████ 's current or former employees since 2017 regarding ████ 's customers with business in sanctioned countries.

2. **OFAC *Brady* Materials[20]**

    a. **Communications to and within OFAC regarding Huawei and Skycom.** This includes any and all communications (including but not limited to correspondence, transaction details, analytic or investigative reports, and reports such as Suspicious Activity Reports or other FinCEN reporting) sent directly to or otherwise made available to OFAC relating to any transactions involving Huawei or Skycom. Included within this request are any such communications made by any of the banks involved (either as originating, intermediary, or beneficiary bank) in the transactions identified in the spreadsheet previously produced by DOJ as DOJ_HUAWEI_A_0000000141. Also included within this request are all internal OFAC communications relating to any such bank communication, as well as any internal communications by the bank regarding communications with OFAC.

    b. **OFAC and bank communications regarding the charges in this case.** This request includes all OFAC communications (both internal within OFAC and

---

[20] For purposes of this category, "communications" include but are not limited to correspondence in the format of hardcopy letters sent by mail or facsimile, electronic messages sent via email, and meeting notes or minutes saved in hardcopy or electronic format.

*United States v. Huawei Technologies Co., Ltd.*,
No. 18-cr-457 (S-3) (AMD) (CLP)
May 30, 2025
Page A-2

between OFAC and DOJ) in which any individual at OFAC expresses skepticism regarding the criminal charges in this case or otherwise fails to pursue related civil enforcement action.  It further includes all communications, whether voluntary self-disclosures or disclosures pursuant to cooperation obligations stemming from agreements with DOJ or other law enforcement agencies, from any of the banks involved in this case (either as originating, intermediary, or beneficiary bank) to OFAC or DOJ regarding the propriety under the ITSR of any U.S. dollar wire transfer from one non-Iranian foreign bank to another non-Iranian foreign bank.

c. **OFAC decisionmaking or analyses regarding the charges in this case.**  This request includes any information or documentation tending to show that OFAC was aware of allegations related to those in the Indictment and declined to pursue an enforcement action against Huawei, Skycom, or the financial institutions at issue in this case.  It further includes any information or documentation indicating or tending to establish that any representative of OFAC believed that any practice or conduct at issue in the Indictment did not constitute a crime or a violation of the ITSR.  This information or documentation includes but is not limited to case referrals or notices to OFAC by another federal, state, or local agency; reports filed by a financial institution; disclosures from the public; and case investigations generated by the OFAC Compliance and/or Enforcement Division.

d. All OFAC policy or legal recommendations, analytical memoranda, meeting notes, or decisions documented by the OFAC Director regarding the application of the ITSR to any U.S. dollar wire transfer sent by one non-U.S. person (who is neither a U.S. Person nor an Iranian national) from a bank located in a third country (i.e., neither in Iran or the U.S.) to another non-U.S. person (who is also neither a U.S. Person nor an Iranian national) at a bank also located in a third country.