

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM:MJC/TGS/AAS/MAA/MS/CJN
F. #2017R05903

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 30, 2025

**TO BE FILED UNDER SEAL**

By ECF

The Honorable Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   United States v. Huawei Technologies Co., Ltd., et al.
>        Criminal Docket No. 18-457 (S-3) (AMD)

Dear Judge Pollak:

The government respectfully submits this letter brief in opposition to the motion to compel production of purportedly discoverable materials filed by Huawei Technologies Co., Ltd.; Huawei Device Co., Ltd.; Huawei Device USA, Inc.; and Futurewei Technologies, Inc. (collectively, "Huawei" or the "defendants").  (ECF No. 536 (the "motion" or "Mot.").)  As discussed below, the government has complied, and will continue to comply, with its obligations pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and Federal Rule of Criminal Procedure 16. The defendants' arguments to the contrary are baseless and premised upon misunderstandings of law and distortions of fact.

The defendants seek to compel production of two broad categories of documents: documents related to prior enforcement actions against the victim banks in this case; and documents purportedly possessed by the Office of Foreign Assets Control ("OFAC") at the U.S. Treasury Department.  Neither category is subject to disclosure.  The victim-bank documents do not bear on the government's fraud charges because the materiality of Huawei's misrepresentations is determined by an objective reasonableness standard, not from the subjective perspective of the victim banks.  Because the victim-bank documents are not probative of materiality, they are not discoverable under Brady.  The OFAC documents — to the extent they exist — are not in the government's possession and, because OFAC is not a member of the prosecution team, the government has no obligation to obtain and produce them under either Brady or Rule 16.  Accordingly, the Court should deny the motion.

I.      Background

     A.      The Defendants' Repeated Requests for Information Regarding the Victim Banks and OFAC

     The defendants first move to compel production of voluminous and vaguely described documents from prior prosecutions of, or civil enforcement actions against, the four victim banks in this case: ███████████████████████████████ ████████ (collectively, the "victim banks").[1]  Each of the prior actions against the victim banks is briefly described below (collectively, the "prior bank actions"):

- ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████

- ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████

- ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

---

[1]      Because this letter identifies and discusses third-party victims, the government respectfully requests permission to file it under seal, with a redacted version filed on the public docket.

-

The <u>victims</u>' conduct in the prior bank actions is entirely distinct from the <u>defendants</u>' offense conduct, as described in the bank and wire fraud charges in this case. Nonetheless, the defendants have repeatedly sought the monitor reports and other documents in the case files associated with the prior bank actions. (<u>See</u> ECF Nos. 117, 174-2, 180, 257, 259, 290, 305, 309, 348). The defendants speculate that these documents will show that that the victim banks were negligent with respect to sanctions compliance and, thus, were not misled by the defendants' misrepresentations concerning, among other things, Huawei's control of Skycom Tech Co., Ltd. ("Skycom") and its business in Iran. In response, the government has consistently maintained that: (1) the defendants' claims regarding the supposed exculpatory nature of these materials are conclusory and legally baseless; and (2) the information in these materials is not discoverable under <u>Brady</u> or Rule 16. (<u>See, e.g.</u>, ECF No. 172.)

Out of an abundance of caution, however, the government has searched the monitor reports and case files associated with the prior bank actions for any connections to Huawei or to this case. Between approximately December 2020 and March 2021, the government voluntarily provided near-verbatim summaries of the Huawei-related portions of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Additionally, in January 2022, the government informed the defendants that it was not aware of any <u>Brady</u> or Rule 16 information in the case files associated with the ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ . Again, however, out of an abundance of caution, the government searched the monitor reports and case files associated with those prior bank actions using terms designed to locate any text relevant to the instant case. Those searches did not uncover any discoverable information.

Notably, as this Court is aware from prior briefing in this case, in February 2022, the government provided defense counsel with a disclosure letter containing information that the government did not believe constituted <u>Brady</u> material, but which the government provided in an

---

[2] The defendants incorrectly claim that "this Court [] ruled in the defense's favor" in connection with the government's provision of the ▮▮▮▮▮▮▮▮▮▮▮▮ . (Mot. 1.) That is incorrect: the government voluntarily provided those materials.

abundance of caution.  (See ECF Nos. 430, 431 (defense motion); 446 (redacted version of government opposition, filed under seal).)  The fact that the government provided such information in February 2022 — long before trial in this case had even been scheduled — itself demonstrates that the government is mindful of its Brady obligations.

The second category of documents the defendants seek to compel concerns purported communications between OFAC and (1) the victim banks regarding transactions between Huawei or Skycom, and (2) members of the prosecution team regarding the charges in this case.[3]  The defendants previously requested these materials in September 2017 and December 2021.  In March 2022, in response to those requests, the government informed the defendants that OFAC was not, and had never been, a member of the prosecution team, and that the prosecution team therefore had no access to, or ability to search, OFAC's communications or files.  The government also informed the defendants that it did not possess any discoverable communications between the prosecution team and OFAC.  Furthermore, in April 2022, the government identified for the defendants communications between OFAC and the victim banks that were among the documents produced by the victim banks.[4]

Moreover, the defendants assert that the government disclosed approximately 144 statements by the victim banks "[i]n response" to their prior request for communications to and within OFAC regarding Huawei and Skycom, and suggest that the government failed to produce OFAC's responses to those statements.  (Mot. 5.)  That claim distorts the record.  The 144 statements made by the victim banks are not communications to OFAC.

B.    The Instant Motion to Compel

The defendants now argue that Brady compels the production of voluminous documents from the prior bank actions, as well as multiple categories of documents purportedly in OFAC's possession.  The defendants also maintain that the OFAC materials are discoverable under Rule 16.  Finally, the defendants claim that Brady compels the early production of certain Jencks Act materials in this case.  All of these arguments lack merit.

---

[3]    The defendants assert that "[t]he government does not dispute the materiality or exculpatory value" of the purported OFAC communications.  (Mot. 5.)  The defendants are mistaken.  Because the government has no access to OFAC's files, it does not know whether the purported OFAC communications with victim banks regarding Huawei or Skycom even exist — apart from the communications contained in the victim banks' productions specifically identified by the government — let alone whether any such communications would be material or exculpatory.  And with respect to OFAC communications with the prosecution team, the government expressly stated in March 2022 that it possessed no such documents that were discoverable under either Brady or Rule 16.

[4]    The defendants appear to suggest that the government provided only one such communication, Bates-numbered DOJ_HUAWEI_A_SDM_0007268824.  (See Mot. 5.)  That is incorrect; the government identified 13 such communications in April 2022

First, with respect to the prior bank actions, the defendants seek: (1) the monitor and/or consultant reports associated with, respectively, the ███████████████████████; (2) all reports and "investigative materials" associated with the ███████████████████████ ██████; (3) all documents that "underlie" any "finding[] related to sanctions violations and compliance failures" by the victim banks in the prior bank actions (collectively, the "victim-bank materials"). (See Mot. App. A ¶ 1(a), (b).)

Second, with respect to OFAC, the defendants seek: (1) all communications to and within OFAC regarding Huawei or Skycom, including regarding transactions that are irrelevant to this case; (2) internal OFAC communications "in which any individual at OFAC expresses skepticism regarding the criminal charges in this case or otherwise fails to pursue related civil enforcement action"; (3) all communications between any victim bank and OFAC regarding "the propriety under the [Iranian Transaction and Sanctions Regulations ("ITSR")] of any dollar-denominated transfer between any foreign bank and any other foreign bank, including transfers that are irrelevant to this case; (4) any documents "tending to establish" that any "representative of OFAC" personally believed that any conduct similar to the charged conduct did not violate the ITSR or any criminal statute; and (5) "[a]ll OFAC policy or legal recommendations, analytical memoranda, meeting notes, or decisions documents by OFAC's Director regarding the application of the ITSR" to any dollar-denominated transfer between any non-U.S. person and another non-U.S. person at any non-U.S. bank (collectively, the "OFAC materials"). (Id. ¶ 2.)

Third, the defendants seek early production of the Jencks Act materials associated with the government's interviews, since 2017, of any current or former ██████ employee (collectively, the "██████ Jencks Act materials"). (Id. ¶ 1(c).)

As discussed below, there is no factual basis for the defendants' conclusory assertion that any, let alone all, of the foregoing materials are exculpatory, that the OFAC-related materials are discoverable under Rule 16, or that the record compels early production of Jencks Act materials.[5]

---

[5]     The defendants purport to identify a handful of quotations from the ███████████ ██████ which they contend are exculpatory and justify the compelled production of the voluminous, irrelevant victim-bank materials they now seek. (Mot. 4.) These quotations, however, are distorted and taken out of context.

█████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████  ████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

II.    Applicable Legal Standards

Under Brady and its progeny, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment.'" United States v. Certified Env'l Servs., Inc., 753 F.3d 72, 91 (2d Cir. 2014) (quoting United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001)).  "Favorable evidence" includes "not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness," also known as "Giglio material."  Id.  "[A] prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that the outcome of a trial in which the evidence had been disclosed would have been different."  Coppa, 267 F.3d at 142.  The "essential purpose" of Brady disclosures is to "protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him."  Id.  Thus, a Brady violation occurs only where the government suppresses evidence and that evidence "could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995).

The government must disclose Brady and Giglio material "in time for its effective use at trial."  Coppa, 267 F.3d at 142.  The required timing of such a disclosure depends on the particular circumstances of each case.  United States v. Taylor, 17 F. Supp. 3d 162, 177 (E.D.N.Y. 2014); see also United States v. Rodriguez, 496 F.3d 221, 227–28 (2d Cir. 2007). A defendant has "no pretrial discovery right to Giglio materials."  United States v. RW Prof'l Leasing Servs. Corp., 317 F. Supp. 2d 167, 179 (E.D.N.Y. 2004) (citing United States v. Nixon, 418 U.S. 683, 701 (1974)); see also, e.g., United States v. Gatto, 316 F. Supp.3d 654, 657-60 (S.D.N.Y. 2018) (declining to order immediate disclosure of purported "exculpatory and impeaching witness statements") (internal citations omitted).



Moreover, the "rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." United States v. LeRoy, 687 F.2d 610, 619 (2d Cir. 1982) (internal citations omitted). As a result, a defendant is entitled only to the "essential facts" related to exculpatory evidence, and the government is not required to disclose purportedly exculpatory, material evidence if a defendant already knows or should have known of the essential facts permitting him to take advantage of any exculpatory evidence. Id. at 618. Moreover, the scope of the government's Brady obligation does not extend to "investigative files merely because they contain information which could assist the defendant." United States v. Reddy, 190 F. Supp. 2d 558, 575 (S.D.N.Y. 2002).

Additionally, Rule 16 provides in relevant part that a defendant may "inspect and . . . copy or photograph . . . documents . . . or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: . . . the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). A document "is material if it could be used to counter the government's case or to bolster a defense." United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993). The purposes of the disclosure required by Rule 16 are to aid the defendant in "uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." United States v. Stein, 488 F. Supp.2d 350, 356-57 S.D.N.Y. 2007) (quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993)); see also United States v. Wilson, No. 19-CR-155 (EAW), 2021 WL 480853, at *5 (W.D.N.Y. Feb. 10, 2021) ("materiality under Rule 16 is not the same as 'useful'"); United States v. Messina, No. 11-CR-31 (KAM), 2011 WL 3471511, at *1 (E.D.N.Y. Aug. 8, 2011) (the "requested information must 'enable[] the defendant significantly to alter the quantum of proof in his favor'" (citation omitted)).

III.    Argument

A.    The Victim-Bank Materials Are Not Discoverable Under *Brady*

The defendants claim that Brady compels the production of the victim-bank materials because those materials will purportedly reveal that the victim banks did not subjectively believe that the misrepresentations at issue in the bank and wire fraud charges in this case were material. (See Mot. 2 ("[T]he relevant question is what factors the Banks considered material[.]").) This argument is meritless and rests on a fundamental misunderstanding of materiality. Because the victim-bank materials are not probative of materiality, they are neither exculpatory nor discoverable under Brady.

Although the bank and wire fraud statutes require that the alleged misrepresentations be "material," materiality is assessed using an objective standard. Neder v. United States, 527 U.S. 1, 4 (1999). A false statement is material if it has "a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed.'" Id. at 16. Whether a statement is capable of influencing the relevant decisionmaking body is analyzed from the objective perspective of a reasonable person, rather than from the subjective perspective of the victim. See United States v. Frenkel, 682 F. App'x 20, 22 (2d Cir. 2017) ("[A] matter is material if 'a reasonable man would attach importance to its existence or

7

nonexistence in determining his choice of action in the transaction in question'"); United States v. Corsey, 723 F.3d 366, 373 (2d Cir. 2013) ("[A] lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal[.]").  The focus, therefore, is on the party that made the alleged fraudulent representations, not on the victim. Corsey, 723 F.3d at 373 n.3 ("The question is not whether victims might smell a rotten deal before they hand over money . . . .  Instead, a misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do.").  And though the government must prove materiality from the perspective of a reasonable person, it is not required to prove that the victim acted as a reasonable person would have when confronted with the defendant's misrepresentations.  See United States v. Thomas, 377 F.3d 232, 241-43 (2d Cir. 2004) (rejecting the defendant's argument that the trial judge should have instructed the jury that "that there can be no fraud if the victim did not act as a person of ordinary prudence and comprehension would").

Relatedly, a victim's reliance on a defendant's material misrepresentation is not an element of either wire fraud or bank fraud.  See, e.g., United States v. Weaver, 860 F.3d 90, 96 (2d Cir. 2017) ("[R]eliance is not an element of criminal fraud, while materiality is."); Corsey, 723 F.3d at 373-74 (reliance by victim not element of wire fraud).  The relevant question is not whether a "false or fraudulent statement . . . exerted actual influence," but rather," whether "it was intended to do so and had the capacity to do so."  United States v. Madakor, 29 F. App'x 636, 638 (2d Cir. 2002) (unpublished) (quoting United States v. Gregg, 179 F.3d 1312, 1315 (11th Cir. 1999)).  If it were otherwise, the legality of a fraud scheme would turn on whether a victim subjectively believed a defendant's lies — but that is not the law.  See Thomas, 377 F.3d at 243 (refusing "to accept the notion that the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim" (internal quotations omitted)); United States v. Colton, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis: 'If a scheme to defraud has been or is intended to be devised, it makes no difference whether the person the schemer intended to defraud was gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts.'" (citation omitted)).

In this case, either the defendants' misrepresentations were material in the eyes of an objective, reasonable decisionmaker, or they were not — a question for the jury.  It is of no consequence whether those misrepresentations actually influenced the victim banks.  See United States v. O'Brien, 953 F.3d 449, 460 (7th Cir. 2020) ("[T]here is no requirement that the misrepresentations must have actually influenced the decision-maker or that the decision-maker in fact relied on the misrepresentations.").  Because materiality is not assessed from the subjective perspective of the victim, see Corsey, 723 F.3d at 373-74, it is not exculpatory if the victim-bank materials purportedly reveal the victim banks' "attitudes towards customers with business in sanctioned countries."[6]  (Mot. 9.)  Indeed, the notion that the victim banks' desire for profits generally caused them to turn a blind eye to any sanctions-related issues, including the defendants' misrepresentations, is the sort of victim-blaming argument that courts in this circuit routinely preclude.  See, e.g., United States v. Miller, 800 F. App'x 39, 41 (2d Cir. 2020) (unpublished)

---

[6]     Of course, if the defendants asserted that they knew or believed that their misrepresentations would be irrelevant to the banks' decision-making, evidence of the defendants' own states of mind could be relevant.  But no such evidence would be persuasive here, because the misrepresentations themselves are powerful evidence to the contrary.

(upholding ruling excluding purported evidence of victim financial institution's involvement in improper mortgage lending practices, as documented in a DOJ settlement and related materials, as both irrelevant and prejudicial); United States v. Kaufman, 617 F. App'x 50, 52 (2d Cir. 2015) (unpublished) (rejecting challenge to jury instruction that victim negligence, carelessness or gullibility is no defense to bank fraud charges and holding that the instruction "was a proper statement of the law"); United States v. Udeokoro, No. 17-CR-629 (AMD), 2023 WL 4138477, at *6 (E.D.N.Y. June 22, 2023) ("It is well-settled in this circuit that a defendant charged with a fraudulent scheme may not assert as a defense the victim's failure to discover the fraud.").

To be sure, to establish the objective materiality of the defendants' false statements at trial, the government may elicit testimony from victim-bank officials about the factors they consider when accepting new clients, retaining those clients, or processing transactions. See, e.g., United States v. Cuti, 720 F.3d 453, 459 (2d Cir. 2013) (collecting circuit cases where courts have permitted the use of hypothetical questions utilizing facts independently established in the trial record to inquire into the effect of a fraud); United States v. Guo, No. 23-CR-118 (AT), 2024 WL 1862022, at *6 (S.D.N.Y. Apr. 29, 2024) (affirming that in fraud cases, "investor testimony can be relevant to whether a defendant's alleged misstatements or omissions were material"). But extrinsic evidence of specific instances where the victim banks failed to comply with their own standards — particularly instances wholly unrelated to the transactions at issue in this case — does not bear upon the objective materiality of the defendants' false statements. Thus, as the victim-bank materials are not probative of the materiality element of the bank and wire fraud charges, neither Brady nor Rule 16 compels their production.[7] See Certified Env'l Servs., 753 F.3d at 91.

In support of their erroneous materiality argument, the defendants assert that the prior bank actions "tend to belie the government's allegations that — during the very same time period [as the charged fraud here] — the Banks cared so deeply about sanctions risk that they would have viewed additional information about the Huawei-Skycom relationship as material." (Mot. 7 (emphasis in original).) This is another distortion. Although the prior bank actions were resolved in the period between 2012 and 2017, nearly all of the relevant offense conduct in those actions occurred years earlier, before the alleged frauds in this case, which occurred between approximately 2007 and 2019. ███████████████████

███████████████████████████████████████

---

[7]    In addition to the total lack of merit to the defendants' Brady claim, the disclosure of the victim-bank materials would significantly prejudice the victim banks. The defendants seek what amounts to the entire case file for each of the prior bank actions, namely, "all materials that underlie the government's findings related to sanctions violations and compliance failures." (Mot. App. A ¶ 1(b).) These materials contain highly sensitive data and information. As detailed in the government's prior filings and court hearings, the government has significant concerns that sensitive discovery in this case might be shared outside of the jurisdiction of the United States, particularly in China. (See, e.g., ECF No. 158 at 5-10; Hr'g Tr. (Sept. 4, 2019) at 34:16-35:4; ECF No. 442 at 5-8.) Indeed, as the Court is aware, one example of the pattern of racketeering activity underlying the Racketeer Influenced and Corrupt Organizations Act conspiracy charge concerns conduct related to the defendants' conspiring with ██████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████   Thus, the actual conduct in the prior bank actions did not occur "during the very same time period" as the offense conduct in this case. In any event, the fact that three of the victim banks were resolving sanctions-related criminal cases with DOJ during the same time period as they were being defrauded by the defendants regarding Huawei's conduct in Iran, a sanctioned country, is something that, logically, would make the victim banks care <u>more</u> about sanctions risk, not less.

Finally, it bears noting that the defendants' erroneous materiality argument also rests on a flawed understanding of U.S. sanctions law. The defendants assert that "[t]here is no dispute that it is perfectly legal for a foreign corporation like Huawei to do business in Iran, whether directly or through an affiliate." (Mot. 1.) This statement is overbroad and incorrect. Counts Eleven and Twelve of the Third Superseding Indictment charge the defendants with violating U.S. sanctions by conspiring to, and causing the provision of, goods or services from the United States to or for the benefit of Iran, and by otherwise causing a United States person to violate Iran sanctions. (ECF No. 126 ¶ 114-120.) Hence, while it is indeed <u>possible</u> for foreign corporations to legally conduct business in Iran, the defendants nonetheless chose to conduct their Iran-related business in a manner that violated U.S. sanctions.

The defendants cite a handful of cases in an attempt to recast the blackletter objective standard of materiality into a subjective standard which, in turn, would enable them to claim that the victim-bank materials are probative of materiality. These cases are inapposite.

<u>First</u>, the defendants distort the holding of <u>United States v. Rigas</u>, 490 F.3d 208 (2d Cir. 2007). In <u>Rigas</u> — which the Second Circuit itself characterized as a "rather unusual bank fraud case," <u>id.</u> at 234 — the court held: "<u>In the context of an objective decisionmaking process,</u> whether a misrepresentation is 'material' requires examination of the factors the decisionmaker would employ, <u>and the degree to which a misrepresentation would be 'capable of influencing[] the decision of the decisionmaking body</u>." <u>Id.</u> at 235 (quoting <u>Neder</u>, 527 U.S. at 16) (emphasis added). The defendants notably omit the underlined text, which is a recitation of the objective standard of materiality, and incorrectly argue that an "examination of the factors the decisionmaker would employ" entails what is functionally a subjective, victim-specific materiality standard. (Mot. 9-10.)

In <u>Rigas</u>, the Second Circuit concluded that misstatements of a defendant borrower's leverage ratios were not material to a victim bank because they were objectively incapable of affecting how much interest the bank could charge the defendant. <u>Id.</u> The bank had a contractual agreement with the defendant that specified, and limited, the varying amounts of interest it could charge if the leverage ratios exceeded certain thresholds. Even if the defendant had reported the correct leverage ratios, the bank could not have charged more interest based on the terms of the contract. <u>Id.</u> Because the bank did not have the discretion to charge more interest, the Second Circuit concluded that the misrepresented leverage ratios were not "capable of influencing[] the decision of the decisionmaking body." <u>Rigas</u>, 490 F.3d at 235 (quoting <u>Neder</u>,

10

527 U.S. at 16). Thus, where <u>Rigas</u> refers to "factors the decisionmaker would employ," those "factors" were objective constraints on the decisionmaker's discretion. <u>Id.</u> ("If a bank's discretion is limited by an agreement, we must look to the agreement to determine what factors are relevant, and when a misstatement becomes material.") Here, however, extrinsic evidence of the victim banks' specific past compliance failures is plainly not the sort of objective constraint on discretion that <u>Rigas</u> recognizes. The defendants' entire <u>Brady</u> claim proceeds from this misreading of <u>Rigas</u>.

Second, the defendants overread <u>United States v. Binday</u>, No. 12-CR-152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013). There, the defendants were charged with fraud in connection with a scheme to defraud life insurance providers by, <u>inter alia</u>, causing elderly straw purchasers to misrepresent their income and other information in order to obtain life insurance policies from which the defendant earned lucrative commissions. The government moved <u>in limine</u> to preclude the defendants from introducing "evidence from specific policy files to show the Insurers' serious financial underwriting deficiencies," which the defendants argued could rebut the government's contention that the alleged misrepresentations were material. <u>Id.</u> As the defendants observe, the court stated in dicta that "if the policy files demonstrate pervasive, as opposed to episodic, ignorance of sound underwriting practices in connection with policy applications by older Insureds, Defendants may be able to argue that a particular Insurer had adopted a <u>de facto</u> policy of ignoring misrepresentations — or at least deeming certain types of information immaterial." <u>Id.</u> at *2.

<u>Binday</u> is neither controlling precedent nor persuasive authority. As an initial matter, <u>Binday</u> appears to misstate the law regarding financial fraud. The opinion states that "if the Insurers were not deceived, they could not have been victims of a scheme to defraud." <u>Id.</u> at *1. But that is incorrect. "[R]eliance is not an element of criminal fraud"; the bank and wire fraud statutes prohibit only the "scheme to defraud," not the "completed fraud." <u>Weaver</u>, 860 F.3d at 95-96; <u>see also United States v. Powell</u>, 509 F. App'x 958, 967 (11th Cir. 2013) (unpublished) ("[T]he government can convict a person for mail or wire fraud even if his targeted victim never encountered the deception — or, if he encountered it, was not deceived."). Moreover, the fraud prosecution in <u>Binday</u> relied upon the now-abrogated right-to-control theory. <u>See United States v. Binday</u>, 804 F.3d 558, 576–77 (2d Cir. 2015) (affirming conviction on grounds that "it suffices to prove that the defendants' misrepresentations deprived the insurers of economically valuable information that bears on their decision-making"), <u>abrogated by Ciminelli v. United States</u>, 598 U.S. 306 (2023).

Indeed, the defendants' reading of <u>Binday</u> runs headlong into caselaw in this Circuit. The defendants' argument appears to be that because the victim-bank materials will purportedly reveal the banks' "attitudes towards customers with business in sanctioned countries," they might evince the sort of "<u>de facto</u> policies" to which <u>Binday</u> refers. This argument is merely a variation on the same flawed premise that underlies the defendants' <u>Brady</u> claim with respect to the victim-bank materials. Even if those materials show that the victim banks' failed to act upon relevant information with respect to customers' dealings in sanctioned countries, that is not a defense to bank and wire fraud. <u>See Thomas</u>, 377 F.3d at 243 (adopting rule that victim's lack of reasonableness or negligence is no defense to fraud). That is precisely why courts in this circuit have instructed juries: "[I]t does not matter whether any of the banks involved might have discovered the fraud had it probed further. If you find that a scheme or artifice existed, it is

11

irrelevant whether you believe that any of the banks involved was careless, gullible, or even negligent." United States v. Cherico, No. 08-CR-786 (CM) (S.D.N.Y.), Tr. (Oct. 31, 2011) at 1498:20-24.

Third, the defendants misread United States v. Litvak, 808 F.3d 160 (2d Cir. 2015). In that case, a sell-side trader at an investment bank was convicted of fraudulently misrepresenting the price at which he had acquired certain residential mortgage-backed securities ("RMBS") to buy-side traders at other financial institutions. The Second Circuit held that the trial court abused its discretion by precluding the testimony of the defense expert, who would have testified that, unlike "traditional, efficient" equities markets, the RMBS market was unique because pricing was "often based on models as opposed to prices from prior transactions." Id. at 182. The court noted that there was trial testimony that an RMBS buyer "nearly always" determines the price it is willing to pay based on such models before approaching a seller, like the defendant, to negotiate the price of the RMBS. Id. at 183. Thus, the court reasoned that, had the defense expert been permitted to testify, "a jury could have reasonably found that misrepresentations by a dealer as to the price paid for certain RMBS would be immaterial to a counterparty that relies not on a 'market' price or the price at which prior trades too place, but instead on its own sophisticated valuation methods." Id.

Nothing in Litvak suggests that materiality may be assessed from the subjective perspective of the victim, which is the basis of the defendants' Brady claim. Indeed, as the defendants recognize, the improperly precluded expert testimony in Litvak was not specific to the investment practices of the actual victims of the fraud scheme at issue, but rather, related to "industry practice" in general. (Mot. 10.) The defendants are free to proffer the analogous evidence here — duly-qualified expert testimony that, based on industry practice during the relevant time period, a reasonable decisionmaker would not have terminated a banking relationship with a customer after learning that the customer did business in sanctioned countries. See Lindsey, 850 F.3d at 1012 (holding that "evidence of the general lending standards applied in the mortgage industry is admissible to disprove materiality, but evidence of individual lender behavior is not admissible for that purpose"). But what they cannot do is seek to shame the victim banks — and likely confuse the jury — by introducing extrinsic evidence that, on prior occasions, the victim banks failed to live up to their own compliance standards.

At bottom, the defendants' attempt to obtain wide swaths of sensitive materials to mine for victim-blaming evidence should be rejected. The question at trial will be whether the defendants engaged in a scheme or artifice to defraud, not whether the victim banks were negligent, careless, or gullible in being defrauded. The defendants' request to rifle through the highly prejudicial victim-bank materials has no basis in law or fact and should be denied.

B.    The OFAC Materials Are Not Discoverable Under *Brady* or Rule 16

The defendants next claim that both Brady and Rule 16 compel the production of the OFAC materials, which the government does not possess and is not required to obtain. (Mot. 10-14.) Although the defendants acknowledge that the government maintains that OFAC is not part of the prosecution team, they insist that "the Indictment itself, and the government's discovery to date," suggest otherwise. (Id. at 11.) Not so.

The government's obligation to disclose <u>Brady</u> or Rule 16 material extends to any material in the possession of any entity that has acted as an "arm of the prosecutor" in a given case. <u>See</u> <u>United States v. Blaszczak</u>, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018) (quoting <u>United States v. Morell</u>, 524 F.2d 550, 555 (2d Cir. 1975)); <u>United States v. Meregildo</u>, 920 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2013). In other words, where the prosecution "conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for <u>Brady</u> [and Rule 16] evidence." <u>United States v. Gupta</u>, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012). A number of factors are relevant in determining whether the prosecution conducted a "joint investigation," including whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings. <u>See</u> <u>Blaszczak</u>, 308 F. Supp. 3d at 741-42; <u>see also</u> <u>United States v. Martoma</u>, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014) (relying on the joint conduct of interviews, exchange of documents, coordination of deposition efforts, and communications regarding the status of fact-gathering to find a joint investigation). However, merely "interacting with the prosecution team, without more, does not make someone a team member." <u>United States v. Ingarfield</u>, No. 20-CR-146 (RA), 2023 WL 3123002, at *3 (S.D.N.Y. Apr. 27, 2023) (cleaned up). "[T]he relevant inquiry is what the person <u>did</u>, not who the person <u>is</u>." <u>United States v. Stewart</u>, 433 F.3d 273, 298 (2d Cir. 2006) (emphasis in original).

Although the victim banks do appear to have communicated with OFAC regarding certain of the transactions at issue in this case (indeed, as noted above, the government previously identified such communications for the defendants), OFAC was not part of the prosecution team. OFAC satisfies none of the <u>Blaszczak</u> factors: OFAC did not participate in the hundreds of witness interviews conducted by the prosecution; it did not present the case to the grand juries that returned the original indictment or any of the three superseding indictments; it played no role in the development of the prosecution strategy; and no staff from OFAC have ever accompanied the prosecution team to any court proceedings during the seven years in which this case has been pending. <u>Blaszczak</u>, 308 F. Supp. 3d at 741-42. Moreover, OFAC did not provide the prosecution team with any documents that it may have obtained through its own investigative process;[8] nor did the prosecution team provide to OFAC any of the millions of documents it obtained via grand jury subpoenas. <u>Id.</u> If the relevant inquiry is "what the person did," <u>Stewart</u>, 433 F.3d 273, then OFAC did nothing to suggest it functions as an "arm of the prosecutor."

The defendants' arguments to the contrary are unavailing. <u>First</u>, the defendants incorrectly claim that "the Indictment alone indicates that OFAC participated in the government's investigation." (Mot. 13.) The defendants point to one paragraph from the Third Superseding Indictment to substantiate this claim, paragraph 112, which alleges that certain of the defendants conspired to obstruct the lawful operation of OFAC. (<u>Id.</u> (citing ECF No. 126 ¶ 112).) That the

---

[8]    The government did conduct OFAC license checks on various persons and entities affiliated with this case and produced the results, which comprised six pages of materials. <u>See</u> DOJ_HUAWEI_A_0124902048 to DOJ_HUAWEI_A_0124902053. The government is not aware of any authority standing for the proposition that the running of searches on a victim agency's databases transforms the agency into a member of the prosecution team.

Third Superseding Indictment alleges that the defendants victimized OFAC plainly does not establish that it was part of the prosecution team.  The defendants also victimized the victim banks; it would be absurd to suggest that this renders them an "arm of the prosecutor."

Second, the defendants claim that the government stated it would "rely on testimony from an OFAC official" in the Record of Case filed in connection with the attempted extradition of co-defendant Wanzhou Meng.  (Id. (citing ROC ¶¶ 1-6).)  There, the government stated only that an OFAC employee was expected to testify as to the nature and application of the U.S. sanctions on Iran, as well as the criminal and civil penalties companies can face if they violate these sanctions.  That the government stated in the Record of Case that it planned to call an OFAC witness to provide such testimony does not transform the witness, let alone OFAC generally, into a member of the prosecution team.  The defendants tellingly provide no authority, as there is none, for the dubious notion that merely being called to testify as a witness is sufficient to establish joint participation in the government's investigation.

Third, the defendants claim that, because OFAC sent an administrative subpoena to Huawei in December 2016 requesting information regarding the export of American technology to Cuba, Sudan, Syria, and Iran, it shows "OFAC's involvement in this case from its inception." (Id. at 13.)  This too misses the mark.  The issue is not whether OFAC undertook any steps of its own to investigate the defendants' alleged sanctions violations, but whether it did so jointly with the prosecution team.  For the reasons already stated, it did not.

Fourth, the defendants claim that certain documents show that "OFAC was involved with the investigation of the charges that became a central pillar of the Indictment." (Mot. 14.)  In support of this claim, the defendants point to a March 2017 Report of Investigation prepared by the Department of Homeland Security ("DHS"), which notes that OFAC had served Huawei with an administrative subpoena in December 2016 — the same administrative subpoena referenced above.  (Id. at 13 (citing Ex. L).)  The defendants further point to the fact that ███████ self-disclosed to OFAC in April 2017 that it may have violated Iranian sanctions, and speculate that "it is likely that this information . . . contributed to the government's decision to transfer its prosecution of Huawei in August 2017 from the District of Columbia to the Eastern District of New York."  (Id.)  Finally, the defendants note that ████████ self-disclosure to OFAC preceded the date on which the case was transferred — August 23, 2017 — as recorded in a "Case Chronology & Review Form" prepared by DHS (the "case chronology"), which recorded a chronological list of certain events that had occurred in the investigation at that point in time.  (See Ex M.)  This argument, too, is unavailing.  That the prosecution team was aware of OFAC's administrative subpoena does not make OFAC a member of the prosecution team.  Ingarfield, 2023 WL 3123002, at *3 ("Interacting with the prosecution team, without more, does not make someone a team member.").  And the case chronology that the defendants cite does not indicate any joint investigation with OFAC (as there was none), nor does it list OFAC's receipt of the ██████ self-disclosure or include any reference whatsoever to OFAC.

Lastly, the defendants' attempt to analogize this case to United States v. Nejad, 487 F. Supp. 3d 206 (S.D.N.Y. 2020), falls flat.  (Mot. 11-12.)  There, the government "knowingly possessed," and failed to timely disclose, a letter from Commerzbank to OFAC in which the bank flagged sanctions-related transactions at issue in the case.  Nejad, 487 F. Supp. 3d at 216.  The

14

letter was exculpatory as to the charged <u>Klein</u> conspiracy, which was "predicated on the prospect of OFAC enforcement," because, among other reasons, "when OFAC was apprised by Commerzbank of [the flagged transactions], it took <u>no</u> enforcement action." <u>Id.</u> at 215-16 (emphasis in original). But in <u>Nejad</u>, unlike here, there was no dispute regarding whether the prosecution team actually possessed the letter. Commerzbank had produced the letter directly to a state prosecutor who was later appointed as a Special Assistant United States Attorney on the <u>Nejad</u> prosecution. <u>Id.</u> at 216. Subsequently, the prosecution team "strategized how to 'bury' the document, settled on a plan to do so, and discussed waiting an additional day before turning it over to aid in burying the document among others." <u>Id.</u> at 219. These facts are simply not analogous to this case. The government does not possess the OFAC materials and is not required to obtain them because, for the reasons already stated, OFAC was not part of the prosecution team. Further, the government lacks any good faith basis to believe that OFAC possesses materials that are helpful to the defense.

C.    <u>The Government Will Comply with its Discovery Obligations Regarding the ▮▮▮▮▮ Jencks Act Materials</u>

The defendants final claim is that <u>Brady</u> compels the early production of the ▮▮▮▮▮ Jencks Act materials associated with government witnesses or prospective government witnesses who are or were employed by ▮▮▮▮▮ (Mot. App. A ¶ 1(c).) Under 18 U.S.C. § 3500, the government is not required to produce these materials until its witnesses have "testified on direct examination in the trial of the case." Given the complexity of this case, however, the government will confer with defense counsel to set a deadline for production of Jencks Act materials in advance of the May 2026 trial date.

IV.    <u>Conclusion</u>

For the reasons set forth above, the Court should deny the motion in its entirety.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

By:    /s/
Alexander A. Solomon
Meredith A. Arfa
Robert M. Pollack
Matthew Skurnik
Assistant United States Attorneys
(718) 254-7000

15

MARGARET A. MOESER
Chief, Money Laundering and Asset
Recovery Section,
Criminal Division
U.S. Department of Justice

By:   /s/                  
Taylor G. Stout
Morgan J. Cohen
Jasmin Salehi Fashami
Trial Attorneys


JENNIFER KENNEDY GELLIE
Chief, Counterintelligence and Export
Control Section
National Security Division, U.S. Department
of Justice

By:   /s/                  
Christian J. Nauvel
Ahmed Almudallal
Sean O'Dowd
Trial Attorneys


cc:  Clerk of the Court (by ECF and Email)
      Defense counsel of record (by ECF and Email)