UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                        Plaintiff,

                    -against-                                    **MEMORANDUM AND ORDER**
                                                                18 CR 457 (AMD) (CLP)

HUAWEI  TECHNOLOGIES  CO.,  LTD., *et
al.*,

                                        Defendants.
-------------------------------------------------------------X
**POLLAK**, United States Magistrate Judge:

Currently pending before this Court on referral from the Honorable Ann M. Donnelly,

United States District Judge, is a letter motion filed by the defendants Huawei Technologies Co.,

Ltd., Huawei Device Co., Ltd., Huawei Device USA, Inc., Huawei Device Co., Ltd., and

Futurewei Technologies, Inc. (collectively, "defendants" or "Huawei"), seeking an Order to

compel the government to produce certain materials pursuant to Brady v. Maryland, 373 U.S. 83

(1963), and Rule 16 of the Federal Rules of Criminal Procedure. (ECF Nos. 535, 536).[1] The

parties also request leave to file the motion papers under seal.

For the reasons set forth below, defendants' motion to compel is denied. The requests to

seal the motion papers are granted.

## DISCUSSION[2]

In this motion to compel, defendants seek documents that they assert relate to the fraud

charges set forth in Counts Four through Fifteen of the Third Superseding Indictment

("Indictment") (ECF No. 126), including:

---

[1] Defendants filed a sealed unredacted version with exhibits on May 30, 2025 (ECF No. 535), and a redacted version on the public docket on June 11, 2025 (ECF No. 536).

[2] The Court assumes familiarity with the factual background of this criminal case. For more specific details, see this Court's Orders, dated November 4, 2024, and November 15, 2024 (ECF Nos. 471, 478).

Bank <u>Brady</u> Materials – these are materials reflecting factors considered by four banks – ███████████████████████████ ████████████████████████████ (the "victim Banks" or "Banks") – in deciding whether to obtain and retain customers who did business in sanctioned countries.

(Defs.' Mot.[3] at 2-3).[4]

The government opposes defendants' request for the Bank <u>Brady</u> materials, arguing that documents related to prior enforcement actions against the victim Banks are not relevant and have no bearing on the fraud charges because the materiality of Huawei's alleged misrepresentations is to be determined by the jury based on an objective standard, and not on the subjective perceptions of the Banks. (Govt. Opp. at 1).

## I.    <u>Brady and Rule 16</u>

In <u>Brady v. Maryland</u>, the Supreme Court made it clear that the prosecution has a constitutional obligation to disclose "favorable" evidence to the accused where such evidence is "material either to guilt or to punishment." 373 U.S. at 87. "Favorable evidence" has been defined by the Second Circuit to include "not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." <u>United States v. Certified Env'l Servs., Inc.</u>, 753 F.3d 72, 91 (2d Cir. 2014) (citation omitted); <u>see also</u>

---

[3] Citations to "Defs.' Mot." refer to the letter motion filed by defendants on June 11, 2025 (ECF Nos. 535, 536).

[4] Defendants' motion originally sought discovery of Office of Foreign Assets Control ("OFAC") <u>Brady</u> Materials – these are documents that the government agency OFAC allegedly reviewed in connection with transactions involving Huawei or Skycom Tech Co., Ltd. ("Skycom"). Specifically, defendants sought all communications "between OFAC and regulated banks, between OFAC and the prosecution team, and within OFAC that relate to Huawei or Skycom." (Defs.' Mot. at 10). In their opposition letter, dated June 30, 2025, the government argued that OFAC is not a member of the prosecution team and therefore, the government has no obligation to obtain or produce these materials under either <u>Brady</u> or Rule 16. (ECF No. 546 ("Govt. Opp.")). In their Reply letter, dated July 15, 2025, defendants note that the government, "for the first time," had offered evidence in its opposition letter that supported the assertion that OFAC was not part of the prosecution team. (ECF Nos. 552, 553 ("Defs.' Reply") at 7 n.4). Defendants indicate that instead of pursuing the instant motion at this time, they intend to seek the requested information through a third-party subpoena, reserving the right to renew their request if any additional facts suggest OFAC is indeed part of the prosecution team. (<u>Id.</u>) Thus, the Court has not addressed this aspect of defendants' motion.

United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002) (defining "favorable" evidence as either exculpatory or impeaching).  In elaborating on the meaning of "material," the Supreme Court has held that Brady is only implicated when the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995).  The purpose of the rule requiring disclosure of Brady and Giglio material is to "protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him." United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (defining "Giglio" material as information used to impeach a witness (citing Giglio v. United States, 405 U.S. 150 (1972))).  It does not entitle a defendant to all evidence which might "conceivably assist the preparation of his defense," but rather to ensure that the defendant will not be denied access to exculpatory evidence exclusively held by the government. United States v. LeRoy, 687 F.2d 610, 619 (2d Cir. 1982).  Disclosure of exculpatory evidence is required if it is favorable to any count in the indictment, see United States v. Johnson, 592 F.3d 164, 171 (D.C. Cir. 2010), regardless of whether it is admissible at trial, United States v. Gil, 297 F.3d at 104, and even if it is both incriminatory and exculpatory.  United States v. Martinez, 388 F. Supp. 3d 225, 230 (E.D.N.Y. 2019).

Disclosure of Brady material must be made in time for the defendant to effectively use it at trial, United States v. Coppa, 267 F.3d at 142, and the timing depends on the circumstances of the particular case. United States v. Taylor, 17 F. Supp. 3d 162, 177 (E.D.N.Y. 2014).  In this case, the district court has directed the government to produce Brady material "promptly after its existence becomes known to the prosecution." (ECF No. 261 at 1).

Rule 16 of the Federal Rules of Criminal Procedure requires the government, "[u]pon a defendant's request," to provide all information that is "material" to the preparation of a defense.

Fed. R. Crim. P. 16(a)(1)(E)(i).  The Rule provides that the government "must permit the defendant to inspect and to copy" documents or other items "within the government's possession, custody, or control" when the item "is material to preparing the defense." Id.  The Second Circuit in United States v. Stevens defined evidence as "material if it could be used to counter the government's case or to bolster a defense." 985 F.2d 1175, 1180 (2d Cir. 1993); see also United States v. Stein, 488 F. Supp. 2d 350, 356-57 (S.D.N.Y. 2007) (stating that "[e]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal").  While "[t]he materiality standard [of Rule 16] normally is not a heavy burden," "materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case." United States v. Messina, No. 11 CR 31, 2011 WL 3471511, at *1 (E.D.N.Y. Aug. 8, 2011) (internal citations and quotations omitted). The defendant seeking such discovery must make an initial showing of what it is looking for, why it expects that information to be there, and how the defendant intends to use the information. United States v. Ashley, 905 F. Supp. 1146, 1170 (E.D.N.Y. 1995).

II.   The Bank Brady Documents

A.  The Parties' Submissions

Defendants argue that in the fraud and sanctions counts of the Indictment, it is alleged that Huawei defrauded the four victim Banks by failing to disclose Huawei's relationship with Skycom, a corporate affiliate of Huawei that operated in Iran. (Defs.' Mot. at 1).  Defendants contend that although it was legal for Huawei to do business in Iran,[5] the government alleges that

---

[5] The government disputes this representation to the extent that while is it "'possible' for foreign corporations to legally conduct business in Iran," here, defendants conducted their Iranian business "in a manner that violated U.S. sanctions." (Govt. Opp. at 10).

had the victim Banks known that Huawei indirectly controlled Skycom, the Banks would have reconsidered whether to provide Huawei with banking services. (Defs.' Mot. at 1). Defendants counter by asserting that the Banks knew of Huawei's relationship with Skycom and yet chose to continue to do business with Huawei, as well as with other clients that operated in sanctioned countries. (Id.) Thus, Huawei seeks materials related to customers other than Huawei,[6] that reflect the victim Banks' decision-making policies with respect to obtaining and retaining clients, arguing that "there is good reason to suspect that the Banks had an interest in retaining large corporate customers such as Huawei regardless of their affiliation with businesses that conducted operations in Iran." (Id. at 7).

In attempting to identify the documents they believe would contain <u>Brady</u> material,



defendants note that during the period between ████████, three of the victim Banks – ████████████████ – entered into ████████████ involving ██████ ████████ and █ entered into civil resolutions in ████████, based on its failure to ████████████████████████████████████. (Id.) Specifically, defendants note that in ████, ████ entered into a resolution and agreed to pay a "████████ dollar fine" based on its admission that it willfully ████████ involving ██████ ██████ ████████ ████, in violation of the ████████████████████. (Id. at 8 (citing ████████████████ ████████))). Also in ████, █ admitted in a ████████████ that it had conspired to ████ illegal ████████ on behalf of ████████ (id. (citing ████████████████)

---

    [6] To the extent they exist, the government has already produced the relevant materials relating to Huawei itself. <u>See</u> <i>infra</i> at 7.



)))), and in ███ , ███ also admitted ████████████████████ involving an ████████ , despite ████████████████████ . (Id. (citing ████████████████████ )))). With respect to ██ , defendants note that in ███ , ██ entered into a civil consent order based on regulatory violations stemming from the Bank's failure to ██ ████████████████ and ████████ with respect to ████████████ . (Id. (citing ████████████████████ )))). In ███ , when the ████████ ████████████ determined that ██ had failed to ████████████ ████████ , it assessed a ████████ penalty against Citi. (Id. (citing I████████████ ████████████████ )))).

Defendants argue that these resolutions, entered into during the same period at issue in the Indictment, suggest, contrary to the government's allegations, that the Banks did not "care[]" so deeply about sanctions risk" that they would have found further disclosures about Huawei's relationship with Skycom to be material to the decision to continue doing business with Huawei. (Id. at 7). Moreover, according to defendants, the investigations into ████████████████ resulted in ████████████████████████████ ████████████████████████ . (Id. at 8). Based on this, defendants argue that the government is "clearly in possession of internal bank communications and other documents evincing the Bank's actual decision-making regarding customers with business in sanctioned countries." (Id. at 9). Thus, they seek:



1. The ████████████ following its ████████ ;
2. The ████████████ following its ████████████ ;
3. ████████████████████████ related to ████████ ████████ ;

4. All interview notes, memoranda, and documents relating to ███████'s customers ████████████ █████████████ that have been collected by the FBI or other investigators/prosecutors from ██████'s current or former employees since ██████;

5. All materials underlying the government's findings related to ████████████████████████████████ in connection with ████████████████████████████████ ████████ and ██████████████ violations.

(Id. at 6).

The government has already produced documents responsive to defendants' requests insofar as the documents relate to any relationship the Banks had with Huawei. Indeed, as part of their Motion, defendants attached several exhibits, including summaries of █████████ regarding ██████'s relationship with Huawei and Skycom, a letter from the government summarizing certain ████████ employees' knowledge of the bank's relationship with Huawei, and a task force investigative report from the Department of Homeland Security regarding criminal charges against ██████ relating to its involvement with Huawei. (ECF Nos. 535-3, -9, -12). Defendants contend that these ██████████████ summaries demonstrate that ████████ was "fully aware of Huawei's relationship with Skycom" and decided to conduct business with Huawei anyway. (Defs.' Mot. at 1-2, ECF No. 535-3).

In response to defendants' request for similar discovery from the other victim Banks, the government asserts that it searched the █████████████ and case files regarding the prior enforcement actions against the victim Banks for "any connections to Huawei or to this case," and thereafter produced the "near-verbatim" ████████████ summaries from ██████ and ██████. (Govt. Opp. at 3). The government further concluded that "it was not aware of any <u>Brady</u> or Rule 16 information in the case files associated with the ████████████████████." (Id.)

The government does not address whether the files included materials related to  relationship with Huawei.

In the government's response letter, it argues that although the bank and wire fraud statutes require that any alleged misrepresentations be "material," the assessment of materiality is based on "an objective standard." (Id. at 7 (citing Neder v. United States, 527 U.S. 1, 4 (1999))). The government contends that "[w]hether a statement is capable of influencing the relevant decision-making body is analyzed from the objective perspective of a reasonable person, rather than from the subjective perspective of the victim." (Id. (citing United States v. Frenkel, 682 F. App'x 20, 22 (2d Cir. 2017) (summary order) (holding that "a matter is material if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'") (citation omitted))). In United States v. Corsey, the Second Circuit held that a "misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do." 723 F.3d 366, 373 n.3 (2d Cir. 2013). Thus, the government takes the position that it need only prove materiality from the perspective of a reasonable person; it is not required to prove that the victim "acted as a reasonable person would have when confronted with the defendant's misrepresentations." (Govt. Opp. at 8 (citing United States v. Thomas, 377 F.3d 232, 241-43 (2d Cir. 2004))).

The government also contends that it need not prove that the victim relied on defendant's material misrepresentation in order to prove either wire or bank fraud. (Id. (citing United States v. Weaver, 860 F.3d 90, 96 (2d Cir. 2017))). The government contends that "[t]he relevant question is not whether a 'false or fraudulent statement . . . exerted actual influence,' but rather, [whether] it was intended to do so and had the capacity to do so." (Id. (quoting United States v. Madakor, 29 F. App'x 636, 638 (2d Cir. 2002) (internal citations omitted))). Accordingly, the

8

government argues that either defendants' representations were "material in the eyes of an objective, reasonable decisionmaker, or they were not;" whether the banks were actually influenced by those misrepresentations is "of no consequence" to the jury's determination of materiality. (Id. (citing United States v. O'Brien, 953 F. 3d 449, 460 (7th Cir. 2020))).

The government argues that any documents that reveal the victim Banks' attitudes towards customers with business in sanctioned countries are not exculpatory because materiality does not depend on the victims' subjective perspective, and any argument that the victim Banks turned a "blind eye" to any sanctions related issues, including defendants' misrepresentations, is "the sort of victim-blaming argument that courts in this circuit routinely preclude." (Id. (citing United States v. Miller, 800 F. App'x 39, 41 (2d Cir. 2020) (summary order) (upholding the exclusion of evidence of a Department of Justice settlement and related materials, allegedly showing the victim's involvement in improper mortgage lending practices, finding the evidence both irrelevant and prejudicial)); see also United States v. Udeokoro, No. 17 CR 629, 2023 WL 4138477, at *6 (E.D.N.Y. June 22, 2023).

The government notes that it may elicit testimony from officials of the victim Banks at trial regarding the factors they consider in accepting new clients, retaining clients, and processing transactions, in order to establish the objective materiality of defendants' alleged misrepresentations. (Govt. Opp. at 9 (citing United States v. Cuti, 720 F.3d 453, 459 (2d Cir. 2013) (collecting cases that allowed narrow hypothetical questioning of fact witnesses, such as "what-if-you-had-known" questions, to determine the impact of a fraud))). However, the government argues that extrinsic evidence regarding the Banks' failure to "comply with their

own standards," especially regarding issues unrelated to the instant case, are not similarly probative of the materiality element.[7] (Id.)

In their reply letter, the defendants insist that the requested materials go to the element of materiality under the objective standard. (Defs.' Reply[8] at 1). To the extent the government indicates that it intends to "'elicit testimony from victim-Bank officials about the factors that they consider when accepting new clients, retaining those clients, or processing transactions,'" Huawei asserts that it is entitled to do the same, and that the documents they are requesting will demonstrate the "actual practices" and factors the victim Banks considered in making decisions to do business with its clients – not just those "advertised in formal policy documents" or elicited from bank spokespersons at trial. (Id. (quoting Govt. Opp. at 9)). Defendants take issue with the government's characterization of the enforcement proceedings as instances where the banks "'failed to live up to their own compliance standards;'" instead, defendants assert that information from these proceedings will demonstrate what the Banks' standards *actually were*." (Id. at 1-2 (quoting Govt. Opp. at 12)) (emphasis in original). Defendants argue that if bank witness testimony is probative of this information, so is the extrinsic evidence that defendants request. (Id. at 3).

---

[7] The government also disputes defendants' claim that documents reflecting Bank policies during the time period in which the victim banks ████████████ with the government are relevant and material to the fraudulent conduct at issue here, noting that "nearly all of the relevant offense conduct" in connection with the banks' corporate ████████████ took place before the alleged frauds in this case which occurred between approximately 2007 and 2019. (Govt. Opp. at 9). According to the government, the ████ related conduct in the case of ████ occurred between the ████████ ; in the ████ , the ████-related conduct occurred between ████ ; and in the ████████ there was no ████ related conduct. (Id. at 9-10). The government does not specifically address the timeframe of the ████ related conduct in the ████ ████. (See id.). Defendants dispute the government's argument that the conduct in this case does not overlap with the conduct at issue in the Banks' past ████████ , citing to materials indicating that certain of the Banks' past conduct extended past 2007 and before 2019, which is the period of time at issue in this case. (Defs.' Reply at 4-5 n.2).

[8] Defendants filed a redacted version of their reply letter on the public docket on July 15, 2025 (ECF No. 552); the sealed unredacted version was filed on July 16, 2025 and provided to the Court on the same date. (ECF No. 553).

Defendants further argue that, to the extent representatives of the Banks stand as witnesses at trial, Brady necessitates that the prosecution produce documents relevant to impeachment. (Id. at 6). Defendants contend that, despite the government's characterization of these banks as "victims," they are in fact "notorious ███ violators," so defendants are entitled to information about the Banks' past ███ violations that may be used to impeach these witnesses by demonstrating that they did not consider Huawei's relationship with Iran to be essential to their decision to provide Huawei with banking services.[9] (Id.)

B.   Analysis

In Neder v. United States, 527 U.S. at 25, the Supreme Court held that materiality of falsehood is a required element to prove federal bank and wire fraud. To establish materiality, the government must show that the false statement had "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Id. at 16 (internal quotations and citations omitted). Courts have held that under Neder, materiality is an objective test based on whether "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." United States v. Frenkel, 682 F. App'x at 22-23 (quoting Neder v. United States, 527 U.S. at 22 n.5)). Under this test, the subjective perspective of a would-be victim is irrelevant: "misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do." United States v. Corsey, 723 F.3d at 373 n.3.

---

[9] The government notes that, to the extent defendants request interview notes, memoranda, and documents collected by the FBI or other government investigators or prosecutors from ███ 's current or former employees, those are considered Jencks Act materials that the government is not required to produce until its witnesses have "'testified on direct examination in the trial of the case.'" (Govt. Opp. at 15 (quoting 18 U.S.C. § 3500)). The defendants assert that they are entitled to these materials in time for their effective use at trial under Brady. (Defs.' Reply at 7). The government has offered to confer with defense counsel on a deadline to produce responsive materials ahead of the trial date. (Govt. Opp. at 15). Given that there appears to be no live dispute as to this issue, the Court declines to rule on it at this time. The parties may submit a letter detailing any dispute that remains after they meet and confer.

11

The distinction between the objective materiality of a false statement and the victim's subjective perception of it is critical because "reliance is not an element of criminal fraud, while materiality is." United States v. Weaver, 860 F.3d at 96. As the Second Circuit noted in United States v. Thomas, the objective materiality requirement "assure[s] that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless," 377 F.3d at 242, and thus, a fraudulent statement "need not have exerted actual influence, so long as it was intended to do so and had the capacity to do so." United States v. Madakor, 29 F. App'x 636, 638 (2d Cir. 2002) (quotation and citation omitted). In United States v. Udeokoro, the court found that the defendants' intent in making affirmative misrepresentations constituted traditional fraudulent conduct regardless of whether victims recognized them or "even tacitly approved of them." 2023 WL 4138477, at *7.

The parties agree, and the law is clear, that for purposes of the bank and wire fraud statutes, a finding of criminal fraud requires materiality based on an objective standard. The issue before the Court is whether the documents defendants request in fact go to materiality such that defendants are entitled to them under Brady or Rule 16. Defendants insist that these documents will show "industry practice" or the "actual standards" used by the Banks, and that these factors confine the "degree to which a misrepresentation would be 'capable of influencing[] the decision of'" the Banks to do business with companies that have ties to sanctioned countries. (See Defs.' Reply at 4 (quoting United States v. Rigas, 490 F.3d 208, 234-35 (2d Cir. 2007))). But see United States v. Madakor, 29 F. App'x at 638 (holding that the false statement "need not have exerted actual influence, so long as it was intended to do so and had the capacity to do so").

First, defendants contend that the materiality requirement is even more demanding in this case because the victim Banks "received what they bargained for" – namely, payment for their services. (Defs.' Reply at 2). Citing Justice Thomas' concurrence in the recently decided Kousisis v. United States, the defendants argue that Huawei's misrepresentation must go to the "essence" of the banks' decision to continue the relationship with Huawei. (Id. (citing 145 S. Ct. 1382, 1404-04 (2025) (Thomas, J., concurring))). Defendants argue that if these materials demonstrated that the Banks regularly provided banking services to companies that engaged in dealings in sanctioned countries, this would tend to demonstrate that Huawei's alleged misrepresentations were not "essential" to the banks' decision, and thus, these materials should be produced as exculpatory. (Id.)

In Kousisis, the defendants were charged with conspiracy and wire fraud for fraudulently inducing the Pennsylvania Department of Transportation ("PennDOT") into awarding them painting projects by falsely promising to obtain materials from a "disadvantaged" business as required by the contract, and in accordance with federal regulations. Kousisis v. United States, 145 S. Ct. at 1388-89. In rejecting the defendants' argument that the government had failed to demonstrate that defendants had schemed to defraud PennDOT of "money or property" because PennDOT had not suffered a "net pecuniary loss," the majority held that "materiality," rather than economic loss, is "the principled basis for distinguishing everyday misstatements from actionable fraud." Id. at 1396. The majority cites to Universal Health Services, Inc. v. United States ex rel. Escobar, 579 U.S. 176, 194 (2016), a case discussing materiality in the context of a claim brought pursuant to the False Claims Act ("FCA"), to demonstrate that materiality cabins the universe of fraud claims. See Kousisis v. United States, 145 S. Ct. at 1396, 1398. Although the government in Kousisis urged adoption of the particular

materiality test set out in Universal, whereby a misrepresentation would be material only if it went "'to the very essence'" of the bargain between the parties, the majority opinion refrained from deciding the question, noting that defendants had not contested materiality and thus, the issue of materiality was not before the Court. (Id. (citing Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. at 194 n.5)).

However, in his concurring opinion, Justice Thomas addressed the materiality requirement, opining that the government in Kousisis would not have been able to prove materiality under the Universal standard. Kousisis v. United States, 145 S. Ct. at 1399. Justice Thomas explains that under Universal, to be actionable under the FCA, a "'misrepresentation about compliance with a statutory, regulatory, or contractual requirement'" must be material to the government's payment decision, defining a "material" contract term as one going to "'the very essence of the bargain.'" Id. at 1400-01 (quoting Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. at 194, 194 n.5)). While acknowledging that the law is not settled as to whether this same standard would apply to criminal wire fraud, Justice Thomas nonetheless analyzed the facts in Kousisis, applying an "essence of the bargain" standard and finding, among other things, that if the government had actual knowledge or if fraud was so prevalent in violating these contract provisions, that would be very "strong evidence that those requirements were not material." [10] Id. at 1403 (internal citation and quotation omitted).

Despite the fact that the majority opinion did not consider the question of materiality and the concurrence has no precedential effect, defendants rely on the concurrence to argue that such a standard should apply in this case. (Defs.' Mot. at 3). While the application of this standard to analyze "statutory, regulatory, or contractual" requirements in matters involving government

---

[10] Whether this will ultimately be the standard adopted by the Court for determining materiality remains to be seen, but at this time, the prevailing case law seems to hold otherwise.

payments may have made sense in <u>Kousisis</u>, where the government imposed a contractual requirement in agreeing to award its painting projects, the "essence of the bargain" standard does not easily fit within the complex circumstances of this case. Here, both sides appear to agree that there were countless decisions by the Banks made over a period of years in deciding whether to contract with Huawei in the first instance and to continue a relationship with Huawei. In the absence of binding precedent applying this suggested standard of materiality in the context of the bank and wire fraud claims at issue here, the Court finds that this "essence of the bargain" standard of materiality does not control the scope of discovery in this case.[11]

Defendants further argue that the Second Circuit has found that evidence demonstrating actual practices can support the materiality inquiry. (Defs.' Reply at 4). However, the types of factors that courts consider in evaluating materiality are much more objective than those at issue here. For instance, although defendants cite <u>Rigas</u> to demonstrate that courts will consider extrinsic evidence in the form of documents that guide the decisionmakers (<u>id.</u>), in <u>Rigas</u>, the documents at issue were binding contracts that objectively restricted the rates at which the banks could charge interest based on leverage ratios. <u>United States v. Rigas</u>, 490 F.3d at 235-36. Specifically, in this "rather unusual bank fraud case," the government offered evidence that the defendants filed false and misleading compliance reports regarding its loans, including misrepresentations relating to leverage ratios, with the intent to yield interest savings. <u>Id.</u> Relevant to the court's determination of materiality were specific Co-Borrowing Agreements that set ranges of interest to be charged. <u>Id.</u> The court found the misrepresentations immaterial to the decisionmaking because the only decisions the bank in <u>Rigas</u> could make regarding how much interest to charge were constrained by the ranges set in these Agreements. <u>Id.</u>

---

[11] Even if this Court adopted this standard, that would not change its ultimate position that the requested documents do not go to materiality for the reasons detailed below.

Defendants rely on the holding in <u>Rigas</u> to argue that the documents they seek would speak to "what sort of information the banks objectively considered essential when making decisions about whether to provide services . . . ." (Defs.' Reply at 3). The government, however, contends that defendants have misstated the holding of <u>Rigas</u>, referring specifically to defendants' reliance on the court's statement that "[i]n the context of an objective decision-making process, whether a misrepresentation is material requires examination of the factors the decisionmaker would employ." (Defs.' Mot. at 9-10). The government points out that although defendants cited this language to support their argument that subjective factors, such as the Banks' "actual policies," should be considered, defendants ignored the second part of that same sentence which added "and the degree to which a misrepresentation would be 'capable of influencing [] the decision of the decisionmaking body.'" (Govt. Opp. at 10 (quoting <u>Rigas</u>, 490 F.3d at 235 (quoting <u>Neder</u>, 527 U.S. at 16))).

Here, while the government alleges that misrepresentations were made to influence the victim Banks' decisions, by contrast to <u>Rigas</u>, extrinsic evidence of the victim Banks' past compliance failures do not reflect outside constraints placed upon the Banks' decisions, but instead would allegedly reveal other subjective factors the Banks employed at their own discretion – what they themselves "considered essential" – in deciding whether to do business involving sanctioned countries. Indeed, defendants are searching for documents revealing factors and considerations that represent a departure from the Banks' own formal policies. (Defs.' Mot. at 10 (arguing that documents "showing that the Banks *in practice* sought out customers with business in sanctioned countries are relevant . . . even if the Bank[s] had formal policies that articulated different considerations" (emphasis added))). By their very nature, such considerations are purely subjective and will likely differ from Bank to Bank and may even

16

differ among one Bank's own account managers or be dependent upon the specific customers involved, having little relevance to Huawei.

Defendants also rely on the case of United States v. Litvak, 808 F.3d 160 (2d Cir. 2015) for the proposition that industry practices have been considered in determining materiality. (Defs.' Mot. at 10). In Litvak, a sell-side trader at an investment bank was convicted of fraudulently misrepresenting to buyer-side traders the prices at which he acquired certain residential mortgage-backed securities ("RMBS"). United States v. Litvak, 808 F.3d 160. The Second Circuit held that the trial court had abused its discretion in excluding expert testimony that, unlike traditional equities markets, the RMBS market was based on models rather than acquisition prices. Id. at 182. Since the excluded testimony would demonstrate that buyers usually determined price point based on these models before approaching the seller, a jury could have found that misrepresentations as to the acquisition price were immaterial to the buyer's decision to purchase securities. Id. at 183.

The government argues that Litvak does not support the defendants' argument that the victim Banks' individual decisions to do business in sanctioned countries is material in the way that industry practices generally would be. Instead, the government argues that defendants are "free to proffer" expert testimony that, "based on industry practice . . . a reasonable decisionmaker would not have terminated a banking relationship with a customer after learning that the customer did business in sanctioned countries." (Govt. Opp. at 12 (citing United States v. Lindsey, 850 F.3d 1009, 1012 (9th Cir. 2017))). This evidence of industry-wide practices is very different from evidence of the various unwritten factors the victim Banks individually may have actually considered in deciding whether to conduct business with other non-Huawei entities. Defendants appear to recognize this to the extent that they argue that the evidence they

seek will show other factors considered by the Banks that depart from their formal policies, suggesting that any such considerations may not in fact be thought of as objectively "reasonable" across the banking industry. (See Defs.' Mot. at 10). In summary, extrinsic evidence of past compliance failures showing whether or why a decisionmaker at the victim Banks did or did not terminate a banking relationship with specific past dealings with particular customers is not expert testimony relevant to a determination of what is an industry-wide practice (Govt. Opp. at 12), and does not bear on materiality.[12]

The question of materiality fundamentally involves determining whether "the misrepresentation actually matter[s] in a meaningful way to a rational decisionmaker." United States v. Calderon, 944 F.3d 72, 86 (2d Cir. 2019). Thus, in United States v. Cuti, the court allowed the decisionmakers to testify in response to hypothetical questions regarding how certain pieces of withheld information would influence their decisions as a means of inquiring into the materiality of the false and fraudulent information. 720 F.3d 453, 459 (2d Cir. 2013). While defendants argue that the *de facto* practices of ignoring intentional misrepresentations, and even unlawful practices, can nonetheless speak to materiality (Defs.' Mot. at 10), the cases defendants rely on for this argument are unpersuasive. Although the lower court decision in United States v. Binday suggests that certain evidence could demonstrate "pervasive . . . ignorance[13] of sound

---

[12] It is notable that in Litvak, the Second Circuit rejected the district court's rationale in precluding the defendant from offering documents and testimony showing that there was widespread use of similar misrepresentations by other employees and that the defendant's supervisors approved of his colleagues' substantially similar behavior. 808 F.3d at 188-89. To the extent that Huawei relies on this case in seeking to show that the Banks ignored similar omissions or misrepresentations by other entities, the evidence in Litvak was not offered to demonstrate lack of materiality but rather to show that the defendant lacked the necessary fraudulent intent in that he held an honest belief that his conduct was not unlawful. Id. at 190.

[13] The court in Binday draws a distinction between pervasive and episodic ignorance, noting that if the defendants "simply intend to place before the jury a small sample of underwriting files, and to argue from them that negligence [on the part of the company in discovering the fraud was] likely the cause," that would not as convincingly undermine materiality as pervasive ignorance. 2013 WL 12154927 at *2. But see United States v. Thomas, 377 F.3d at 243 (holding that a victim's negligence in failing to discover a fraudulent scheme is not a defense to criminal fraud).

underwriting practices" on a company-wide level, suggesting that a particular insurer had adopted a *de facto* policy of ignoring misrepresentations such that it could undermine materiality, as the government notes, <u>Binday</u> seems to misstate the standard for fraud. (Govt. Opp. at 11 (citing No. 12 CR 152, 2013 WL 12154927, at \*2 (S.D.N.Y. Sept. 16, 2013) (stating that "if the Insurers were not deceived, they could not have been victims of a scheme to defraud"))). Indeed, the court's reasoning for tentatively allowing evidence of such *de facto* policies rests on the court's ruling that there must be proof that the alleged victims were actually deceived by the fraud. 2013 WL 12154927 at \*1. In misstating this requirement, the court in <u>Binday</u> commented that proof of a widespread policy of ignoring certain types of information would make it more likely that the victim insurers themselves ignored misrepresentations and so were not actually deceived. <u>Id.</u> at \*2.

However, as noted *supra*, it is well established that reliance on the misrepresentation is not a necessary element of proof in the context of a wire fraud or bank fraud charge. <u>See</u> <u>United States v. Weaver</u>, 860 F.3d at 96 (finding that defendant's arguments that victims were not actually influenced by the misrepresentations "confuse materiality . . . for reliance" and noting Supreme Court precedent that "reliance is not an element of criminal fraud, while materiality is" (citing <u>Neder v. United States</u>, 527 U.S. at 24-25)); <u>see also</u> <u>United States v. Gentile</u>, No. 21 CR 54, 2024 WL 2941849, at \*1 (E.D.N.Y. June 11, 2024) (noting that "reasonable reliance is not an element of the relevant criminal statutes" in a case that included allegations of wire fraud). Thus, to the extent that defendants rely on <u>Binday</u>, the Court finds the holding unpersuasive.

Although the government characterizes Huawei's arguments as "victim blaming," (Govt. Opp. at 8), defendants argue that the Banks were "free" to have policies with varying degrees of tolerance for dealing with companies that had affiliates doing business in Iran, since it was not

19

absolutely illegal for U.S. banks to provide services to those companies. (Defs.' Reply 5). According to defendants, the cases the government cites for the proposition that Huawei is seeking evidence to support their "victim blaming" charge are not relevant, as those cases deal with fraud victims who were potentially gullible, careless, or negligent. (Id. at 5-6 (citing cases)). Here, Huawei is seeking these materials not to show that the banks were negligent, but to determine the factors the banks used in their decisionmaking. (Id. at 6). Defendants contend that the only case cited by the government that does not involve a gullible victim – United States v. Miller – supports the defendants' argument, as it noted that a "'victim's wrongdoing may in some cases absolve a defendant of fraud liability.'" (Id. (citing 800 F. App'x 39 at 41)).

However, defendants' reliance on United States v. Miller is unconvincing. In Miller, the defendant sought to introduce evidence that Wells Fargo had entered into a settlement with the Department of Justice in connection with civil mortgage fraud claims, arguing that the documents would show that Wells Fargo would "accept anything on loan documents" and therefore any misrepresentation on an application would not be material to the bank's decision to extend a loan. 800 F. App'x at 41 (internal quotations omitted). In ruling that documents relating to false certifications of eligibility for an FHA insured mortgage loan was properly excluded where the defendant used false documents to secure a non-FHA mortgage loan, the court simply suggested, in dicta, that a victim's wrongdoing "may in some cases absolve a defendant of fraud liability," but then disallowed such evidence, adding a footnote citing to cases holding the opposite. Id. at 41 n.2. Although defendants try to distinguish Miller by arguing that the past wrongdoing in Miller was not directly relevant to the fraud as it is here (Defs.' Reply at 6), the past alleged wrongdoing of the victim Banks in response to conduct by other entities based on unknown circumstances is also not directly relevant to the fraudulent conduct charged

20

here.  As it is, because the statement in <u>Miller</u> is merely dicta and not the holding in the case, it does not directly support defendants' position.

Indeed, other cases have explicitly rejected the argument that the victim's negligence or culpability excuses the defendant from criminal fraud.  <u>See United States v. Allen</u>, 201 F.3d 163, 167 (2d Cir. 2000) (holding that "[t]he victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for her substantive offense"); <u>see also United States v. Lindsay</u>, 850 F.3d 1009, 1014 (2d Cir. 2017) (holding that "two wrongs do not make a right" and a lender's negligence or "even intentional disregard" cannot excuse another's criminal fraud).  Defendants do not cite, and the Court has not found, case law where a court actually holds that past enforcement proceedings against the alleged victims go to materiality under an objective standard.

While the victim Banks' state of mind is irrelevant to the objective determination of materiality, the government concedes that evidence of Huawei's state of mind could be relevant if the defendants were claiming that they believed their misrepresentations would be irrelevant to the Banks' decisions.  (Govt. Opp. at 8 n.6).  Moreover, to the extent that testimony from the victim Bank officials about factors to be considered when accepting or retaining clients or processing transactions might be relevant to provide context to the jury as to industry practices, the government reiterates it position that "extrinsic evidence of specific instances" where employees of the victim Banks failed to comply with stated Bank standards – particularly in dealings with entities wholly unrelated to Huawei or the transactions in this case – "does not bear upon the objective materiality of the defendants' false statements." (<u>Id.</u> at 9).

Indeed, it is not immediately clear why documents which do not involve Huawei but are related to past enforcement actions against the Banks based on their dealings with other entities,

would be relevant to the defense in this case.  With respect to ███████ the defendants already

have access to information regarding ████████ employees' knowledge of the bank's relationship to

Huawei, which they can utilize to elicit relevant testimony regarding the employees'

decisionmaking as to that relationship, and defendants possess summaries of ████████████ on

████████ 's relationship with Huawei.  Specifically, ████████████████████████████████



████████████████████ .[15]

---

[14] These bank "affiliates" appear to be subsidiaries of ████████ operating in certain countries, as ██████████ ████████████████████████████████████ as "affiliates." (Id. at 3 n.4).

[15] "Mismanagement" suggests negligence on the part of the Banks, and as the caselaw consistently holds, a victim's negligence is not a defense to criminal fraud. See, e.g., United States v. Allen, 201 F.3d at 167.



Thus, given that the bank seems to have incongruous policies even in dealing with a single entity, it appears unlikely that the factors ▮▮▮ considered in conducting business with customers other than Huawei would be indicative of its decisionmaking process with Huawei or would amount to an overarching *de facto* policy.

Moreover, given that the standard by which materiality is evaluated is an objective one, at best, ▮▮▮ only show that based on management structures within ▮▮▮, individual affiliates were at times able to operate without sufficient guidance or control, and without complete information about the risks posed by certain clients, resulting in a breach of the bank's compliance controls. Whether a decisionmaker decided to ignore certain risks or acted out of a deliberate desire to prioritize their own goals over compliance risks does not render these individual decisions a policy of the bank, nor does it demonstrate this particular bank's decisionmaking practices generally. To the extent defendants find this relevant to their defense, they already have access to this information regarding ▮▮▮'s practices from ▮▮▮ ▮▮▮.

Even if the information requested regarding ███'s relationships with entities other than Huawei was able to demonstrate ███'s "actual practices" in dealing with businesses involved with sanctioned conduct, for the reasons stated above, the case law does not support a finding that this would assist in determining materiality under an objective standard or would otherwise be material to the defense.

With respect to the other Banks, the government notes that it did not find information regarding Huawei in the files on the ██████████ against ██████████, and it appears to have searched for any information regarding Huawei in these past enforcement actions with all the victim Banks and found none. (Govt. Opp. at 3). In arguing that these Banks' decisionmaking practices with respect to other customers are relevant to determining the objective materiality of Huawei's alleged misrepresentations, defendants appear to be treating the victim Banks as monolithic entities that considered discernable, consistent factors across their different customers and indeed, even across the different Banks. However, as ████████ ██████████ demonstrate, these Banks may engage in various complex considerations in handling even a single customer's sanctions risk; indeed, the reports suggest that ████ managed the risk posed by a given multinational customer inconsistently. Thus, although defendants suggest that the broad range of documents sought here – including ██████████, complete investigative files, notes, and memoranda collected by the government and others – will contain information relating to the Banks' "unofficial" policies, defendants' requests as to these Banks appear to be based on little more than speculation that the factors related to customers other than Huawei would be factors employed by the Banks in their dealings with Huawei. Moreover, as the government notes, even if there were documents contained in these files reflecting unofficial

24

policies, given the age of some of the investigations, it is unclear how relevant the factors would be to the decisionmaker at the time of the Huawei transactions.

Defendants do not offer any other arguments for the necessity of these documents beyond their potential use in challenging the materiality of Huawei's failure to disclose its alleged involvement with sanctionable conduct, and given the case law that focuses on objective factors rather than the subjective thought processes of the defendant, there is nothing to demonstrate that these documents would in fact assist Huawei in its defense. Moreover, the Court credits the government's representation that it has searched for and produced all Brady material related to Huawei, and its stated concerns in turning over voluminous and highly sensitive documentation of the Banks' past enforcement proceedings related to other entities in a case where the government believes, among other things, that defendants conspired to obstruct the prosecution by obtaining confidential information. (Govt. Opp. at 9 n.7). Given these considerations, the Court finds that these requested documents are neither exculpatory nor "material" to the defense's preparation. Thus, they do not need to be produced under Brady or Rule 16.

However, the government indicates that it may introduce testimony from officials of the Banks as to the factors they employ in making their decisions to accept and retain clients and process transactions. (Govt. Opp. at 9). The government also suggests that it may, under United States v. Cuti, elicit responses to hypotheticals that would explore whether these witnesses would have considered the misrepresentations important. (Id. (citing 720 F.3d at 459)). To the extent the government intends to pursue this testimony, the defendants are entitled under Giglio to discovery that would tend to impeach this testimony of the witnesses, such as contrary statements from those witnesses.[16] The government shall produce the Giglio discovery to

---

[16] However, this does not entitle the defendants generally to extrinsic evidence related to the Banks' past enforcement proceedings that does not directly impeach these witnesses' testimony.

defendants "sufficiently in advance of trial for the defendant to make effective use of it at trial, or at such other time as the Court may order." (ECF No. 261 at 1). By the same token, to the extent the ███ interviews or any of the other "Bank Brady materials" provide potential Giglio or 3500 material for any witness the government intends to present at trial, those materials also need to be produced.

For the reasons stated above, the defendants' motion to compel the production of the "Bank Brady materials" is denied, except for Giglio or 3500 material.

III.    Motions to Seal

Defendants have moved for leave to file their motion, related exhibits, and Reply under seal in their cover letters to each brief. (See Defs.' Mot.; Defs.' Reply). The government also has moved for leave to file its opposition letter under seal. (Govt. Opp. at 2 n.1). Defendants assert that the basis for sealing is that the motion and exhibits contain information that may not be filed publicly under the terms of the Protective Order in this case. (See Defs.' Mot.; ECF No. 57).

Having reviewed the terms of the Protective Order as well as the briefings and exhibits, the Court finds that the briefings and exhibits contain material protected by the Protective Order and grants the motions to file under seal.

Finally, the Court will initially file this Order under seal for the parties' review and comment as to any necessary redactions before filing publicly.

CONCLUSION

For the reasons set forth above, defendants' motion to compel is denied, except to the extent they request Giglio or 3500 material. The motions to seal are granted and the parties' submissions shall remain under seal with redacted versions filed publicly on the docket. By

**August 15, 2025**, the parties shall submit any comments as to necessary redactions to this Order before it is filed publicly.

The Clerk of Court is respectfully directed to send a copy of this Memorandum and Order to the parties either by ECF or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
       August 13, 2025

/s/ Cheryl L. Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York
