NJM:AAS/RMP/MAA/MS/MJC
F. #2017R05903

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

HUAWEI TECHNOLOGIES CO., LTD., ET AL.,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

18-CR-457 (S-3) (AMD)

REPLY BRIEF IN FURTHER SUPPORT OF THE
GOVERNMENT'S PRELIMINARY MOTIONS *IN LIMINE*

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

MARGARET A. MOESER
Chief
Money Laundering, Narcotics
and Forfeiture Section
Criminal Division
U.S. Department of Justice

CHRISTIAN NAUVEL
Acting Chief
Counterintelligence and Export
Control Section
National Security Division
U.S. Department of Justice

ALEXANDER A. SOLOMON
MEREDITH A. ARFA
ROBERT M. POLLACK
MATTHEW SKURNIK
MATTHEW F. SULLIVAN
Assistant U.S. Attorneys
(Of Counsel)

TAYLOR G. STOUT
MORGAN J. COHEN
JASMIN SALEHI FASHAMI
Trial Attorneys

CHRISTOPHER FENTON
Trial Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 1

I. The Court Should Preclude Cross-Examination and Evidence Regarding the Victim Banks' Prior Enforcement Proceedings and Related Evidence ........................................... 1

II. The Court Should Admit the Statement of Facts Against Huawei Tech ............................ 7

    A. The Statement of Facts Is an Adoptive Admission by Huawei Tech ........................... 8

    B. The Statement of Facts Is Properly Imputed to Huawei Tech as an Admission by Huawei Tech's Agent ................................................................................................ 11

    C. Huawei Tech Waives Any "Confrontation" Right by Procuring Meng's Absence ... 13

    D. The Court Should Not Preclude the Statement of Facts Under Rule 403 .................. 15

CONCLUSION .................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Anonymous*,
   1 Strange 527 (1734) .................................................................................................... 11

*Old Chief v. United States*,
   519 U.S. 172 (1997) ...................................................................................................... 5

*Reynolds v. United States*,
   98 U.S. 145 (1878) ...................................................................................................... 14

*Sparf v. United States*,
   156 U.S. 51 (1895) ................................................................................................. 9, 10

*United States v. Abel*,
   469 U.S. 45 (1984) ........................................................................................................ 4

*United States v. Campbell*,
   426 F.2d 547 (2d Cir. 1970) ..................................................................................... 3, 4

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) ......................................................................................... 5

*United States v. James*,
   609 F.2d 36 (2d Cir. 1979) ....................................................................................... 3, 4

*United States v. Litvak*,
   889 F.3d 56 (2d Cir. 2018) ........................................................................................... 5

*United States v. Mastrangelo*,
   693 F.2d 269 (2d Cir. 1982) ....................................................................................... 14

*United States v. Mayes*,
   512 F.2d 637 (6th Cir. 1975) ................................................................................ 14, 15

*United States v. Miller*,
   800 F. App'x 39 (2d Cir. 2020) .................................................................................... 7

*United States v. Southland Corp.*,
   760 F.2d 1366 (2d Cir. 1985) ..................................................................................... 13

*United States v. Sullivan*,
   118 F.4th 170 (2d Cir. 2024) ...................................................................................... 13

*Yabsley v. Doble*,
   1 Ld. Raym. 190 (1697) ............................................................................................. 11

**Other Authorities**

Isaac Espinasse, A Digest of the Law of Actions and Trials at Nisi Prius (1794) ............... 8

Thomas Peake, A Compendium of the Law of Evidence (1804) ......................................... 9, 11

## PRELIMINARY STATEMENT

The government respectfully submits this reply brief in further support of its preliminary motions *in limine* (ECF Nos. 589, 590 (the "Brief")) seeking: (1) to preclude the Corporate Defendants[1] from cross-examining Victim-Bank witnesses and introducing evidence about the Victim Banks' Prior Enforcement Proceedings and purported related compliance failures; and (2) to admit Wanzhou Meng's Statement of Facts against Huawei Tech.[2]  For the reasons below and in the Brief, the Court should reject the Corporate Defendants' arguments (*see* ECF No. 615 ("Def. Br.")), and grant these motions.

## ARGUMENT

I. The Court Should Preclude Cross-Examination and Evidence Regarding the Victim Banks' Prior Enforcement Proceedings and Related Evidence

The Corporate Defendants assert three arguments in opposition to the government's motion to preclude evidence and questioning about Prior Enforcement Proceedings involving the Victim Banks.  These arguments each fail.

*First*, the Corporate Defendants contend that to impeach the testimony of witnesses from the Victim Banks, they must present to the jury evidence related to the Prior Enforcement Proceedings.  (Def. Br. 11.)  The thrust of their argument is that the Victim-Bank witnesses are no different than a cooperating witness who has agreed, pursuant to a plea agreement, to testify for the government in exchange for cooperation credit.  (*Id.* at 11-13.)  According to the Corporate Defendants, like cooperating witnesses, the Victim Banks avoided "criminal, regulatory, and financial jeopardy" because they "point[ed] the finger at Huawei," and the Corporate Defendants

---

[1]  Capitalized terms not otherwise defined herein have the meanings ascribed in the Brief.

[2]  The government seeks authorization to file this brief under seal, with a redacted version filed publicly, for the reasons set forth in the Brief.

1

thus must be permitted to "raise the Bank Prosecution evidence to the jury" to demonstrate the banks' purported "bias." (*Id.* at 11, 13.)

This argument is wholly unfounded. Unlike cooperating witnesses, who typically enter into formal agreements with the government requiring them to plead guilty to crimes and provide testimony in the hopes of leniency at a future sentencing, the Victim Banks are under no such obligation to provide testimony in this case. Indeed, though the Victim Banks may have previously agreed with the government to resolve certain unrelated investigations, those agreements have all expired, the banks have not pleaded guilty to any crimes related to the conduct charged here, and the banks are not required by any agreement to testify at this trial. The Corporate Defendants simply surmise that some secret understanding continues to exist between the banks and the government—they speculate that if the Victim Banks agree to falsely implicate the Corporate Defendants, then they will avoid unspecified "criminal, regulatory, and financial jeopardy." The government has not entered into any such secret agreements or understandings.

Against this backdrop, the Corporate Defendants' argument amounts to a transparent effort to shame their victims and dissuade them from testifying at trial by threatening to introduce evidence of their unrelated prior bad acts. However, as Judge Pollak held—and this Court affirmed—the Victim Banks' prior compliance failures and other related misconduct are irrelevant to the bank and wire fraud charges in this case. (*See* ECF Nos. 558, 559 (the "Order") at 20-21 ("[T]he past alleged wrongdoing of the victim Banks in response to conduct by other entities based on unknown circumstances is also not directly relevant to the fraudulent conduct charged here.").)

Attempting to skirt Judge Pollak's ruling, the Corporate Defendants refer to certain U.S.-dollar transactions between Skycom and ███████████████████

2



(Def. Br. 7-8, 11-12.) These transactions, however, were not related to the conduct underlying ▮▮▮▮, and, as the government will prove at trial, the Corporate Defendants took numerous steps to hide the true nature of those transactions from ▮▮.[3] The Corporate Defendants are thus wrong that, because certain of the ▮▮

As the authorities cited by the Corporate Defendants confirm (*see id.* at 11), "[a]ctions evidencing the intention of the government to trade leniency for cooperation are . . . irrelevant unless it can be established that the witness knew of these actions." *United States v. Campbell*, 426 F.2d 547, 549-50 (2d Cir. 1970); *see also United States v. James*, 609 F.2d 36, 45-46 (2d Cir. 1979) (defendant's knowledge of government's case against him is relevant to his motivation to testify). Further, the admissibility of extrinsic evidence for impeachment purposes depends on whether it is "sufficiently probative of [the witness's asserted bias] to warrant its

---

[3] Indeed, as the government will show at trial, Huawei and ▮▮▮▮ colluded to remove any references to "Iran" from contracts, invoices, and other documents because of sanctions-related issues.

3

admission into evidence." *United States v. Abel*, 469 U.S. 45, 49 (1984). Thus, where a witness lacks personal knowledge of the basis of his purported bias, cross-examination regarding, and extrinsic evidence of, the purported bias are, by definition, not probative and should be prohibited. *See Campbell*, 426 F.2d at 549-50; *James*, 609 F.2d at 45-46.

Accordingly, the Court should preclude cross-examination and extrinsic impeachment evidence about the prior enforcement proceeding against ▌ if the ▌ witness lacks personal knowledge of either (1) the ▌ Transactions; or (2) the purported arrangement under which the witnesses could avoid "displeasing DOJ" by "pointing the finger at Huawei" while the ▌. (Def. Br. 11, 14.) The Court similarly should preclude cross-examination and extrinsic impeachment evidence about the Prior Enforcement Proceedings with respect to witnesses from other Victim Banks who were not aware of the supposed quid-pro-quo arrangements whereby "pointing the finger at Huawei" would "save[] them from . . . adverse consequences." (*Id.* at 11.) The Corporate Defendants may seek to impeach the credibility of the Victim-Bank witnesses, but that does not afford them free rein to introduce prejudicial and irrelevant information regarding the Prior Enforcement Proceedings.

For example, based on his prior interviews, the government anticipates that ▌ ▌ on whose anticipated testimony the Corporate Defendants focus (*id.* at 12)—will testify at trial that he had no knowledge of either the ▌ Transactions or any supposed agreement between ▌ and the government to "trade leniency for cooperation," *Campbell*, 426 F.2d 549.[4] If ▌ in fact provides such testimony, there

---

4 ▌

would be no basis for cross-examination or extrinsic impeachment evidence on those subjects, and any such inquiry and evidence would be both irrelevant and unduly prejudicial.

*Second*, the Corporate Defendants attempt, yet again, to relitigate the Court's findings regarding the irrelevance of the Prior Enforcement Proceedings to the materiality element of the bank and wire fraud charges. They contend that if the "government attempts to bolster its materiality case at trial by arguing that the Banks actually did rely" on the Corporate Defendants' misrepresentations, then they "must be permitted to present evidence rebutting that theory," which they characterize as "evidence demonstrating that [*sic*] Banks' repeated willingness to enter into very similar transactions on behalf of other lucrative customers." (*Id.* at 15.) Such evidence is both irrelevant to the charged crimes and highly prejudicial. Unlike a civil fraud case, the government is not required here to prove actual reliance on the defendants' misrepresentations. *See United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013) ("[A] misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do."); *United States v. Litvak*, 889 F.3d 56, 66 (2d Cir. 2018) ("A finding of materiality, therefore, requires a showing only of importance, not 'actual reliance.'" (citation omitted)).

To be sure, some of the Victim Bank witnesses may testify that they in fact relied on the Corporate Defendants' false statements. It is well established that the "prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." *Old Chief v. United States*, 519 U.S. 172, 188 (1997). But doing so does not open the door for the Corporate Defendants to introduce highly inflammatory evidence of the Prior Enforcement Proceedings to embarrass and blame their victims. The Corporate Defendants are free to attempt to impeach the credibility of

5

the bank witnesses, including with respect to any actual reliance. But they may not properly do so through evidence that, years ago, the witnesses' employers entered into resolutions with the government based on different conduct having nothing to do with the Corporate Defendants. As discussed below, even if there were some probative value to such evidence—and there is not—it is properly excluded under Federal Rule of Evidence 403.

As Judge Pollak held, the notion that the "factors related to customers other than Huawei would be factors employed by the Banks in their dealings with Huawei" is "little more than speculation." (Order 24.) The Victim Banks are not "monolithic entities that considered discernable, consistent factors across their different customers." (*Id.*) Thus, contrary to the Corporate Defendants' assertions, evidence that the Victim Banks entered into "very similar transactions on behalf of other lucrative customers" (Def. Br. 15) is wholly irrelevant to the materiality element of the bank and wire fraud charges in this case, and should be precluded.

*Third*, the Corporate Defendants contend that the evidence regarding the Prior Enforcement Proceedings is not excludable under Rule 403. According to the Corporate Defendants, such evidence "legitimately casts doubt on the veracity or bias" of the Victim-Bank witnesses. (*Id.* at 17.) But even in the Corporate Defendants' telling, the purported bias of the Victim-Bank witnesses arose from their desire to avoid adverse consequences during the pendency of the Victim Banks' deferred prosecution agreements and monitorships, *not* from the actual facts underlying the Prior Enforcement Proceedings. There is no logical connection between, for example, ▇▇▇ facilitation of U.S.-dollar transactions for entities in ▇▇▇▇▇▇▇ ▇▇▇ prior to the offense conduct in this case and the "veracity or bias" of the Victim-Bank witnesses. The only apparent purpose for introducing such evidence would be to mislead the jury about which entity's conduct is at issue—precisely the type of risk that Rule 403 is designed to

6

prevent.

The Second Circuit's decision in *United States v. Miller* is directly on point. 800 F. App'x 39 (2d Cir. 2020). There, the Circuit affirmed the district court's refusal to admit, in a mortgage fraud prosecution in which Wells Fargo was the victim, evidence that Wells Fargo had entered a settlement agreement with the DOJ in connection with civil mortgage fraud claims arising from its lax underwriting standards. *Id.* at 41. The district court excluded such evidence because (1) the defense did not proffer a connection between Wells Fargo's misconduct and the defendant's own mortgage application; and (2) the "relevance of any connection, if it existed, was substantially outweighed by the risk of unfair prejudice associated with introducing the documents, particularly given the scale of the misconduct to which Wells Fargo admitted." *Id.* Similarly, here, the connection between the Victim-Banks' prior compliance failures and the transactions at issue in this case is absent. (Order 24.) In addition, cross-examination or evidence regarding the Prior Enforcement Proceedings will expose the jury to the fact that the Victim Banks previously facilitated billions of dollars of U.S. dollar-denominated transactions for entities associated with sanctioned countries, which threatens to unfairly prejudice the jury's perception of the Victim Banks and Victim-Bank witnesses. The Corporate Defendants' effort to distinguish *Miller* by summarily asserting that unspecified "Bank Prosecution evidence" is "similar in nature to the trial allegations" and "has a direct connection to the credibility of the government's proffered evidence" (Def. Br. 17 n.23) is unavailing. The first claim is irrelevant; the second is, for the reasons already stated, incorrect.

II.     The Court Should Admit the Statement of Facts Against Huawei Tech

The Corporate Defendants argue that the admission of Meng's Statement of Facts at trial would violate the Confrontation Clause, principally because both adoption by silence and the imputation to principals of agent admissions (other than statements made as an act of agency)

7

were supposedly unknown to the common law during the Founding Era.  The Corporate Defendants also argue that it is not ordinary practice for defendants to disavow the plea or deferred prosecution agreement allocutions of their co-defendants, that Huawei Tech and Meng had conflicting litigation positions at the time she entered the deferred prosecution agreement, and that the Statement of Facts should be excluded pursuant to Rule 403.  All of these arguments miss the mark.  And they obscure a more fundamental point: Huawei Tech at trial will have every ability to confront Meng about her statements if it chooses.  Indeed, Meng remains to this day not only an agent of Huawei Tech but one of its primary principals, whom Huawei Tech can make available at trial to cross-examine or even call to testify in a defense case if it wishes.  Under well-established Confrontation Clause jurisprudence, Huawei Tech is not permitted to manufacture a Confrontation Clause violation by purposefully making Meng unavailable for trial.

    A.    <u>The Statement of Facts Is an Adoptive Admission by Huawei Tech</u>

Huawei Tech's contention that the legal principle of adoption by silence was unknown during the Founding Era and first appeared in a 19th-century decision by the Kentucky Supreme Court (*see* Def. Br. 33) is simply mistaken.  As early as 1794, the principle was described in a legal treatise as a common practice in the trial courts of England: while recognizing the general rule that "hearsay be not allowed as direct evidence," the treatise author observed that "what a party has himself been heard to say respecting the matter in dispute, is good evidence against himself," and similarly, "so are conversations which have passed in the hearing of the party respecting the matters in difference, and which were uncontradicted or admitted by him, good evidence; as is the constant practice at *Nisi Prius*."[5]  Isaac Espinasse, A DIGEST OF THE LAW OF ACTIONS AND TRIALS AT NISI PRIUS 784 (1794).  Another treatise, from 1804, likewise explained

---

[5] "*Nisi Prius*" refers to a type of English trial court.

8

that, "[w]hat a party has himself been heard to say, does not fall within the objection as to hearsay evidence. Any thing, therefore, which he admits . . . or which another asserts in his presence, and he does not contradict, is received as evidence against him . . . ." Thomas Peake, A COMPENDIUM OF THE LAW OF EVIDENCE 16 (1804).

Although these treatises describe the principle of adoption by silence in the context of Founding Era civil litigation, the Supreme Court subsequently applied the same principle in the criminal context in *Sparf v. United States*, 156 U.S. 51, 56 (1895) ("The declarations of Hansen after the killing, as detailed by Green and Larsen, were also admissible in evidence against Sparf, because they appear to have been made in his presence, and under such circumstances as would warrant the inference that he would naturally have contradicted them if he did not assent to their truth."). That remains good law. The principle that a defendant may adopt another person's statement by non-contradiction in circumstances that would warrant contradiction thus is well established—it was well known at common law at the time of the Founding and was later endorsed in a criminal case by the Supreme Court—and does not violate the Confrontation Clause.

That is precisely what happened here: Huawei Tech adopted the statements of its agent and principal by not refuting them, and indeed by giving Meng an extraordinary "hero's welcome" upon her return to China,[6] in circumstances that would warrant contradiction of the statements if Huawei Tech "did not assent to their truth." *Sparf*, 156 U.S. at 56. Huawei Tech's assertion that criminal defendants in most cases do not expressly disavow the plea allocutions of their co-defendants is beside the point. In most multi-defendant cases, the guilt or innocence of one defendant has no legal bearing on the guilt or innocence of any other, and one defendant might

---

[6] *See, e.g.*, "*South China Morning Post*, "Hero's Welcome for Meng Wanzhou at Huawei Offices in China After Extradition Battle and Quarantine," YouTube (Oct. 27, 2021), https://www.youtube.com/watch?v=4bYlTKfb2Rs (last accessed Feb. 17, 2025).

9

be indifferent to (or welcome) the guilty plea of another and have no motive to disavow the other's allocution. Here, by contrast, Meng was (and remains) not only an agent, but one of the primary principals of Huawei Tech—its CFO, deputy chairwoman, and rotating chairwoman, who spends six months of every two years as "the foremost leader of the company," and the rest of the time as one of three deputies to the foremost leader.[7] Meng was charged with crimes she committed on Huawei Tech's behalf as a high-level corporate executive, and the Statement of Facts pertains to that conduct, which is naturally imputable to Huawei Tech. If Huawei Tech did not wish for the *public*—never mind the law—to impute Meng's admissions about her own conduct to the corporation she served, it "would naturally have contradicted them." *Id.* Instead, Huawei Tech released an anodyne statement that it would continue to defend itself in court while welcoming the resolution of Meng's case, and extravagantly fêted Meng upon her return. Even now, Huawei Tech appears not to dispute the facts that Meng admitted, and cannot do so without accusing one of its principal leaders, still at the helm of the company, of committing perjury.[8] Accordingly, Huawei Tech's enthusiastic welcoming of Meng after her admission of conduct undertaken on

---

[7] According to Huawei Tech's public webpage, Huawei's Board of Directors and Executive Committee are led by four people, including Meng, who rotate as chair and deputy chair, each of whom is "the foremost leader of the company" while serving as chair. *See* https://www.huawei.com/en/executives. Each term as chair lasts for six months. *See* https://www.huawei.com/en/corporate-governance#board-of-directors.

[8] Notably, Meng agreed in her deferred prosecution agreement that neither she *nor her lawyers* would make any statements that contradict any of the facts in the Statement of Facts, and that any such statement would constitute a breach of the agreement. As noted in the Brief, one of the law firms that represented Meng and signed her deferred prosecution agreement, Steptoe LLP, also represents Huawei Tech in the instant case, further indicating their alignment with respect to the accuracy of the Statement of Facts. Irrespective of whether Steptoe erected a "wall" preventing the sharing of information between the teams representing Meng and Huawei Tech, as the Corporate Defendants assert (Def. Br. 31 n.25), it simply cannot be that Steptoe attorneys can now contradict the Statement of Facts.

10

Huawei Tech's behalf, along with its deliberate choice not to contradict the Statement of Facts, constitutes an adoptive admission.

   B.  The Statement of Facts Is Properly Imputed to Huawei Tech as an Admission by <u>Huawei Tech's Agent</u>

   Similarly, the Corporate Defendants significantly oversimplify the state of the law during the Founding Era by asserting that the common law never allowed agent admissions to be used as evidence against a principal unless they were statements made as part of the agent's responsibilities. In fact, a treatise writer in 1804 described then-existing controversy on this point and cited several significantly older cases standing for the contrary principle, at least for some instances of agency. *See* Peake, at 17-18 (citing *Yabsley v. Doble*, 1 Ld. Raym. 190 (1697), in which the confession of an under-sheriff in an action for escape was adjudged admissible against the sheriff because "the under-sheriff gives him a bond to save him harmless" and his confession was therefore "good evidence" against the sheriff "because in effect it charges himself," and *Anonymous*, 1 Strange 527 (1734), in which a wife's declaration that she agreed to pay a wet nurse four shillings per week was admissible against her husband in an action for payment).

   The treatise author observed that although "the admissions of the *wife* and *under-sheriff* were received in evidence, it may still be doubted how far those of a mere *servant* or *agent* can be received against his master or principal." *Id.* at 18. He then described a case in which the letter of a ship captain was admitted against the ship's owner, and "in a subsequent case *Lord Kenyon*, alluding to this decision, expressed a doubt whether the evidence was properly admitted, and that learned judge is said to have frequently held at nisi prius that the agent must himself be called as a witness," except where the statement at issue was made at the time of the act of agency. *Id.* In other words, at common law during the Founding Era, there was controversy over whether after-the-fact statements by "mere" servants or agents were properly admissible against their

11

principals, but at least in some instances of particularly close agency—as in the case of an under-sheriff acting on behalf of the sheriff or a wife on behalf of her husband—such statements *were* imputed to the principal.

So too here: Meng was and is no "mere" employee, but rather, as noted above, the primary principal of Huawei Tech, whose relationship to Huawei Tech is one of special closeness more akin to the wife whose admission is imputed to her husband and the under-sheriff whose admission is imputed to the sheriff than to a hired hand, whose statements are only imputed to his employer if they are made during the course of his responsibilities as agent. This closeness both explains and demonstrates the alignment of Meng's and Huawei Tech's interest in resolving her case by deferred prosecution agreement. And Huawei Tech's contrary assertion that it and Meng had conflicting litigating positions does not make it so. Indeed, even in the Corporate Defendants' own telling, Huawei Tech had a literal seat at the table negotiating Meng's deferred prosecution agreement (Def. Br. 22-23), at which "[i]ts litigating interest was to avoid damage to its ability to" maintain its innocence (*id.* at 30), and Meng's was to resolve her case "without a criminal conviction" and "refus[ing] to admit any intentional wrongdoing" (*id.* at 30-31). That is, they had the same interest—an interest in avoiding consequences for Meng's criminal conduct. And when the government initially requested a *Crawford* waiver from Huawei Tech in connection with an earlier version of the Statement of Facts (to avoid litigating admissibility, not as any legal concession), *both* Huawei Tech's counsel *and* Meng's counsel took the unified position—to which the government later assented—that no resolution for Meng should be conditioned on any concession by Huawei Tech. (*Id.* at 22.) Ultimately, resolving Meng's case depended on terms being mutually agreeable to Meng and Huawei Tech, because she was admitting to conduct

12

performed as Huawei Tech's agent and principal, which she would continue to be. Their interests were aligned, and Meng's admissions are properly imputed to Huawei Tech as its own admissions.

### C. Huawei Tech Waives Any "Confrontation" Right by Procuring Meng's Absence

The above constitute sufficient bases for the Court to rule that the Statement of Facts is non-hearsay and admissible against Huawei Tech. But the Corporate Defendants' arguments about supposedly conflicting litigating positions and norms respecting guilty plea allocutions obscure a more fundamental fact: in the eyes of the law, Meng is Huawei Tech, and her statements are those of the corporation. "A corporation can only act through its directors and officers." *United States v. Sullivan*, 118 F.4th 170, 219 (2d Cir. 2024) (citation omitted). During Meng's commission of the conduct described in the Statement of Facts and during the negotiation of her deferred prosecution agreement, Meng was, and remains to this day, one of the principal leaders of Huawei Tech. Thus, an objection to the admission of Meng's statements based on the Confrontation Clause "seems hardly appropriate when voiced by [Huawei Tech], since the witness it wishes to confront is, in the eyes of the law, itself." *United States v. Southland Corp.*, 760 F.2d 1366, 1377 (2d Cir. 1985).

Indeed, to the extent that Huawei Tech purports to wish to "confront" Meng by cross-examination on the facts in the Statement of Facts—or even, if it chooses, to contextualize the Statement of Facts by calling her to testify in the defense case—Huawei Tech is uniquely empowered to procure Meng's testimony to do so.[9] If Huawei Tech elects not to do so, it should

---

[9] To that end, contemporaneously with the filing of this brief, the government is serving on Huawei Tech's and Meng's counsel a trial subpoena for Meng's testimony. The government will issue a safe passage letter for Meng upon request by defense counsel, as it has already done upon counsel's request for dozens of other Huawei personnel located in the PRC, and anticipates continuing to do during trial preparation and trial. To the extent Meng is located in the PRC, the government acknowledges that she is beyond the reach of compulsory process and the government cannot procure her testimony. But Huawei Tech can.

13

not be heard to complain that it is deprived of an opportunity to cross-examine her, and any right under the Confrontation Clause has been waived.

It is well established that a defendant who procures the absence of a witness waives any confrontation right that might otherwise foreclose admission of that witness's prior statements. "Any other result would mock the very system of justice the confrontation clause was designed to protect." *United States v. Mastrangelo*, 693 F.2d 269, 272-73 (2d Cir. 1982). The Supreme Court has traced the recognition of this intuitive principle to "as long ago as the year 1666." *Reynolds v. United States*, 98 U.S. 145, 158 (1878). And although such waiver usually arises in cases of violence and intimidation or even the murder of witnesses, no such extreme conduct is required by law. In *Reynolds*, for instance, the defendant was charged with bigamy when the deputy marshal went to his home to serve a trial subpoena on his second wife. The defendant told the deputy marshal that she was not there, declined to say where she could be found, invited the marshal to obtain a search warrant, and assured the marshal that "she would not appear in this case." *Id.* at 148-49. Her testimony from another trial was thus offered in her absence, and the Supreme Court ruled that although the Confrontation Clause "grants [the defendant] the privilege of being confronted with the witnesses against him[,] . . . if he voluntarily keeps the witnesses away, he cannot insist on his privilege," and "he is in no condition to assert that his constitutional rights have been violated." *Id.* at 158.

By similar reasoning, the Sixth Circuit rejected a Confrontation Clause challenge in *United States v. Mayes*, 512 F.2d 637 (6th Cir. 1975), when a defense lawyer represented the defendant and his brothers, who were witnesses, and counseled the defendant's brothers to invoke the Fifth Amendment privilege. The Sixth Circuit ruled that counsel's "unseemly conduct . . . in purporting to 'wear two hats'" was successful "in protecting his client, the defendant, from the

14

impact of the potential testimony of his client, the witness." *Id.* at 650-51. As a result, the court held, the defendant "cannot now be heard to complain that he was denied the right of cross-examination and confrontation when he himself was the instrument of the denial."

The same principle applies here. Even now, Meng works for Huawei Tech and is one of its chief decisionmakers. Huawei Tech has the ability to facilitate her appearance to testify in the government's case in response to the trial subpoena, and then to cross-examine her; or it can call her in a defense case; or it can choose to do neither. If it chooses to do neither, Huawei Tech cannot be heard to complain that it is denied the right of cross-examination because it is itself "the instrument of the denial." *Id.* at 651.

### D. The Court Should Not Preclude the Statement of Facts Under Rule 403

The Corporate Defendants' argument that the Court should preclude the Statement of Facts under Rule 403 is wholly unavailing. The Statement of Facts speaks for itself and is undeniably probative, without posing undue prejudice. Admission of the Statement of Facts does not pose any materially greater risks than admissions of any other statements by Huawei representatives. And indeed, in this instance, as set forth above, Huawei Tech is readily able to make Meng available to provide context for the statements, if it wishes to do so. Contrary to the Corporate Defendants' suggestion, testimony by prosecutors and defense attorneys not only is unnecessary, but is irrelevant and should be precluded.

### CONCLUSION

For the foregoing reasons, and for those stated in the Brief, the government respectfully requests that the Court grant the government's preliminary motions *in limine*.

15

Dated:     Brooklyn, New York
            February 20, 2026

                              JOSEPH NOCELLA, JR.
                              United States Attorney
                              Eastern District of New York

By:   /s/
       Alexander A. Solomon
       Meredith A. Arfa
       Robert M. Pollack
       Matthew Skurnik
       Matthew F. Sullivan
       Assistant United States Attorneys
       (718) 254-7000


MARGARET A. MOESER
Chief, Money Laundering, Narcotics and
Forfeiture Section,
Criminal Division,
U.S. Department of Justice

Taylor G. Stout
Morgan Cohen
Jasmin Salehi Fashami
Trial Attorneys


CHRISTIAN NAUVEL
Acting Chief, Counterintelligence and
Export Control Section,
National Security Division,
U.S. Department of Justice

Christopher Fenton
Trial Attorney

16