UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

       :   ~~SEALED / SDM~~

**UNITED STATES OF AMERICA**,     :

       :   **MEMORANDUM DECISION AND**

     – against –      :   **ORDER**

       :

**HUAWEI TECHNOLOGIES CO., LTD.**, *et al.*,    18-CR-457 (AMD) (JAM)

       :

       Defendants.    :

----------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:[1]

      Before the Court is the defendants'[2] motion to suppress four laptops seized from Huawei employees, a recording of a telephone call between two Huawei employees, and a recording of a conversation with a Huawei executive. (ECF Nos. 541, 542.)[3,4] The Court has reviewed the entire record, including classified materials, and, as explained below and in the Court's *Ex Parte* Classified Supplemental Memorandum Decision and Order, denies the defendants' motion in its entirety.

---

[1] The Court orders that this decision be designated Sensitive Discovery Material ("SDM") pursuant to the protective order in this case (ECF No. 57), and docketed under seal. The Court further orders that the parties treat this decision with the protective procedures for Sensitive Discovery Material detailed in the protective order. (*See id.* ¶¶ 11–15.)

   The parties are directed to propose redactions for a version of this order to be filed on the public docket.

[2] The moving defendants are Huawei Technologies Co, Ltd. ("Huawei Tech"), Huawei Device Co., Ltd. ("Huawei Device"), Huawei Device USA, Inc. ("Huawei Device USA"), and Futurewei Technologies, Inc. ("Futurewei") (collectively, "Huawei"). Unless otherwise specified, the term "defendants" refers to these four entities.

[3] This decision cites the unredacted sealed or HSD versions of the parties' submissions. Because HSD filings do not have ECF headers with page numbers, citations to the record refer to the page number of the document, not the ECF page number.

[4] The defendants filed a sealed unredacted version of their motion and the attached exhibit on June 24, 2025 (ECF Nos. 541, 541-1), and a public redacted version on June 25, 2025 (ECF Nos. 542, 542-1). The Court grants all of the requests to seal the parties' submissions related to this motion *nunc pro tunc*.

## BACKGROUND[5]

The defendants move to suppress four laptops seized from Huawei employees in 2013 and 2018, a recording of a telephone call between two Huawei employees, and a recording of a conversation with a Huawei executive.  (ECF Nos. 541, 542; ECF No. 562 at 1.)

As an initial matter, the government has represented that it does not intend to rely in its case-in-chief upon any contents of the laptop seized in June 2018 or the recorded conversation with a Huawei executive, and argues that "the Court need not reach" the underlying legal questions about these searches because the motion to suppress this evidence should be denied as moot.  (ECF No. 562 at 1, 10–11.)  In light of this representation, the Court denies the suppression motion as moot as to this evidence and evidence derived from these sources.  *See United States v. Rivera*, 89 F. Supp. 3d 376, 396 (E.D.N.Y. 2015).[6]

The Court addresses the lawfulness of the January 2013 search of a laptop (the "January 2013 Laptop") and the recorded telephone call between two Huawei employees in the Court's *Ex Parte* Classified Supplemental Memorandum Decision and Order.  The searches of the remaining devices are discussed below.

## I.    Factual Background

The devices at issue are: (1) a Dell Latitude laptop assigned to and seized from a Huawei employee on February 12, 2018 (the "February 2018 Laptop") and (2) a Dell Latitude laptop assigned to and seized from a Huawei employee on April 27, 2018 (the "April 2018 Laptop").

---

[5] The facts are drawn from the parties' submissions, including exhibits.

[6] This evidence and evidence derived from it may be admissible for impeachment purposes.  *See Rivera*, 89 F. Supp. 3d at 396 n.17 (citing *Parsad v. Greiner*, 337 F.3d 175, 184 (2d Cir. 2003)).  The defendants reserve their rights to object to this evidence should the government seek to use it.  (ECF No. 573 at 10 n.5.)

(ECF No. 541 at 2–3; ECF No. 562 at 2–3; ECF No. 541-1 ¶¶ 4–7.)  Huawei owned the devices. (ECF No. 541 at 3; ECF No. 541-1 ¶¶ 4–7.)

      a.      **The Huawei Investigation[7]**

United States authorities investigated Huawei for years before a grand jury returned the first indictment in 2018.  For example, on January 9, 2013, a Huawei employee arrived at San Francisco International Airport ("SFO") on a flight originating from Seattle, Washington.  (ECF No. 625-3 ¶ 8.)  Agents searched his baggage and seized various electronic devices, including the January 2013 Laptop and a Toshiba hard drive.  (*Id.* ¶¶ 8–9.)  Agents "imaged" and returned the devices.  (*Id.* ¶¶ 10–12.)[8]  An agent processing data acquired during the search discovered child pornography on the image of the Toshiba hard drive.  (*Id.* ¶ 13.)  According to an April 16, 2013 Federal Bureau of Investigation ("FBI") memorandum about the January 2013 Laptop, "[a]mong the documents of interest [the Huawei 'Senior Engineer' had] were 133 files containing information on Huawei projects with the two Internet service providers in Iran, Iran MobinNet and MTN Irancell."  (ECF No. 609-1 at 1–2.)

On April 5, 2016, the U.S. Treasury Department's Bureau of Industry and Security ("BIS") issued an administrative subpoena for information about Huawei's U.S. subsidiaries' exports.  (ECF No. 573, Ex. D. at 2.)  On August 16, 2016, Huawei, through counsel, responded to the subpoena and provided the government with documents "related to the sale of equipment"

---

[7] The facts in this overview come from the parties' submissions, including the U.S. government investigation reports and documents that the defendants submitted in connection with their suppression motion.  (*See* ECF No. 573, Exs. D–H; ECF Nos. 625-1–625-3.)  This is not a comprehensive summary of the government's investigation.

[8] "Imaging refers to the act of 'creat[ing] a digital copy of the hard drive that is identical to the original in every relevant respect.'" *United States v. Kamaldoss*, No. 19-CR-543, 2022 WL 1200776, at *5 n.5 (E.D.N.Y. Apr. 22, 2022) (quoting Office of Legal Education, Executive Office for United States Attorneys, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 78, https://www.justice.gov/file/442111/download (last accessed Apr. 22, 2021)).

— "which contained United States goods" — "to Iran telecommunications companies," including MTN Irancell. (*Id.* at 3.) At some point, Huawei "voluntary[ily] self-disclosed" to the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") "violations related to the sale of goods and services to MTN Irancell" and another company. (*Id.*)

On December 23, 2016, OFAC issued an administrative subpoena to Huawei, seeking information about potential illegal exports to Cuba, Sudan, Syria, and Iran. (*See* ECF No. 573, Ex. E.) By March 2017, the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") was "conducting a joint investigation with the [FBI] and the [BIS] targeting [Huawei] . . . for possible violations of United States export laws." (ECF No. 573, Ex. D at 1.) The government suspected that Huawei had "exported telecommunication equipment to Iran or other countries that are subject to economic sanctions pursuant to regulations of [OFAC]." (*Id.*) The government also received information that Huawei was "using front companies to purchase the United States goods and to conceal that the goods were destined to be diverted to prohibited end users" (*id.*), and that Huawei had transacted with "Iran customers," including "MTN Irancell" (*id.* at 3).

On April 11, 2017, a grand jury in the District of Columbia issued a subpoena to Huawei for documents and communications related to "the export of any goods, services, and/or technology from the United States, or with an ultimate end destination, provided directly or indirectly by or on behalf of Huawei and/or Huawei/USA, in . . . Iran, Syria, Cuba, North Korea, and/or the Sudan," and related to "any business travel to Iran, Syria, Cuba, North Korea, and/or the Sudan." (ECF No. 573, Ex. G ¶¶ 1–3, 8.) The subpoena also requested a detailed description of Huawei's exports "to MTN Irancell" and other Iranian companies since 2007. (*Id.* ¶ 1(c).) In

4

addition, throughout 2017, the DOJ received information from an international bank about Huawei's potential sanctions violations. (*See* ECF No. 573, Ex. F.)

**b.      The February 2018 Laptop Search**

On February 12, 2018, at approximately 9:00 a.m., the same Huawei employee entered the United States at Dallas-Fort Worth International Airport ("DFW") from Cairo, Egypt. (ECF No. 562 at 2.) At about 10:00 a.m., a U.S. Customs and Border Protection ("CBP") agent, with the assistance of HSI, conducted a secondary inspection of the employee. (*Id.* at 2–3.) The employee told them that he had four electronic devices, one of which was the February 2018 Laptop. (*Id*. at 3.) Agents reviewed the employee's prior visa applications, and found that he had declared travel to Italy, Thailand, and the Philippines. (ECF No. 625-2 at 3.) They told him that travelers sometimes went to the Philippines and Thailand to have unlawful sexual encounters with children, and that law enforcement often found evidence of those crimes on travelers' electronic devices. (*Id.*) The agents asked the employee for consent to search his devices for child pornography and other violations, and the employee gave verbal and written consent. (*Id.*)[9] The employee gave the agents the passwords for the devices and signed a consent form, witnessed and signed by two agents, that included the following statements: (1) agents informed him of his "right to refuse to consent to a search of [his] property;" (2) he "voluntarily and intentionally consent[ed] to allow ICE to search [his] property," including a "Dell Laptop," an "iPhone," a "Huawei Phone," and a "Samsung Pad," and acknowledged that "anything discovered during this search may be used against me in any criminal, civil, or

---

[9] A March 7, 2018 version of the HSI Report of Investigation for this search said that agents "requested consent to conduct a search of the electronic devices of [the employee] for child pornography, and [the employee] provided verbal and written consent." (ECF No. 625-1 at 3.) A March 12, 2018 version says that agents "requested consent to conduct a search of the electronic devices of [the employee] for child pornography and other violations, and [the employee] provided verbal and written consent." (ECF No. 625-2 at 3.)

administrative proceedings;" and (3) his "consent [was] freely given and not the result of any promises, threats, coercion, or other intimidation," and he "**read the above statement and understand[s] [his] rights.**" (ECF No. 562 at 3; ECF No. 562, Ex. A (emphasis in original).) The agents imaged the devices and returned them to the employee. (ECF No. 562 at 3.)

### c. The April 2018 Laptop Search

On April 27, 2018, the same Huawei employee arrived at DFW for an international flight. (*Id.*) The FBI arrested him pursuant to a federal criminal complaint charging him with possession and transportation of child pornography in violation of 18 U.S.C. §§ 2252(a)(1) and 2252(a)(4)(B), based on the evidence seized during the January 2013 search. (*Id.*; ECF No. 625-3 ¶ 1.)

Agents interviewed the employee and searched his luggage. (ECF No. 562 at 3.) During the search, the agents found electronic devices, including the April 2018 Laptop. (*Id.*; ECF No. 562, Ex. B at 13:33–14:40, 18:50–24:00.) The employee gave the agents verbal consent to search all the devices, and provided the passwords for the devices. (ECF No. 562, Ex. B at 15:00–15:25, 22:58–23:01, 23:47–24:02, 25:10–25:45, 55:54–56:12). In addition, the audio recording of the agents' interview of the employee reflects that they gave him a consent form, told him to him to read it "at [his] leisure" and offered to answer questions about it; after a short pause, the employee gave the form back to the agent, who thanked him and stepped out of the room briefly. (*Id.* at 25:10–25:50.)[10] Based on the recording, the Court finds that the employee also gave written consent to search the devices. Law enforcement agents subsequently imaged the April 2018 Laptop. (ECF No. 562 at 3.)

---

[10] The government did not submit the consent form as part of the briefing. It has advised the defendants that it cannot locate the form. (ECF No. 573 at 1 n.2.)

Two agents interviewed the employee in a private room.  (ECF No. 562, Ex. B at 00:35–01:20.)[11]  The employee spoke English, but an interpreter was also present.  (*Id.* at 01:28–02:00.)[12]  The door was partially opened during the interview, and the agents gave the employee water, offered him bathroom breaks, and told him to let them know if there was anything they "could do to accommodate" him during the interview.  (*Id.* at 00:47–00:53, 01:20–02:05.)  One agent read the employee his constitutional rights; he acknowledged that he understood his rights and waived them.  (*Id.* at 02:05–04:25.)  The employee was not handcuffed during the questioning, the tone was conversational throughout the interview, and agents did not use or threaten to use any force.

At the outset of the interview, the agent told the employee that "we know for a fact that you had child pornography."  (*Id.* at 05:17–05:35.)  At another point, the agent mentioned the Toshiba hard drive imaged in January 2013, and said that he wanted to "talk about what you had on your external hard drive" "many years ago."  (*Id.* at 09:05–09:37, 13:13–13:20.)  The employee admitted that he downloaded child pornography from the Internet and stored it on the Toshiba hard drive.  (*Id.* at 08:56–09:58.)

The employee also said that he was a wireless engineer at Huawei and ▮▮▮▮ its ▮▮▮▮▮▮▮ department in the United States.  (*Id.* at 56:56–57:51, 59:05–59:26.)  He explained that his direct supervisor reported to the head of Huawei in the United States, and was third in the management chain in the United States.  (*Id.* at 1:00:48–1:01:16.)  The employee described his work at the company, and said that he was in Iran from 2006 to 2007 to work on an

---

[11] The interview lasted for about an hour and fifty minutes.  (*See* ECF No. 562, Ex. B.)

[12] At points during the interview, the interpreter translated some of the agents' questions and the employee's answers.  (*See, e.g.*, ECF No. 562, Ex. B at 19:55–20:52, 21:28–22:10.)

"Iran MTN" cell site project, developing ███████████████████████████ (*Id.* at 1:08:51–1:11:00, 1:27:33–1:29:30.)

## II.    Procedural Background

The defendants are charged with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to violate and violations of the International Emergency Economic Powers Act ("IEEPA") by exporting goods, technology, or services to Iran, in violation of 50 U.S.C. §§ 1705(a), 1705(c), and 1702 (Counts Nine through Twelve); conspiracy to steal trade secrets, in violation of 18 U.S.C. §§ 1832(a)(5) and 1832(b) (Count Two); wire fraud and wire fraud conspiracy, in violation of 18 U.S.C. §§ 1343, 2, and 1349 (Counts Three, Five, and Seven); bank fraud and bank fraud conspiracy, in violation of 18 U.S.C. §§ 1344, 2, and 1349 (Counts Four and Six); conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count Eight); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Thirteen); and conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k) (Count Fourteen).  (*See* ECF No. 689.)[13]  On June 24, 2025, the defendants moved to suppress four devices, two recordings, and evidence derived from these sources.  (ECF Nos. 541 (sealed), 542 (redacted).)  The government opposed (ECF Nos. 561 (redacted), 562 (HSD)), and the defendants replied in support of their motion (ECF Nos. 573 (HSD), 576 (redacted)).

The Court ordered the government to address (1) whether the federal agents had reasonable suspicion to search the employee's devices at the border, and (2) whether discovery of the contents of those devices was inevitable.  (*ECF Order dated Dec. 5, 2025.*)  The

---

[13] After the defendants filed their motion to suppress and the parties finished briefing the motion, a grand jury returned the fourth superseding indictment.  (*See* ECF No. 689.)  There are no material differences in the indictment relevant to the suppression motion.  (*Compare* ECF No. 126 *with* ECF No. 689.)

government filed its supplemental memorandum (ECF Nos. 609 (sealed), 610 (redacted)), and the defendants replied (ECF Nos. 612 (sealed), 613 (redacted)).

On February 13, 2026, the defendants asked to file a supplemental brief because the government had recently produced "additional documents bearing on the legality of the searches at issue" as part of pre-trial discovery disclosures. (ECF No. 624 at 1.) The Court granted the request. (*ECF Order dated Feb. 13, 2026*.) The defendants filed their supplement (ECF Nos. 625 (sealed), 627 (redacted)), and the government responded (ECF Nos. 634 (sealed), 635 (redacted)).

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "With few exceptions, warrantless searches are *per se* unreasonable." *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (citing *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973)). "A defendant who contends that his Fourth Amendment rights were violated by reason of an illegal search or seizure may, by filing a motion to suppress, seek to prohibit the government from using the fruits of such search or seizure in a prosecution against that defendant." *United States v. Brito*, 771 F. Supp. 3d 157, 166 (E.D.N.Y. 2025) (citing *United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992)), *reconsideration denied*, No. 24-CR-1, 2025 WL 1826390 (E.D.N.Y. July 2, 2025). "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected the defendant to a search or seizure." *Brito*, 771 F. Supp. 3d at 166 (quoting *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014)). "Once the defendant has met this burden, the burden shifts to the government to demonstrate by

9

a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment." *Id.* (quoting *Herron*, 18 F. Supp. 3d at 221).

"If evidence was directly or indirectly obtained in violation of the Fourth Amendment, the court may forbid its use at trial under the exclusionary rule." *United States v. Fox*, No. 23-CR-227, 2024 WL 3520767, at *5 (E.D.N.Y. July 24, 2024) (citing *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015)), *appeal withdrawn sub nom. United States v. Cross-Mcknight*, No. 24-2262, 2024 WL 4925220 (2d Cir. Nov. 26, 2024). "However, even if an officer obtained evidence in violation of the Fourth Amendment, the evidence will not be excluded 'when the Government acts with an objectively reasonable good-faith belief that their conduct is lawful.'" *Id.* (quoting *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018)). "The good-faith exception covers 'searches conducted in objectively reasonable reliance on appellate precedent existing at the time of the search,' as well as evidence obtained by 'officers acting in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court.'" *Id.* (first quoting *Zodhiates*, 901 F.3d at 143; and then quoting *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015)).

## DISCUSSION

The defendants argue the Court should suppress "evidence obtained from the warrantless searches of the [electronic] [d]evices" because the government has not met its burden of showing that the searches fell within one of the exceptions to the search warrant requirement. (ECF No. 541 at 5–9.) The government responds that the searches were permissible under the border search exception, that the employee consented to the searches, and that the employee had apparent authority to do so. (ECF No. 562 at 6–9; ECF No. 609 at 2–5.) In any event, the government argues, the discovery of the contents of the devices was inevitable, and the good

10

faith doctrine applies. (ECF No. 609 at 5–10.) Finally, the government cites the reasons described in its *ex parte* classified supplemental memorandum. (ECF No. 562 at 1.)

### III. Border Searches

#### a. Border Search Exception

The government argues that the February 2018 and April 2018 Laptop searches were "lawful [ ] border searches." (ECF No. 609 at 1.) According to the defendants, the searches were not covered by the border search exception, and the agents needed a search warrant in any case. (ECF No. 541 at 5–9.)

"With few exceptions, warrantless searches are *per se* unreasonable." *Irving*, 452 F.3d at 123 (citation omitted). Border searches, however, are an exception to this rule. Indeed, "[t]here has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless reasonable has a history as old as the Fourth Amendment itself." *United States v. Ramsey*, 431 U.S. 606, 619 (1977) (citation modified); *see also United States v. Asbury*, 586 F.2d 973, 975 (2d Cir. 1978) ("From our nation's earliest days, the government has exercised the right to control the movement of people and goods across our national boundaries." (collecting cases)). "It is well established that the Customs area of an international airport is the functional equivalent of a border for purposes of the border search doctrine." *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015) (citing *Irving,* 452 F.3d at 123). There is, moreover, no distinction between border searches of passengers arriving and leaving the country. *See United States v. Walden*, No. 24-CR-521, 2025 WL 3154359 at *1 n.1 (E.D.N.Y. Nov. 12, 2025) ("[T]he Second Circuit has expressly rejected any distinction between outbound and inbound border searches." (collecting cases)).

The "touchstone of the Fourth Amendment is reasonableness." *United States v. Kamaldoss*, No. 19-CR-543, 2022 WL 1200776, at *9 (E.D.N.Y. Apr. 22, 2022) (quoting *United States v. Knights*, 534 U.S. 112, 118 (2001)). Courts have justified the border exception based on historical practice and "a balancing of the interests that border searches implicate." *United States v. Gavino*, No. 22-CR-136, 2024 WL 85072, at *3 (E.D.N.Y. Jan. 7, 2024) (first citing *Ramsey*, 431 U.S. at 619; then citing *United States v. Flores-Montano*, 541 U.S 149, 152–53; and then citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985)); *see also Montoya de Hernandez*, 473 U.S. at 537–38 ("The permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" (citations omitted)). The government has a "strong interest" in "'stopping and examining persons and property crossing into this country'" in order "'to prevent the entry of unwanted persons and effects.'" *Gavino*, 2024 WL 85072, at *3 (first quoting *Ramsey*, 431 U.S. at 616; and then quoting *Flores-Montano*, 541 U.S. at 152 (citation modified)). This interest is "at its zenith at the international border." *Flores-Montano*, 541 U.S. at 152. While people traveling in and out of the country undoubtedly have an expectation of privacy, that expectation "is less at the border than it is in the interior." *Id.* at 154 (citation omitted). As a consequence, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is [ ] struck much more favorably to the Government at the border." *Montoya de Hernandez*, 473 U.S. at 540.

Law enforcement officers at the border are permitted to conduct "[r]outine" searches of a person and his effects without "any requirement of reasonable suspicion, probable cause, or warrant." *Id.* at 537–38. For more invasive searches, officers must have reasonable suspicion of criminal activity. *See Irving*, 452 F.3d 123–24 (finding reasonable suspicion existed for

12

reviewing diskettes and undeveloped film found in luggage); *see also United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir. 1985) (requiring reasonable suspicion for body cavity searches); *Asbury*, 586 F.2d at 976–77 (requiring reasonable suspicion for strip searches); *Montoya de Hernandez*, 473 U.S. at 541–42 (requiring reasonable suspicion for the overnight detention of a traveler for the purpose of monitoring her bowel movement). The suspected criminal activity may "fall[ ] outside the primary scope of [border officials'] official duties;" whether an agent's reasonable suspicion "arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search." *Levy*, 803 F.3d at 123–24. However, "officials at the border must have a particularized and objective basis for suspecting the particular person" of criminal activity. *Montoya de Hernandez*, 473 U.S. at 541–42 (citation modified).

There is no binding authority in this Circuit requiring an officer to have probable cause or to obtain a search warrant for a border search of electronic devices like those at issue in this case. *See Ramsey*, 431 U.S. at 617 ("This interpretation, that border searches were not subject to the warrant provisions of the Fourth Amendment and were 'reasonable' within the meaning of the Amendment, has been faithfully adhered to by this Court." (citation omitted)).[14],[15] "Border

---

[14] Cases involving these issues are pending before the Second Circuit. *See United States v. Alisigwe*, No. 24-960 (2d Cir.) (argued Mar. 28, 2025) (warrantless manual search of cell phones at the border based on reasonable suspicion); *United States v. Kamaldoss*, No. 24-824 (2d Cir.) (argued Mar. 31, 2025) (warrantless manual and forensic searches of cell phone and laptop at the border); *United States v. Smith*, No. 24-1680 (2d Cir.) (argued June 24, 2025) (warrantless manual and forensic searches of cell phone at the border based on reasonable suspicion); *United States v. Robinson*, No. 25-1428 (2d Cir.) (argued Apr. 14, 2026) (warrantless manual search of cell phone at the border).

[15] Consistent with *Levy*, two circuit courts have held that the government may search cell phones at the border without a warrant or reasonable suspicion in at least some circumstances. *See United States v. Touset*, 890 F.3d 1227, 1231–33 (11th Cir. 2018) (holding that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border" because "[t]he Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we."); *see also Alasaad v. Mayorkas*, 988 F.3d 8, 13, 19 (1st Cir. 2021) ("[B]asic border searches" of electronic devices, such as manual searches, "are routine searches

searches . . . from before the adoption of the Fourth Amendment, have been considered 'reasonable' by the single fact that the person or item in question had entered our country from outside." *Irving*, 452 F.3d at 123 (quoting *Ramsey*, 431 U.S. at 619).

Citing *United States v. Fox*, No. 23-CR-227, 2024 WL 3520767 (E.D.N.Y. July 24, 2024), the defendants say that the border search exception does not apply at all, because while the officers seized the devices at the border, they did not search them at the border. (ECF No. 541 at 1, 5–7; ECF No. 616 at 2–4.) According to the defendants, "courts consistently hold that if a search is too geographically or temporally distant from the border crossing, the border search exception ceases to apply." (ECF No. 616 at 3.)

In *Fox*, an HSI agent started tracking Fox's international travel in 2021 "for the apparent purpose of seizing her phone and laptop at the border" as part of an ongoing criminal investigation into fraud and money laundering scheme involving Paycheck Protection Program ("PPP") loans. 2024 WL 3520767, at *1–2. Agents seized the devices at Miami International Airport when the defendant arrived from Colombia. *Id.* at *2. They sent the devices to New York without searching them. *Id.* at *3. An HSI agent in New York searched the devices for the

---

and need not be supported by reasonable suspicion."). By contrast, the Ninth Circuit allows a manual search of a cell phone without a warrant or reasonable suspicion "only to determine whether the phone contains contraband," but requires reasonable suspicion of contraband on a phone for a forensic search. *United States v. Cano*, 934 F.3d 1002, 1018–21 (9th Cir. 2019).

Some appellate courts have considered the crime at issue and whether it implicates border interests. *See United States v. Xiang*, 67 F.4th 895, 900–02 (8th Cir. 2023) (upholding the denial of a motion to suppress the fruits of a warrantless forensic search of electronic devices seized at the border because CBP had reasonable suspicion that the defendant was engaged in economic espionage for a Chinese company); *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) ("[T]o conduct [a forensic search of electronic devices], the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband."); *see also Alasaad*, 988 F.3d at 21 (finding that the border-search exception permits "advanced" forensic searches based on reasonable suspicion for "contraband, evidence of contraband, or for evidence of activity in violation of the laws enforced or administered by CBP or [Immigration and Customs Enforcement]").

14

first time three days after the Miami agents seized them. *Id.* Twenty-seven days after the devices were seized, the HSI agent applied for a warrant to do a forensic search, which a magistrate judge signed. *Id.* at *3–4.

Judge Nicholas Garaufis found that the forensic search — which occurred "over one thousand miles from where Fox entered the country," "days" after she entered the country, and was not for the purpose of searching for contraband, evidence of contraband, or evidence of a crime with any "transnational connection" — "was entirely untethered from the purpose of [the border search] exception and fell outside of its authorized uses." *Id.* at *6, 9. Judge Garaufis concluded that "[a]part from the seizure of Fox's phone taking place at the airport upon her return from an international trip," "the justifications for the border-search exception — border integrity, stopping contraband or individuals from entering the country, exigency, national security — are not present." *Id.* at *9.

The searches at issue here are easily distinguished from the searches in *Fox*. First, in this case, law enforcement agents conducted the searches as part of ongoing investigations into the illegal exports of goods, services, and technology to Iran in violation of IEEPA. (ECF No. 573 at 7.) The law in this circuit is that officers at the border "have the authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties." *Levy*, 803 F.3d at 124. Even so, the investigations in this case clearly "implicate[ ] border interests." *Fox*, 2024 WL 3520767, at *8 (citing *United States v. Xiang*, 67 F.4th 895, 901–02 (8th Cir. 2023) (applying the border search exception when there was reasonable suspicion by CBP of evidence that Xiang engaged in economic espionage for a Chinese company) and collecting cases). The parties agree that "[b]y the time of these searches

15

(early 2018), the government had already launched multiple investigations into Huawei and its affiliates" related to violations of export controls. (ECF No. 573 at 7; ECF No. 609 at 3; *see also* ECF No. 573, Ex. E (Dec. 23, 2016 letter from OFAC to Huawei's counsel describing that OFAC "has reason to believe that Huawei Technologies USA and its affiliates may have exported goods, services, or technology to Cuba, Iran, Sudan, or Syria"); ECF No. 573, Ex. D (Mar. 27, 2017 HSI Report about "possible violations of United States export laws" related to "export[ing] telecommunication equipment to Iran or other countries that are subject to economic sanctions pursuant to regulations of [OFAC]"); ECF No. 573, Ex. G ¶¶ 1–3, 8 (Apr. 11, 2017 grand jury subpoena to Huawei for documents and information related to "the export of any goods, services, and/or technology from the United States, or with an ultimate end destination, provided directly or indirectly by or on behalf of Huawei and/or Huawei/USA, in . . . Iran, Syria, Cuba, North Korea, and/or the Sudan" and related to "any business travel to Iran, Syria, Cuba, North Korea, and/or the Sudan").)

Nor were the searches in this case "untether[ed] . . . from the justifications underlying" the border search exception. *Fox*, 2024 WL 3520767, at \*6 (quoting *Collins v. Virginia*, 584 U.S. 586, 595 (2018)). The government's interest in searching these devices — as part of an ongoing criminal investigation into illegal exports of goods, services, or technology by a Chinese telecommunications company operating in the United States to Iran in violation of IEEPA — was "at its zenith." *Flores-Montano*, 541 U.S. at 152; *see also Xiang*, 67 F.4th at 900 (rejecting the argument that a border search to investigate economic espionage by a Chinese company was "not tethered to any border search justifications" as "absurd" because the purpose of the statute at issue, the Economic Espionage Act, was to protect against "threats to the nation's economic interest [that] are threats to the nation's vital security interests" (citations omitted)); *Fox*, 2024

16

WL 3520767, at *12 (observing that "[i]n a case with different facts," "where the search occurred near in location or time to the seizure," "related to a cross-border crime," or "was of a personal item other than a cell phone," "the court may find such a search reasonable" and "covered by the border search exception").

The defendants also say that the border search exception does not apply because the government imaged, but did not search, the devices at the border. (ECF No. 541 at 1, 5–7; ECF No. 616 at 2–4). But in *United States v. Levy*, the Second Circuit upheld a border search in which agents seized evidence from Levy, copied it, and then returned it. Levy was suspected of participating in stock manipulation schemes for which his wife had already been charged. *Levy*, 803 F.3d at 121. CBP officers stopped him at the border, photocopied the contents of his notebook, and returned it to him. *Id.* The district court found that the border search exception applied, and denied Levy's motion to suppress the photocopies. *Id.* at 122. The Second Circuit affirmed, finding that the officer was justified in copying the notebook because he had reasonable suspicion to believe that Levy was committing a financial crime. *Id.* at 123–24 ("Because their conduct was fully supported by reasonable suspicion that Levy was engaged in a financial crime, the CBP officer in this case was entitled to inspect and copy the notebook [at the border] as evidence of that crime."); *see also Kamaldoss*, 2022 WL 1200776 at *5, 11 (holding that the forensic imaging of electronic devices at the border was within the scope of the border search exception to the warrant requirement). In this case, CBP officers, assisted by HSI agents, took the February 2018 Laptop during a secondary inspection of the employee, copied it, and returned it to him. (ECF No. 562 at 3.) The *Levy* rationale applies here, and agents were entitled to search the evidence seized at the border by making forensic copies of it.

Nor did the agents need to have a warrant based on probable cause to search the laptops at the border. As explained above, there is no binding appellate authority requiring more than reasonable suspicion for searches of electronic devices at the border. Nonetheless, two district courts in this circuit have concluded that, absent exigent circumstances, agents at the border must have a search warrant based on probable cause to search cell phones. *United States v. Smith*, 673 F. Supp. 3d 381, 395–96 (S.D.N.Y. 2023); *United States v. Sultanov*, 742 F. Supp. 3d 258, 291–94 (E.D.N.Y. 2024); *United States v. Robinson*, No. 23-CR-192, 2025 WL 1359352, at *7–9 (E.D.N.Y. May 9, 2025). Those courts relied on *Riley v. California*, 573 U.S. 373 (2014), in which the Supreme Court balanced the public interest in the search-incident-to arrest warrant exception and the privacy interest in cell phones and held that the exception did not apply to searches of cell phones. *See Riley*, 573 U.S. at 385–97; *see also Smith*, 673 F. Supp. 3d at 391–96 ("In holding that warrants are required for cell phone searches at the border, the Court believes it is applying in straightforward fashion the logic and analysis of *Riley* to the border context."); *Sultanov*, 742 F. Supp. 3d at 279–94 ("It is one thing for courts to give border officials the authority to briefly detain and question air travelers and search their physical belongings based on something more than a hunch but obviously less than is necessary for probable cause. But it is an entirely different matter for courts to exempt those agents from the Fourth Amendment's probable cause and warrant requirements in the vastly more intrusive context of a cell phone search, which can reveal '[t]he sum of an individual's private life.'" (quoting *Riley*, 573 U.S. at 394) (citation modified)); *Robinson*, 2025 WL 1359352, at *5–9 (same). The Court respectfully disagrees that *Riley* requires that border agents have a search warrant to search electronic devices because as explained below, the balance of interests at the border is different than the balance of interests in searches incident to arrest. Moreover, the

18

rationale in *Smith*, *Sultanov*, and *Robinson* does not appear to comport with "the relatively expansive approach to border searches articulated by the Second Circuit in *Levy*." *Gavino*, 2024 WL 85072, at *6; *see also Irving*, 452 F.3d at 124 (finding that the border search of diskettes and film was supported by reasonable suspicion).[16]

The Court adopts Judge Rachel Kovner's reasoning in *United States v. Gavino*. Judge Kovner found that *Riley* did not support the conclusion that border agents needed search warrants to search cell phones. *See Gavino*, 2024 WL 85072, at *4–6. "*Riley*'s discussion of privacy interests establishes that searches of cell phones should be treated as intrusive border searches, rather than standard ones," but did not support "requiring more than reasonable suspicion for cell phone searches at the border." *Id.* at *4–5. In concluding that warrantless searches of cell phones incident to arrest "did not meaningfully advance governmental interests in protecting officer safety or preventing the destruction of evidence," Judge Kovner reasoned that the *Riley* Court balanced the governmental interests underlying the exception — "preventing harm to officers and destruction of evidence" — and the private interests at stake with cell phones, which are "pervasively used to carry a vastly greater quantity of data than other devices, and because the data they carry is often sensitive." *Id.* (citing *Riley*, 573 U.S. at 385–86, 393–94) (citation modified)).[17]

---

[16] Though multiple appeals are pending, *see* n.14 above, the Second Circuit has not had occasion to determine whether the *Riley* rationale extends to the border search exception. Thus, *Levy* and *Irving* are binding precedent, which this Court must follow. "[T]he district court must follow Second Circuit precedent unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *Walden*, 2025 WL 3154359, at *8 (quoting *Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*, No. 19-CV-5394, 2025 WL 622546, at *1 (E.D.N.Y. Feb. 26, 2025)) (citation modified).

[17] For the purposes of this analysis, "there is no basis to distinguish a forensic cell phone search from a forensic laptop search." *Kamaldoss*, 2022 WL 1200776, at *12 n.12 (citation modified).

As Judge Kovner found, the balance of interests is different in the border search context; "cell phone searches transparently advance the public interest in 'preventing the entry of unwanted persons and effects,' which the Supreme Court has described as at the heart of the border-search rule." *Id.* at \*5 (quoting *Flores-Montano*, 541 U.S. at 152). "Communications, documents, or images on a phone may also reveal that a traveler is carrying drugs, weapons, or other contraband." *Id.* The private interest, on the other hand, has to do with the intrusive nature of the search, but "courts consistently have deemed reasonable suspicion sufficient to justify even the most intrusive of nonroutine border searches, including body cavity and alimentary canal searches." *Id.* (citations omitted); *see also Irving*, 452 F.3d at 123–24 ("Although routine border searches of a person's belongings are made reasonable by that person's decision to enter this country, more invasive searches, like strip searches, require reasonable suspicion." (citing *Asbury*, 586 F.2d at 975–76)). "Moreover, a person headed abroad can leave behind a cell phone or curate its contents, even if doing so is inconvenient; a traveler seeking to avoid an intrusive body search has no comparable choice." *Gavino*, 2024 WL 85072, at \*5 (citing *United States v. Touset*, 890 F.3d 1227, 1235 (11th Cir. 2018)). If reasonable suspicion is sufficient for strip searches or body cavity searches, which are arguably far greater intrusions, it is sufficient to support the search of an electronic device at the border. *See id.* ("It is therefore unsurprising that no appellate court has required a greater quantum of suspicion for cell phone searches at the border than the reasonable suspicion that suffices for sensitive searches of travelers' bodies.").

It is equally clear that the searches were supported by reasonable suspicion, notwithstanding the defendants' arguments to the contrary. (*See* ECF No. 616 at 4–7.) "The Supreme Court has instructed that 'the level of suspicion [the reasonable suspicion] standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and

20

obviously less than is necessary for probable cause.'  Reasonable suspicion requires only 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *Levy*, 803 F.3d at 123 (quoting *Navarette v. California*, 572 U.S. 393, 397, 404 (2014)); *see also Asbury*, 586 F.2d at 976 (noting that the issue in the border search context "is simply whether the border official has a reasonable basis on which to conduct the search," and "what is reasonable will depend on all the facts of a particular case" (citations omitted)).  Because the reasonable suspicion standard "takes into account the totality of the circumstances," *Navarette*, 572 U.S. at 403 (citation modified), a "mosaic" of factors can form the basis for a reasonable suspicion, *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (citing *Ornelas v. United States*, 517 U.S. 690, 698 (1996)).  "Reasonable suspicion is a relatively low standard and border officials are afforded deference due to their training and experience."  *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 282 (E.D.N.Y. 2013) (citing *Montoya de Hernandez*, 473 U.S. at 542).

The government has met this "relatively low" burden; agents had "a particularized and objective basis" for suspecting the defendants and their employee of criminal activity.  *Id.* (citation omitted); *see also Levy*, 803 F.3d at 123 (same).  As the defendants' exhibits demonstrate, the government was conducting a wide-ranging investigation before the 2018 searches, including, as the government points out, "a grand jury subpoena to Huawei Technologies USA in Texas" — where the employee worked — for documents and information about the defendants' business activities in Iran and with Iranian telecommunications companies, including MTN Irancell.  (ECF No. 609 at 3.)[18]  Before the 2018 searches, the government knew

---

[18] The subpoena is dated April 11, 2017, and requests documents and communications related to "the export of any goods, services, and/or technology from the United States, or with an ultimate end

from the lawful search of the January 2013 Laptop that the Huawei employee had documents "containing information on Huawei projects with the two Internet service providers in Iran, Iran MobinNet and MTN Irancell," as well as "documents includ[ing] training materials and memos related to internal policies, security protocols, data configurations, [ ] network [ ] solutions, and Huawei USA [ ] project plans." (ECF No. 609-1 at 2–3.)[19] The government also had information that Huawei was "using front companies to purchase the United States goods and to conceal that the goods were destined to be diverted to prohibited end users," and that Huawei had transacted with the "Iran customer[]" "MTN Irancell." (ECF No. 573, Ex. D at 1, 3). And the Huawei employee told agents during the April 2018 interview that he worked on Huawei's MTN cell site project in Iran from 2006 to 2007. (ECF No. 562, Ex. B at 1:08:55–1:11:00.) In addition, the government cites the news articles from around 2011 to 2013, described in the Third Superseding Indictment, reporting that Huawei had sold embargoed U.S.-origin goods to Iran in violation of U.S. law. (ECF No. 609 at 4–5 (citing ECF No. 126 ¶¶ 73–75).) According to a 2011 *Wall Street Journal* article, Huawei downplayed the company's activities in Iran, while it had a contract to provide telecommunications services to a company controlled by the Iranian government; that company followed the Iranian government's order to suspend text messaging and block internet phone service as part of a crackdown on anti-government protests in 2009. *See The Wall Street Journal*, "Chinese Tech Giant Aids Iran" (Oct. 27, 2011), https://www.wsj.com/articles/SB10001424052970204644504576651503577823210. Moreover,

---

destination, provided directly or indirectly by or on behalf of Huawei and/or Huawei/USA, in . . . Iran." (ECF No. 573, Ex. G.)

[19] The defendants' speculation that the government did not review the contents of the January 2013 Laptop until 2018 is refuted by the FBI's April 16, 2013 memorandum, which the government filed January 9, 2026. (*See* ECF No. 609-1.) That memorandum reflects that agents completed their review of English language documents from the laptop on April 12, 2013. (*See id.* at 2.)

according to the FBI memorandum about the January 2013 Laptop document review, "[a]mong the documents of interest were 133 files containing information on Huawei projects with . . . Iran MobinNet and MTN Irancell," most of which "were dated in 2009." (ECF No. 609-1 at 2.)

When agents stopped the Huawei employee at the border in February 2018, and again in April 2018, they "had a reasonable basis to believe that he was involved in a transnational [criminal] conspiracy" to export goods, technology, or services to an Iranian telecommunications company in violation of IEEPA. *Kamaldoss*, 2022 WL 1200776, at \*11. Within months, the government filed the initial underlying indictment charging the defendants with a years-long criminal conspiracy. (*See* ECF No. 1.) Based on the investigation records submitted by the parties and the allegations in the original indictment in this case, the government had, at the very least, reasonable suspicion of the defendants' criminal activity — and the likelihood the employee's laptop would have evidence of it — before the 2018 searches. *See Levy*, 803 F.3d at 123 ("[A] review of the allegations in the initial underlying indictment against [the defendants] (filed within [months] of the search) . . . confirm[s] that the search was justified by the [government's] reasonable suspicion of [the defendants'] ongoing [ ] participation in [criminal] schemes.").[20]

Accordingly, the Court finds that the February 2018 and April 2018 Laptop searches were lawful based on the border search exception.

---

[20] The government does not address whether agents also had reasonable suspicion that the employee possessed child pornography on his devices at the time of the February 2018 and April 2018 searches. Child pornography is "digital contraband," *see, e.g.*, *Gavino*, 2024 WL 85072, at \*5; *United States v. Tineo*, No. 23-CR-223, 2024 WL 2862289, at \*5 (E.D.N.Y. June 6, 2024), for which only reasonable suspicion, not probable cause, is required to justify a border search, *see Montoya de Hernandez*, 473 U.S. at 541.

b.      **Good Faith Exception**

As explained above, law enforcement officers lawfully searched the electronic devices at issue in this case.  Even if those searches violated the Fourth Amendment, however, the fruits of those searches should not be suppressed, because law enforcement officials were acting in good faith.  "[U]nder the 'good faith' exception, when the Government 'act[s] with an objectively reasonable good-faith belief that their conduct is lawful,'" the exclusionary rule does not apply. *Zodhiates*, 901 F.3d at 143 (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)).  "While the 'evidentiary fruits of Fourth Amendment violations are generally inadmissible at trial,' the fruits of 'a search conducted in reasonable reliance on binding appellate precedent are not subject to the exclusionary rule, as that rule is designed to deter *future* Fourth Amendment violations.'" *Kamaldoss*, 2022 WL 1200776, at *12 (quoting *United States v. Aigbekaen*, 943 F.3d 713, 725 (4th Cir. 2019)) (citation modified); *see also Davis*, 564 U.S. at 249–50 ("[W]hen the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply.").

When agents searched the February 2018 and April 2018 Laptops, "there was neither Supreme Court nor Second Circuit precedent limiting warrantless forensic searches to digital contraband." *Kamaldoss*, 2022 WL 1200776, at *12 (discussing precedent at the time of an April 23, 2019 border search).  "Instead, caselaw existed from both courts making clear that, in the context of border searches in general, at most reasonable suspicion was required for some more intrusive searches." *Id.* (first citing *Flores-Montano*, 541 U.S. at 152; and then citing *Irving*, 452 F.3d at 123).  As explained above, this Court is bound by Second Circuit and Supreme Court precedent holding that agents at the border need only reasonable suspicion for intrusive searches.

For that reason, the defendants' description of the "legal landscape" as "unresolved" is inaccurate, at least as of this writing. (ECF No. 616 at 10.) "*Levy* and *Irving*, as well as more than two centuries of jurisprudence establishing the extraordinary breadth of border search authority, provided a solid foundation for the Government's actions." *Walden*, 2025 WL 3154359, at *9. Courts addressing these very issues — including those courts holding that border agents need more than reasonable suspicion to search cell phones — have applied the good faith exception in similar circumstances. *See, e.g.*, *Walden*, 2025 WL 3154359, at *9 (applying good faith exception to April 2024 border search); *Kamaldoss*, 2022 WL 1200776, at *12 (applying good faith exception to April 2019 border search); *Smith*, 673 F. Supp. 3d at 386–87 (applying good faith exception to March 2021 border search); *Sultanov*, 742 F. Supp. 3d at 267, 299 (applying good faith exception to March 2022 border search). It was reasonable for the agents to rely on the existing case law, which, in the Court's view, is still binding precedent.

Accordingly, suppression of the fruits of the February 2018 and April 2018 Laptop searches is unwarranted.

## IV. Consent to Search Exception

The government also argues that the February 2018 and April 2018 Laptop searches were lawful because the employee consented to the searches. (ECF No. 562 at 6–9.) The defendants maintain that the employee did not have authority to consent to the searches, and that the agents could not have reasonably assumed that he did without further inquiry. (ECF No. 573 at 1–7.)

"'It is . . . well settled that one of the specifically established exceptions' to the Fourth Amendment requirements that private property not be searched without a search warrant issued upon probable cause 'is a search that is conducted pursuant to consent.'" *United States v. O'Brien*, 926 F.3d 57, 75 (2d Cir. 2019) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, (1973)). "When the 'prosecution seeks to rely upon consent to justify the lawfulness of a search,

it has the burden of proving that the consent was, in fact, freely and voluntarily given.'" *Id.* at 75–76 (quoting *Schneckloth*, 412 U.S. at 222) (citation modified). "[V]oluntariness 'is a question of fact to be determined from the totality of all the circumstances.'" *Id.* (quoting *Schneckloth*, 412 U.S. at 227). The government must prove "by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Pecoraro*, 568 F. Supp. 3d 169, 182 (N.D.N.Y. 2021) (quoting *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005)).

The government argues that "officers had a reasonable basis for believing that [the employee]'s consent for the searches of the February 2018 and April 2018 Laptops was voluntary." (ECF No. 562 at 6–7.) The government cites the employee's verbal and written consent, as well as the recording of the April 2018 interview, which demonstrate that the agents did not employ coercive tactics, and that the employee was calm and cooperative. (*Id.*)[21]

The Court has reviewed the submissions, including the recording (ECF No. 562, Ex. B), and finds that the employee voluntarily consented to the search of his devices. He gave his written consent for the February 2018 Laptop search. (*See* ECF No. 562, Ex. A.) In that consent form, which the employee and two witnessing agents signed, he confirmed that agents informed him of his "right to refuse to consent to a search of [his] property," that he "voluntarily and intentionally consent[ed] to allow ICE to search [his] property," and that his "consent [was] freely given and not the result of any promises, threats, coercion, or other intimidation." (*Id.*) According to the consent form, the employee consented to a search of a "Dell Laptop" — which is the February 2018 Laptop — as well as other devices. (*Id.*)

The employee's consent to the April 2018 Laptop search was also voluntary, as reflected by the recording of the interview. There was an interpreter present, which ensured that he

---

[21] The February 2018 encounter was not recorded.

understood the agents' questions. (ECF No. 562, Ex. B at 01:28–02:00.) They advised him of his constitutional rights, which the employee waived. (*Id.* at 02:05–04:25.) The employee gave the agents written and verbal consent to search the devices. (*Id.* at 15:00–15:25, 22:58–23:01, 25:10–25:45.) The tone of the interview was conversational and calm; the agents did not raise their voices, threaten the employee, or handcuff him. They also left the door to the interview room partially open, gave him water, offered him bathroom breaks, and told him to let them know if there was anything they "could do to accommodate" him. (*Id.* at 00:47–00:53, 01:20–01:28.) The employee did not ask to stop the interview, or express any discomfort about the questions or the agents' request to search his devices. *See United States v. Murphy*, 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998) (concluding the defendant's "consent unquestionably was valid" even though he was "in custody and had been handcuffed prior to signing the consent form" because "[h]e was calm throughout," "there was no show of force," the consent form "gave clear notice of his rights," and "[a]t no point did he refuse to consent"). Accordingly, based on the totality of the circumstances, the Court finds that the government has proven by a preponderance of the evidence that the employee's consent for the February 2018 and April 2018 Laptop searches was "freely and voluntarily given." *United States v. Garcia*, 554 F. Supp. 3d 421, 429 (E.D.N.Y. 2021) (quoting *Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir. 1983)).

The parties disagree about whether the employee had the authority to consent to searches of the company's devices. The defendants say that he did not, and cite their internal policies about employees and computers. (*See* ECF No. 573 at 1–7.) The government says that he did have the authority to consent, and even if he did not, he had apparent authority. (ECF No. 562 at 7–9.)

The government may justify a warrantless search by "show[ing] that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). "As the Supreme Court has made clear, 'the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.'" *Rodriguez v. United States*, No. 13-CR-85, 2021 WL 4078621, at *8 (E.D.N.Y. Sept. 8, 2021) (first quoting *Matlock*, 415 U.S. at 170; and then citing *United States v. McGee*, 564 F.3d 136, 138–39 (2d Cir. 2009)). Additionally, even "in situations where the defendant is present," "Supreme Court and Second Circuit law establishes that . . . officers may nevertheless rely on consent from a third party who has the requisite authority to give it." *United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004) (first citing *Matlock*, 415 U.S. at 166, 171 (holding that a warrantless search may be justified based on the consent of a third party with proper authority even when the arrested defendant was on the scene and available to give consent); and then citing *United States v. Davis*, 967 F.2d 84, 86–88 (2d Cir.1992) (holding that third-party consent justified a search and seizure despite the fact that the defendant was in the custody of police in a squad car outside and was never asked to consent)). A third party has actual authority to consent to a search if "first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *McGee*, 564 F.3d at 139–40 (quoting *Davis*, 967 F.2d at 87). "[A]ccess to the area searched" under the first prong "depends on the understandings communicated by the titular owner to [the consenting] person." *Id.* at 140. The government must prove adequate authority to consent to the search by a preponderance of the evidence. *See Lewis*, 386 F.3d at 481 (citing *Matlock*, 415 at 171).

28

"Even if the person giving consent in fact lacked [actual] authority to do so, the consent may nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search." *McGee*, 564 F.3d at 139. "In other words, in the absence of actual authority, law enforcement may rely upon apparent authority so long as the reliance is not 'unrealistic.'" *United States v. Nayyar*, 221 F. Supp. 3d 454, 464 (S.D.N.Y. 2016) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 187–88 (1990)). Apparent authority "must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188 (citation modified).

The government argues that the employee had authority to consent to the searches under *Davis*. (ECF No. 562 at 7–9.) First, the defendants gave him access to and near absolute control over the February 2018 and April 2018 Laptops, which satisfies the first *Davis* element. (*Id.* at 7–8.) Second, the employee used the laptops for work, and had common authority over, a substantial interest in, and permission to gain access to the laptops, which satisfies the second *Davis* element. (*Id.* at 8–9.) Finally, the government argues that the agents reasonably believed that the employee had authority to consent to the searches. (*Id.* at 9.)

The defendants argue that the employee did not have actual authority to consent to law enforcement searches on Huawei's behalf. (ECF No. 573 at 1–7.) They cite Huawei's information security policies in effect at the time of the searches, which prohibited employees from disclosing corporate information and data stored on or accessible via Huawei devices, as well as domain account credentials, outside of Huawei, without permission. (*Id.* at 2–4; ECF No. 573, Ex. A ¶¶ 8–12, 14–15.) In particular, the Employee Business Conduct Guidelines ("BCG") instructed employees to refer requests from law enforcement to Huawei's Legal Affairs

29

Department before disclosing any data. (ECF No. 573 at 3; ECF No. 573, Ex. A ¶ 10.) The employee agreed to follow these policies as part of his July 17, 2013 employment contract and reaffirmed his agreement to abide by information security policies annually. (ECF No. 573, Ex. A ¶¶ 13, 16–17.) Additionally, each time the employee logged onto the February 2018 Laptop, Huawei required him to acknowledge that "[b]y logging on, you represent that you are an authorized user and that you have read and consent to . . . Huawei's information security policies." (ECF No. 573 at 3; ECF No. 573, Ex. B ¶¶ 13–16.)[22] Citing *McGee*, 564 F.3d at 139–40, the defendants argue that because "access to the area searched" under the first prong of *Davis* "depends on the understandings communicated by the titular owner to [the consenting] person," and Huawei authorized the employee to use his company-issued laptops for work but prohibited him from exposing them to third parties or voluntarily handing them over to law enforcement, he did not have authority to consent to the searches. (ECF No. 573 at 3–5.)

The defendants distinguish the cases on which the government relies. In those cases, the defendants argue, the employees had "absolute" or "complete" control over the company's property. (ECF No. 573 at 4–5 (first quoting *United States v. Jenkins*, 46 F.3d 447, 456 (5th Cir. 1995); and then quoting *United States v. Murphy*, 506 F.2d 529, 530 (9th Cir. 1974) (per curiam)).) The defendants also point out that in *United States v. Zhu*, 23 F. Supp. 3d 234 (S.D.N.Y. 2014) — the only laptop case the government cites — the employer consented to a search of an employee's work laptop, over the employee's objection. (*Id.* at 4–5.)

Finally, the defendants contend that it was not reasonable for the agents to believe that the employee had authority to consent to the searches, and in any event, the agents were required

---

[22] A digital forensic examiner for Huawei represented that he could not reconstruct the log-on process for the April 2018 Laptop because of the format of the digital copy the government produced in discovery. (ECF No. 573, Ex. B ¶ 18.)

to take affirmative steps to confirm that the employee was authorized to consent the search. (ECF No. 573 at 5–7.) The defendants argue the government knew that Huawei, not the employee, owned the February 2018 and April 2018 Laptops, because the February 2018 Laptop's login screen stated the device was "the property of Huawei and may be used only by authorized users and only for the legitimate business purposes of Huawei;" the defendants say that the agents could not reasonably assume that a Huawei employee could consent to a law enforcement search of Huawei's computers, particularly in light of the ongoing government investigations into Huawei. (ECF No. 573 at 5–7; ECF No. 573, Ex. B ¶ 14.)

The Court assumes without deciding that the employee did not have actual authority to consent to the searches. However, the government has met its burden to show that the agents reasonably relied on the employee's apparent authority to consent to the searches. The employee had physical control of the devices and the means to get access to the devices' contents. He was traveling internationally with the laptops, had the passwords for them, and could log in using his own credentials. *See Davis*, 967 F.2d at 87; *see also McGee*, 564 F.3d at 141 ("[S]uppose [a] padlock had been on the door of the study, but [the defendant] had explained to [his girlfriend, who consented to the search] that he kept it locked only to keep out others, and that she was welcome to enter it at will, needing only to ask him for the key. . . . [I]n those circumstances, she would be found to have *access* to the study as the term is used in *Davis*, and her consent would have been valid."). The employee also told the agents that he was fairly senior in Huawei Device USA — he was head of a department and his supervisor reported to the head of Huawei Device USA. (ECF No. 562, Ex. B at 57:21-57:51, 1:00:48–1:01:16.) Law enforcement officers confronting these circumstances — a senior employee who is travelling internationally with company devices, who has the passwords to those devices, and who agrees to allow the officers

31

to search them — could justifiably and reasonably conclude that the employee has authority to give his consent. It would be unreasonable under these circumstances to require law enforcement agents to familiarize themselves with and analyze a company's policies or to delay their investigation to contact a corporate representative to determine the extent of an employee's authority to consent on behalf of the company. "[I]n the absence of actual authority, law enforcement may rely upon apparent authority so long as the reliance is not 'unrealistic.'" *Nayyar*, 221 F. Supp. 3d at 464 (quoting *Rodriguez*, 497 U.S. at 187–88). In this case, "the facts available to the [agents] at the moment" of the searches "warrant[ed] a man of reasonable caution in the belief that the consenting party had authority over the [devices]," *Rodriguez*, 497 U.S. at 188 (citation modified), and it was not "unrealistic" for the employee to have authority to consent to a search on the defendants' behalf, *Nayyar*, 221 F. Supp. 3d at 464.[23]

The defendants cite *Moore v. Andreno*, 505 F.3d 203 (2007), and *Nayyar* for the proposition that Second Circuit law required the agents to use "reasonable caution" and take affirmative steps to confirm that the employee was authorized to consent to the searches. (ECF No. 573 at 6.) In *Moore*, a civil case, police officers knew that Moore had not given his girlfriend access to his office; she told them as much, and said that she had cut the locks on the office door. 505 F.3d at 205–06. Nevertheless, they searched the office and recovered drugs and drug paraphernalia from a desk drawer and a closet in the office. *Id.* at 206. As the Second Circuit found, the officers went into Moore's office "with the specific knowledge that [his

---

[23] In an affidavit submitted in support of the defendants' reply brief, an Information Security Manager in Huawei Tech's Information Security and Business Secrets Protection Department asserts that "[a]t no point during [his] employment at Huawei did [the employee] qualify as 'management' . . . or otherwise hold a position that was senior enough under Huawei's policies to authorize the disclosure of Huawei information or data to parties outside of Huawei." (ECF No. 573, Ex. A ¶¶ 3, 12.) This is, however, not relevant to the apparent authority analysis. The question is whether it was objectively reasonable for the agents, based on facts they had at the time of the search, to believe the consenting party had authority to consent. *See Rodriguez*, 497 U.S. at 188; *Nayyar*, 221 F. Supp. 3d at 464.

girlfriend] was not permitted to enter" the office, and that she had "used force to gain access" to the office. *Id.* at 213. Under those circumstances, the police "could not validate their warrantless search of Moore's study on the basis of [his girlfriend's] consent." *Id.* Thus, "the facts available to the officers" did not "warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Id.* at 209 (quoting *Rodriguez*, 497 U.S. at 188) (citation modified).

In *Nayyar*, a case from the Southern District, Nayyar's wife told agents that her husband "typically used" a computer; the district court found that this answer created an ambiguity about whether she had authority to consent to the search of the computer. 221 F. Supp. 3d 454, 464 (S.D.N.Y. 2016), *aff'd sub nom. United States v. Mulholland*, 702 F. App'x 7 (2d Cir. 2017). Thus, the court found, "agents were required to ask further questions regarding the scope of her purported authority to consent before relying on it." *Id.* (citing *United States v. Purcell*, 526 F.3d 953, 963–64 (6th Cir. 2008)). There is, however, no binding Supreme Court or Second Circuit precedent requiring agents to take affirmative steps to confirm that a consenting person has actual authority to consent to a search. What is required is that "the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 188 (citation modified). There was no ambiguity in this case. As explained above, the employee, who had access to the devices and appeared to have a position of some seniority, gave agents consent to search his devices, including his work computers. The agents were not required to engage in additional investigation under those circumstances.[24]

---

[24] The consent form for the February 2018 search lists the February 2018 Laptop as a "Dell Laptop" but does not specify whether it was a personal laptop or a company laptop, as the form does with the "Huawei Phone." (ECF No. 562, Ex. A.) However, the defendants' digital forensic examiner found that the login screen contained a disclaimer that the device belonged to Huawei. (ECF No. 573 at 3;

"The common thread in [Supreme Court precedent] upholding searches conducted pursuant to third-party consent is an understanding that a person 'assume[s] the risk' that those who have access to and control over his shared property might consent to a search;" this "assumption of risk is derived from a third party's 'joint access or control for most purposes' of shared property." *Georgia v. Randolph*, 547 U.S. 103, 134 (2006) (Roberts, J., dissenting) (quoting *Matlock,* 415 U.S., at 171, n.7). The defendants, aware that they were under investigation, nevertheless permitted their employee to travel internationally with his work devices, thereby assuming some risk that the employee, like all international travelers, might consent to a search of their shared property by the host country's law enforcement at some point during his journey.

The defendants also argue that the government was aware that Huawei had retained counsel to represent it in multiple investigations, and counsel was negotiating with government attorneys about the production of information in response to those investigations. (ECF No. 573 at 7.) Thus, the defendants say, it was not reasonable for the agents to think that Huawei had authorized its employees to give the government company information in their possession. (*Id.*) However, even "in situations where the defendant is present . . . the officers may nevertheless rely on consent from a third party who has the requisite authority to give it." *Lewis*, 386 F.3d at 481 (first citing *Matlock*, 415 U.S. at 166, 171; and then citing *Davis,* 967 F.2d at 86–88); *see also Randolph*, 547 U.S. at 108 (noting that the Supreme Court held in *Matlock* that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared"). The agents were not required to ask

---

ECF No. 573, Ex. A ¶¶ 14–16.) Additionally, during the April 2018 search, the employee told agents that he had a work laptop in his bag. (ECF No. 562, Ex. B at 13:33–13:53.)

the defendants — who were obviously not present — for permission to search the February 2018 and April 2018 Laptops. The agents reasonably relied on the employee's apparent authority to consent to the searches.

Finally, the defendants argue that the employee's consent was limited to a search for child pornography. (ECF No. 573 at 8.) This is not supported by the record. The written consent for the February 2018 Laptop was broad — he "voluntarily and intentionally consent[ed] to allow ICE to search [his] property" and acknowledged that "anything discovered during this search may be used against me in any criminal, civil, or administrative proceedings." (ECF No. 562, Ex. A.) Similarly, in addition to telling the agents "you can look at all my [devices]" (ECF No. 562, Ex. B at 22:50 –23:02), the employee signed a form, which he confirmed he could read and understand, consenting to a search of "these devices" (*id.* at 25:10–25:45). He did not do or say anything that limited his consent to a particular device or location on a device. *See Davis*, 967 F.2d at 87–88 ("[The consenting third-party] authorized [law enforcement] to search his footlocker and . . . 'did not place any explicit limitation on the scope of the search.'" (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991))).

Accordingly, the Court finds that the February 2018 and April 2018 Laptop searches were also lawful based on the apparent authority to consent exception. For the reasons described in Parts III and IV above, the Court denies the defendants' motion to suppress the contents of the February 2018 and April 2018 Laptops.[25]

---

[25] Because the Court finds the February 2018 and April 2018 Laptop searches lawful under the border search exception, good faith exception, and apparent authority to consent exception, the Court does not address whether inevitable discovery also applies.

## CONCLUSION

For the reasons described above, Huawei's motion is denied.

**SO ORDERED.**

S/ Ann M. Donnelly
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
June 18, 2026